1

United States Courts
Southern District of Texas
FILED

SEP 1 0 2008

Michael N. Milby, Clerk of Court

**V N Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | § | CASE NO.: H-08-00158-M |
| | § | |
| VERSUS | § | HOUSTON, TEXAS |
| | § | SEPTEMBER 3, 2008 |
| SXP ANALYTICS, LLC | § | 10:23 A.M. TO 12:33 P.M. |

MOTION HEARING

(SEALED BY ORDER OF THE COURT)

BEFORE THE HONORABLE STEPHEN WM. SMITH
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR PLAINTIFF:     SEE NEXT PAGE

FOR DEFENDANT:     SEE NEXT PAGE

COURT RECORDER:    DORIS CLARK/JEANETTE GONZALEZ

CASE MANAGER:      (NOT PROVIDED)


PREPARED BY:

JUDICIAL TRANSCRIBERS OF TEXAS, INC.
P.O. Box 925675
Houston, Texas 77292-5675
Tel: 713-697-4718 ▼ Fax: 713-697-4722
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



EXHIBIT

1

1          <u>APPEARANCES</u>:

2

3

**FOR THE GOVERNMENT:**          BRET W. DAVID
4                                U.S. ATTORNEY'S OFFICE
                                 PO BOX 61129
5                                HOUSTON, TEXAS   77208-1129
                                 713-567-9305
6

7

**FOR SXP ANALYTICS, LLC:**      DAVID GERGER
8                                DAVID ISAAK
                                 DAVID GERGER & ASSOCIATES
9                                700 LOUISIANA ST., STE. 2300
                                 HOUSTON, TEXAS   77002
10                               713-224-4400

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    <u>INDEX</u>

2

3   <u>WITNESS:</u>                    <u>Direct</u>   <u>Cross</u>   <u>Re-Direct</u>   <u>Re-Cross</u>

4   AGENT RYAN DUSEK:

5       By Mr. Gerger:              17                    63

6       By Mr. Davis:                      51                        --

7

8   AGENT ERIC HAWKINS:

8       By Mr. Gerger:              73                    77

9       By Mr. Davis:                      75                        --

10

11                                           <u>Offered</u>       <u>Received</u>

12  <u>Exhibit</u>

    (NONE)
13

14

15

16

17

18

19

20

21

22

23

24

25

1    HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 3, 2008; 10:23 A.M.

2              (SEALED BY ORDER OF THE COURT)

3         THE COURT:  All right.  The next case,

4    *United States of America versus SXP Analytics, LLC*, Case

5    Number H-08-158-M.

6              Counsel, come forward please.

7         MR. GERGER:  Good morning, Your Honor.

8         THE COURT:  Good morning.

9         MR. GERGER:  David Gerger and David Isaak for

10   SXP.

11        THE COURT:  Mr. Gerger, Mr. Isaak.

12        MR. DAVIS:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. DAVIS:  Brett W. Davis for the Government.

15        THE COURT:  Mr. Davis.  All right.

16              Gentlemen, this is a motion hearing for

17   return of seized property.  I've briefly -- I have reviewed

18   the motion and the responses and I believe a letter that was

19   recently filed by Counsel for the Movant.

20              But, Mr. Gerger, I'll let you --

21        MR. GERGER:  Okay.  Thank you, Your Honor.

22        THE COURT:  -- proceed and tell me a little bit

23   about the motion.

24        MR. GERGER:  The first thing I should try to

25   correct, Your Honor, is I think we neglected to ensure that

1  everything that's been filed in this case be filed under

2  seal or to get orders to that effect.  And we'd like to do

3  that because it's a -- the criminal investigation stage much

4  like we would a grand jury subpoena matter.  So I would like

5  to move verbally that what's been filed in this case and

6  today's hearing and your orders on it and any related

7  pleadings be under seal.

8           THE COURT:  Okay.  And now is -- there is an

9  ongoing criminal investigation in this matter.

10          MR. DAVIS:  That is correct, Your Honor.

11          THE COURT:  And no ---

12          MR. DAVIS:  No charges have been filed at this

13  point.

14          THE COURT:  No charges have been filed yet.  All

15  right.  Well, I'll order that all proceedings and filings

16  sealed in this matter during the pendency of the criminal

17  investigation.

18          MR. GERGER:  All right.  And --

19          THE COURT:  Once the charges are made public,

20  then the file's going to be made public.

21          MR. GERGER:  Understood.

22          THE COURT:  All right.

23          MR. GERGER:  And the one exception I understand

24  from the recording office is that if we order a transcript

25  of today's hearing, that you would have to allow that and we

1   would keep that just among the parties.  We would not

2   publicize the transcript or file it in open court but that's

3   the one exception that we'd ask for.

4           **THE COURT:**  Okay.  All right.  That'll be fine.

5           **MR. GERGER:**  Your Honor, we did meet yesterday

6   and perhaps I can tell you where we are.  The background, as

7   you know, is that SXP started in 2007.  And I think -- yeah,

8   we don't have any other observers here.  I will introduce

9   Kevin Blood who's with us.  He's an independent computer

10   expert who is going to help me try to understand what

11   happens today because --

12           **THE COURT:**  All right.

13           **MR. GERGER:**  -- it's a lot of computer talk.

14           SXP started in 2007 in order to develop a

15   method of modeling the stock market.  And what that involves

16   is: buying a lot of computers, hiring a lot of smart

17   computer people, then gathering a lot of historical data

18   from the stock markets, analyzing that data, and then trying

19   to write mathematical formulas to model that and explain the

20   movements in stocks and hopefully predict movements in

21   stocks.

22           A company in Houston called Quantlabs is in

23   the same business and SXP did have two employees who used to

24   work at Quantlabs.  And I understand that the -- what's

25   being investigated is whether maybe one of those employees

Case 4:09-cv-04039   Document 133-1   Filed on 02/06/12 in TXSD   Page 7 of 50
Case 4:08-mj-00158   Document 13   Filed in TXSD on 09/10/08   Page 7 of 51

7

1   took some information from Quantlabs when he left Quantlabs

2   or somehow got information from Quantlabs and placed that

3   onto an SXP computer which -- you know, SXP's position is:

4   "We don't want any trade secrets of Quantlabs.  We think we

5   have a better mousetrap.  And if we had their secret

6   formula, we wouldn't have spent months and months and months

7   writing our own formula."

8           **THE COURT:**  Now, is there a pending civil suit in

9   this matter and a wrongful termination suit?

10          **MR. GERGER:**  That's very important.  Quantlabs

11  did go to Harris County District Court.  They're a big

12  sophisticated company.  They have plenty of ability to hire

13  lawyers and they did, and they lost.  They sought a

14  temporary restraining order and a temporary injunction and

15  they lost.

16          And I want to come back sort of at the end

17  because every day these matters are best handled by civil

18  litigation and where the plaintiff does not get to come and

19  take the defendant's computers and deprive the defendant of

20  their business.  But having lost that civil litigation, then

21  there was a -- we assume, a complaint to the Government and

22  then a search where our material was taken.

23          The only -- I've tried to put this in terms

24  that I can understand.  It would -- I think it's like a

25  lawyer -- to pick a friend of mine, David Beck, or

1   Steve Sussman, or Craig Smizer (sp.ph.) -- starting a law

2   firm, they hire someone from Baker Botts.   Maybe that

3   Baker Botts lawyer took a disk that has some Baker Botts

4   material on it, it might even have things that are signed,

5   "Respectfully submitted, Baker Botts," and suspecting that

6   there might be a trade secret, the Government has taken all

7   of the new law firm's computers and servers.   And for

8   reasons we can discuss at the end, we just don't think that

9   that's right.

10          And I think this -- what we discussed

11  yesterday is perhaps a proposal to at least return our

12  hardware without our hard drives.   I don't want to speak for

13  Mr. Davis about whether we have an agreement that far but I

14  think that Mr. Davis is going to call a witness to explain

15  what's been happening in the six months that the Government

16  has had our computers.   We'll have a chance to question that

17  person.   If Mr. Blood can translate it into my head what the

18  computer talk means, then we might have some ideas right now

19  about how to move forward.   We may want to come back to you

20  in a couple of days after Mr. Blood has digested it.

21          And I'll tell you by way of background,

22  Mr. Blood, as I've said, doesn't work with SXP; he's

23  independent.   He was at Pricewaterhouse.   He's handled

24  enormous computer projects searching computers, things like

25  the Holocaust victims search for assets in Europe.   He's

1  super bright.

2          THE COURT:  Okay.  Well, I gather I'm going to be

3  hearing from him on the witness stand anyway so --

4          MR. GERGER:  Well, I don't know that today that

5  we will because what I'm hoping he will do is hear what the

6  Government has done to the computers and be able to tell us

7  if there's -- if he has any ideas about how they can do it

8  faster.  But that might -- I don't know that we'll be ready

9  for that immediately but that's why he's here is to help me

10  understand what the Government will be explaining.

11          THE COURT:  All right.  So you're -- are you

12  proposing to put on evidence before me or waiting for the

13  Government to put on evidence?

14          MR. GERGER:  I can call the --

15          THE COURT:  I mean it is your motion.

16          MR. GERGER:  -- Government's agent or the

17  Government can call their agent either way to hear what's

18  been done with the computers for the last six months.

19          THE COURT:  Okay.  Mr. Davis?

20          MR. DAVIS:  Thank you, Your Honor.  Just some

21  parameters just real quick.  My understanding of a

22  Rule 41(g) motion is: the burden is on the movement -- I'm

23  sorry -- that the burden is on the movement -- or Movant in

24  this particular matter so I would want to understand what

25  it is that the Movant is bringing particularly under

1   Rule 41(g).  I guess the biggest hurdle that I see at this

2   point, they have got to show that the seizure, number one,

3   was illegal.  That's the first thing.

4              And then the second thing is is that under

5   Rule 41(g) -- now this is separate and apart from my

6   Fourth Amendment argument that I wrote in the brief, but

7   under 41(g), the second thing they had to show is that they

8   were, in fact, entitled to lawful possession.  But we don't

9   even get there, Your Honor, until they can show that the

10  seizure was illegal.

11             And as you're aware, it sounds like that you

12  did have a chance to review the -- in camera, the search

13  warrant affidavit.  And so based upon that, obviously, this

14  Court, the U.S. Magistrate Court I'm referring to, has

15  already reviewed that.  It's different than if we were to do

16  something with -- in a warrantless situation.  So I clearly

17  feel like the burden should rest on the defense or as -- not

18  the defendant because there are no charges, but SXP in this

19  matter to show that the seizure was illegal.

20             And then, even if we get past that, the

21  Fourth Amendment arguments -- you know, the Courts have

22  basically said that they're looking for callous disregard by

23  the Government, Your Honor, that the Government is acting

24  unreasonable with callous disregard to the defendant.  And,

25  of course, we have none of that here.

1        **THE COURT:**  Well, you don't think hanging on to

2   their computers for six months might border on that

3   category?

4        **MR. DAVIS:**  In a usual case, I absolutely do,

5   Your Honor.  We do it all the time where we image the hard

6   drives and get it back.  But that's not this case and that's

7   what, I think, is important for me to try to purvey to the

8   Court.

9            What we have here is the actual formatting

10  of the source code which is a set of algorithms, if you

11  will.  It is in a digital format.  And that digital format,

12  when they took those trade secrets and began this new

13  company, that commingled that same source code so it's

14  digital evidence.  So there's no way to separate the source

15  code that we're saying that was stolen from the digital

16  evidence on SXP's hard drive.  So it's one and the same.

17        **THE COURT:**  There's no way to make a copy of

18  that?

19        **MR. DAVIS:**  If you make -- you can make a copy of

20  it but then essentially what you would be doing is giving

21  the very instrumentality, fruit, or contraband, which we're

22  saying is the source code belonging to the victim company,

23  which is proprietary in nature --

24        **THE COURT:**  But they haven't been -- nobody's

25  been --

1          **MR. DAVIS:**  -- back over to the defendant.

2          **THE COURT:**  Nobody's been charged yet.

3          **MR. DAVIS:**  Right, but there has been some --

4          **THE COURT:**  So how can you say there's been a

5   victim?  You're in a course of investigation.  I presume you

6   haven't reached a conclusion or else charges would've been

7   brought.

8          **MR. DAVIS:**  Right, Your Honor.  But in

9   constructing the search warrant, there are someone that had

10  their source code taken from them and that's who I am

11  discussing in this context as "the victim" but it's

12  Quantlab.

13         **THE COURT:**  Okay.

14         **MR. DAVIS:**  So Quantlab is in a position to say

15  that the source code that is digital in nature is sitting on

16  the hard drives over at SXP.

17              The other thing is that -- I believe the

18  defense has asked for -- and excuse me, Your Honor -- in

19  this case he has asked for several items in return,

20  particularly the nine servers.  That is -- the nine servers

21  were seized in a different search warrant altogether by a

22  different jurisdiction, by a different magistrate up in

23  Carteret, New Jersey.  So I don't believe that this Court

24  would have jurisdiction over those particular servers.

25              And then the other thing is --

1      **THE COURT:**  Where was that property seized?

2      **MR. DAVIS:**  In New Jersey.

3      And the other thing, Your Honor, is the fact

4   that the second portion in a Rule 41(g) is that the defense

5   has to demonstrate or in this case, SXP has to demonstrate

6   that they're entitled to lawful possession of this property.

7   I don't have any indication at this point what particular

8   items that the business or the corporation of SXP saying

9   belongs to them versus individual subjects or targets of our

10  investigation, only those different pieces of equipment.  So

11  I believe the burden is on them to show who SXP has -- or

12  what SXP has ownership of regarding that.  So that's our

13  position.

14      **THE COURT:**  All right.  Well, let me ask you

15  about your Rule 41(g) position.  You say there has to be

16  proof of an illegal seizure but the first sentence of the

17  rule says:

18          "A person aggrieved by an unlawful search and

19          seizure of property or by the deprivation of

20          property may move for the property's return."

21      That seems to me to suggest they don't --

22  that's an alternative.  They don't have to prove an unlawful

23  search and seizure.

24      **MR. DAVIS:**  And I think the way that's -- that's

25  correct, Your Honor.  And I think the way that's been

1    interpreted though is the fact that if it comes after some
2    type of charging document or -- there was a case that
3    I would like to present to the Court, *United States v.*
4    *Harrell*.  It's out of the Ninth Circuit.  And basically --
5            **THE COURT:**  Is that good law in the
6    Fifth Circuit?  Just joking.
7        **(Laughter)**
8            **MR. DAVIS:**  In this case, Your Honor, I'll use
9    it.
10       **(Counsel confer)**
11           **THE COURT:**  All right.  So it's five -- the cite
12   is 530 F.3rd 1051.  Okay.
13           **MR. DAVIS:**  In this particular case, we do see
14   a post-indictment; however, the defense prevailed on a
15   motion to suppress.  However, what's important about that
16   is: the Court has said -- and if you look at, I guess,
17   Footnotes 2 and 3, the Court basically looked at and made
18   a determination that after an indictment or before an
19   indictment, the movement bears the burden -- and two things
20   like I've already articulated -- that they would have to
21   show that the seizure is illegal, and that the defendant
22   would be entitled to lawful possession of those items that
23   they're asking to be returned.
24           **MR. GERGER:**  Your Honor?
25           **THE COURT:**  Yes, sir?

1          **MR. GERGER:**  Every case cited by the

2   United States involves a very different situation than we

3   have today.  Every case cited by the United States involves

4   an attempt by the defense or by the aggrieved party to

5   suppress evidence, or block the Government investigation, or

6   prevent the Government from using data that's been taken.

7          We don't seek that.  We say, "Let the

8   Government do its investigation.  We don't believe there are

9   any trade secrets.  We don't want any trade secrets."  We

10  are very skeptical about what has been done in the last six

11  months.  All we want is a copy of our own material and none

12  of the cases cite to that example and the Court has complete

13  authority to order a copy to be made --

14          **THE COURT:**  Well, what --

15          **MR. GERGER:**  -- of our material.

16          **THE COURT:**  What about their argument that, well,

17  somewhere in this material, which is difficult to separate

18  out, there may well be trade secrets that belong to another

19  party and that had been stolen from another party and

20  therefore, in effect, you're just asking to get possession

21  of property that someone stole that -- either on your behalf

22  or one of your employees stole?

23          **MR. GERGER:**  You know, if that were true, then I

24  guess for purposes of today I would say, "Fine, keep that

25  data and give us back the hardware, give us back the rest of

1   the software." And I think when we question the agent we're

2   going to hear what steps they've been making and -- to try

3   to do that.

4          THE COURT:  All right.  It seems to me I need

5   to -- it would be helpful to hear testimony on this matter.

6   I mean, I do agree with the Government, Mr. Gerger, that

7   you're the Movant here and so I think you've got the burden

8   of going forward so I'm going to ask you to put on your

9   witnesses first.  Obviously, you can call whoever you wish.

10          MR. GERGER:  Then my first -- then my witness

11   will be the agent in the courtroom, Your Honor.

12          THE COURT:  All right.  Well, have a seat at

13   counsel table then.

14          MR. GERGER:  Thank you.

15          THE COURT:  And we'll let SXP --

16          MR. DAVIS:  Which agent would he like to call,

17   Your Honor?

18          THE COURT:  Call your first witness.

19              Who's the name?

20          MR. GERGER:  All right.

21          THE COURT:  What's the name of the witness?

22          MR. GERGER:  Well, I guess I'll start with

23   Agent Dusek.

24          THE COURT:  All right.  Agent Dusek, come forward

25   and be sworn, sir.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                          17

 1          **(Witness Sworn)**

 2                     All right.  Have a seat, sir.  Pull that

 3      microphone to you.

 4                     You may proceed, Counsel.

 5               **MR. GERGER:**  Thank you.

 6               <u>**DIRECT EXAMINATION OF AGENT RYAN DUSEK**</u>

 7      **BY MR. GERGER:**

 8      Q      Is it Agent Dusek or Mr. Dusek?

 9      A      It's Agent Dusek, sir.

10      Q      Who do you work for?

11      A      I work for the FBI, but I'm assigned to the Regional

12      Computer Forensics Laboratory.

13      Q      All right.  And what have you done on this matter

14      here, the SXP matter?

15      A      Well, as far as the SXP matter is concerned, there was

16      conducted several search warrants and so the --

17               **THE COURT:**  Wait, wait, wait, excuse me.

18               **(ERO confers with the Court)**

19                     Can you spell your name for the record,

20      please?

21               **THE WITNESS:**  Absolutely.  My name is Ryan Keith

22      Dusek.  Last name is D-u-s-e-k.

23               **THE COURT:**  Thank you, sir.

24               **MR. GERGER:**  And, Agent, the Judge will

25      appreciate, I'm more used to cross-examinations so I omitted

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    18

1   that step.  Thank you. Okay.

2                So go back to the SXP matter.

3                **THE WITNESS:**  Well, as far as SXP, there was

4   several search warrants that were conducted and so the

5   computers came in at different times.  And we don't -- at

6   the RCFL don't dictate which computers come in first, that's

7   up to the case agent themselves to bring it in.  We're more

8   kind of a services organization for the Bureau and for the

9   rest of local law enforcement as far as digital forensics is

10  concerned.

11  **BY MR. GERGER:**

12  Q    And what services have you provided on the SXP matter?

13  A    On the SXP matter, under several other search warrants

14  associated with the SXP matter, we've conducted examinations

15  on several laptops, desktops, and several loose media.  As

16  far as SXP goes for the business itself, we were brought in

17  13 rackmount servers, six desktops, three desktop servers,

18  and approximately six loose hard drives and external hard

19  drives, and one laptop.

20  Q    All right.  And your job was to search those SXP

21  materials for the items described in the warrants.

22  A    Essentially, yes.  The information that was provided

23  to us as far as identifying this source code that they are

24  looking for, we can identify it by using what's called an

25  "MD5 algorithm" or "MD5 hash set."  It's essentially a

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                           19

1   mathematical algorithm that creates a digital fingerprint.

2   The initial number of MD5 hashes that they provided to us

3   was approximately -- over 87,000 different ones.  Depending

4   upon the different types of operating systems and the size

5   of the hard drives it could vary depending on the amount of

6   time it takes to actually forensically process this

7   evidence.

8   Q     Let me slow down for a second.

9   A     Sure.

10  Q     You had a -- several servers and computers that you

11  took from SXP, correct?

12  A     Yes.

13  Q     And then you just mentioned a number, 87,000.

14  A     Yes, sir.

15  Q     What you mean by that is that Quantlabs gave you

16  87,000 items that you were supposed to then search the SXP

17  computers to see if any of those 87,000 items were on the

18  SXP computers?

19  A     That is correct, sir.

20  Q     Now, would you tell us again what -- these 87,000

21  items that you got from Quantlabs, are those words, are they

22  algorithms?

23  A     It's called a "MD5 hash," sir.  It's basically a

24  32 alphanumeric character of a particular file so it's --

25  think of it as a digital fingerprint.  If a certain file has

1   this hash set, then no matter what you rename the file -- if

2   another file has that same hash set, it is exactly the same

3   file, bit for bit.

4   Q    Now, are you telling the Court that the 87,000 -- what

5   they call it, "hash"?

6   A    Hashes.

7   Q    Hashes.  That each one of those 87,000 hashes is a

8   trade secret of Quantlabs?

9   A    That's not for my -- that's not my decision, sir.

10  Q    You basically -- simply got a list from Quantlabs and

11  are using that list to search the SXP for matches?

12  A    That's one set of lists that we are searching, sir.

13  Q    What else are you using to search?

14  A    Search terms which are basically terms that we will

15  search for.  I try to identify unique ones that would not

16  show up in this particular case, the Linux Operating System,

17  which is full source code, that would possibly be unique to

18  Quantlab itself.

19  Q    And who gave you the list of those terms?

20  A    Well, I printed out my list from the case agent.

21  Q    And did Quantlabs give the case agent those terms, as

22  well?

23  A    I would assume so, sir.

24  Q    Have you, yourself, done any work whatsoever to

25  determine if the tens of thousands of words and hashes you

1   have from Quantlabs are even trade secrets of Quantlabs?

2   A      They provided me a list.  And the previous items that

3   we've already processed I had mentioned earlier, I've run

4   those lists and I've identified several items that did

5   appear to me to be what they were looking for.

6   Q      What do you mean?

7   A      Sometimes they come out to a zero file -- zero-sized

8   file.  Basically, it's just a name of a file but the file

9   has no content.  So I went back to the case agent and

10  identified that.  The case agent has now provided me with a

11  list of 17,000 as far as --

12  Q      Additional items?

13  A      No, just -- they reduced it down to 17,000.  This is

14  just in the last week.

15  Q      So at first, Quantlab gives you 87,000 hashes plus

16  some words and says, "Go check on SXP's computers to see if

17  those appear," right?

18  A      The case agent did, yes, sir.

19  Q      And last week you're saying that through the case

20  agent SXP said, "Forget about the 87,000, take it down to

21  17,000"?

22  A      I got a listing that was a reduced number to about

23  17,000.

24  Q      And what was it that you had found that caused that to

25  happen?

1   A      It was just that I found files that it was matching on

2   that appeared to be part of the Microsoft operating system

3   files.

4   Q      So you had matches when you did your initial searching

5   that obviously could not be a trade secret of Quantlabs;

6   fair to say?

7   A      Well, that's not -- I can't identify exactly that that

8   piece of software that identified to -- with that hash that

9   was owned Microsoft or whether it was a modified version for

10  Quantlab in this case.

11  Q      Uh-huh.

12  A      That would have to be looked at by a Quantlab expert

13  to determine whether it's part of their code or not.

14  Q      Have you shared with Quantlabs the results of your

15  work?

16  A      No, I have not.

17  Q      Has anyone on the Government team shared with

18  Quantlabs the results of your work?

19  A      Not that I am aware of.

20  Q      Has anyone in the Government given SXP's hard drives

21  or computer data to Quantlabs?

22  A      Not that I am aware of.

23  Q      You said that a hash set is 32 characters, right?

24  A      Thirty-two alphanumeric characters, yes, sir.

25  Q      I mean, let me see if I can put this in terms that

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                          23

1   maybe a layman can understand.

2   A     Sure.

3   Q     If I were trying to search a law firm's computer base

4   and there were some signature lines that said, "Respectfully

5   submitted, Baker Botts" as an example, okay, what -- is it

6   fair to say that what a hash set does is is it might break

7   that phrase up into smaller bits like "R-e-s-p" and you

8   would be looking for the letters "R-e-s-p" in Baker Botts'

9   computers?

10  A     No, that is incorrect.

11  Q     How would you describe what "a hash set" is?

12  A     A hash set is: you set a -- what in this case, a file.

13  So I pick a file.  So in -- what you're asking for is you're

14  asking for just like a signature block within a file.  The

15  hash set's not going to do that.  What it's going to do is

16  it's going to take the entire file content itself, run it

17  through this algorithm, industrial standard algorithm, and

18  produce a unique signature for that file.  If we were to

19  look for that file within other computers, we would run

20  those computers against that hash and if we've got a match,

21  that file would be an exact match of the one that we were

22  looking for.

23  Q     What software are you using to do this search of the

24  SXP computers?

25  A     Well, that kind of depends on the operating system

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    24

1  itself.  We have both Microsoft operating system and the

2  Linux operating system.

3  Q      Okay.  For the Microsoft operating system -- using it

4  on SXP, there are some Microsoft operating system?

5  A      There are some -- what's called a "NTA file system"

6  which is based on the Microsoft's file system.

7  Q      What software are you using to search the Microsoft --

8  the SXP computers that have Microsoft Office?

9  A      We have a variety of tools but our main tool right now

10 is Forensic Tool Kit by AccessData.

11 Q      Okay.  And for the Linux operating systems that are on

12 the SXP computers, what software are you using to search

13 that?

14 A      Well, I'm having to do most of that by command line

15 driven.

16 Q      What does that mean?

17 A      That means we actually have to type in each step of

18 our process.  It's not an automated tool like Forensic Tool

19 Kit is for the Windows operating system.

20 Q      Why aren't you using a search engine like Forensic

21 Tool Kit for the Linux side?

22 A      Because in -- Microsoft owns over 80 percent of the

23 market share as far as desktops and -- are concerned so most

24 of our tools that have to go -- all of our tools have to go

25 through a testing and validation process.  Most of them that

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                                    25

1   we put through that process is for the Windows operating

2   system because it is the greater amount that we see coming

3   in.

4                    As far as the Linux side, that has less

5   than 10 percent of the operating system out there and --

6   that we've come across and so, therefore, we don't have the

7   tools -- the automated tools yet to -- through our testing

8   and validation in order to do that so most of our processing

9   is done via command line.

10  Q     So let me see if I can explain for myself and the

11  Judge, the difference.  If you're using Forensic Tool Kit,

12  what it does is: it allows you to take several if not all of

13  the 87,000 hashes and thousands of words and search a

14  computer at the same time for several of those hashes or

15  words, right?

16  A     That's just part of it, yes, sir.

17  Q     Okay.  And therefore, you -- the search is faster?

18  A     The search is more automated which means that we don't

19  have to intervene as much.

20  Q     All right.  Well, is it faster?

21  A     It's really depending upon the processor speed of the

22  computer that's being done -- used on it.  So to say that

23  it's faster, there's a -- it could've been coded faster than

24  what Linux is.  But in this situation it's more -- just a --

25  it's an automated process where you don't have to intervene

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                          26

1    and actually go check and make sure things don't break out

2    on it.

3    Q        And on the Linux systems at SXP, you're having to

4    search those one hash at a time; is that what you're saying?

5    A        No.  No, that's not correct.

6    Q        Okay, tell me.

7    A        Linux has its own other problems than what the

8    Microsoft does.  In Microsoft, you only have a few varieties

9    of different types of distributions.  You have, for example:

10   Windows 95, Windows NT, Windows Vista, Windows XP that most

11   people are familiar with.  All of those are based upon

12   the -- almost the same format, same configuration with some

13   minor differences so there's -- automated tools are

14   developed for this higher market share of this operating

15   system.  It can almost work on each one.  It's not a lot of

16   different change.

17            But Linux, since it's "an open source" which

18   means anybody can contribute to the operating system itself,

19   there's literally thousands of different distributions and

20   there's more intricacies that you have to deal with such as

21   logical volumes, SE Linux which is a type of -- and I don't

22   want into -- too tangled but, I mean, there's different ways

23   to manage the operating system itself.  And we come across

24   those different types of intricacies that we have to try to

25   figure out and therefore it's harder to make an automated --

1  for a third party to make an automated tool that will deal

2  with every single situation that could be out there.  So

3  when it comes to Linux forensic examinations, most of our

4  commands are done by the command line.  Now, there's tools

5  built into the operating system to help speed it up but,

6  again, it just requires much more intervention on the

7  forensic examiner to use that by typing in the commands.

8  Q      So in the Linux system, are you using any software at

9  all to do the search of the SXP?

10 A      We're using the Linux operating system, yes.

11 Q      Okay.  Now, let me ask you some questions about the

12 SXP computers in general and then I want to go through each

13 one separately.

14              But the SXP computers in general, when you

15 search those computers, are you just hooking something up to

16 search the original computer that was seized?

17 A      Well, it depends on the configuration of the computer

18 itself.  For example, the nine servers that were up at

19 Carteret, those each held about 500 gigabyte hard drives and

20 held two each, in a RAID configuration which basically means

21 that instead of having one huge terabyte volume, they were a

22 mirror so one drive was a mirror of the other.  And this is

23 used mainly to -- if one drive fails, then the other drive

24 can pick up and continue operation.  It's a redundancy

25 factor.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                              28

1             The ones for that is in order to do a RAID

2    configuration, you can either have a software base or a

3    hardware base.  So what we'll do, and what we did in this

4    situation is: we hooked up the original server to -- using

5    one of our Linux boot CDs.  It's a CD that can boot up into

6    the operating system without actually touching the hard

7    drives, go in and image that volume which was created by --

8    on those two RAID drives.  So from there we ooze that off to

9    another computer and then we'll do our forensics examination

10   on that computer.  And at that point, you know, we don't

11   touch the evidence anymore unless we have to come back for

12   some reason.

13   Q     Okay.  So what you're saying is: of the nine -- we'll

14   call them "the New Jersey computers."

15   A     Okay.

16   Q     For those computers, what you're saying is: you made a

17   copy of the hard drives and you're searching the copy?

18   A     That is correct.

19   Q     And how did you make the copy of those hard drives?

20   A     Just --

21             MR. DAVIS:  We'll object, Your Honor.  I think

22   that is outside the scope of this hearing.  One of the

23   arguments I had before the Court was I thought that those

24   nine servers were under a different search warrant

25   altogether and, therefore, we don't have jurisdiction.

1              MR. GERGER:  Well, they're --

2              THE COURT:  Yeah, I was wondering about that.

3                       These are the nine New Jersey computers?

4              MR. GERGER:  Yeah, and they have been seized in

5     New Jersey but as I understand it, they're in Houston and

6     they're in the custody of these people before us and you

7     would have the authority to let us copy them.

8              THE COURT:  Well, the motion -- the Rule says the

9     motion must be filed in the district where the property was

10    seized and so I'm not sure that I would have jurisdiction

11    over computers that were seized in another district even if

12    those computers are now here in Houston it seems to me.

13    I mean, I'll be open to seeing some authority --

14             MR. GERGER:  Well, I think --

15             THE COURT:  -- for your contention but just on

16    the face of it, Mr. Davis appears to have a point here.

17             MR. GERGER:  I don't -- I'd like the chance to

18    brief that because again, all we're -- the only relief

19    we're seeking -- and I believe the evidence is going to

20    show, Judge, by the time this is through, there is zero --

21    zero -- Quantlabs trade secrets or non-trade secrets on

22    those nine computers.  They have nothing to do with

23    Quantlabs.

24             THE COURT:  All right.  Well, at this point, I'm

25    going to allow the question.

1          I'll note your objection, Mr. Davis --

2              MR. DAVIS:  Thank you, Your Honor.

3              THE COURT:  -- but I think for background anyway

4    it's useful to hear so go ahead.

5    BY MR. GERGER:

6    Q      How did you make the copy of those nine?

7    A      Again, what we did was we loaded the Linux boot CD

8    which is loading the Linux operating system where it doesn't

9    touch the actual hard drives.  And then from there, we're

10   able to view the hard drives without actually writing to

11   them and we push them out over a network and created what

12   was called "a DD image" which is an industrial standard for

13   an image file that contains a copy of the actual hard drive

14   volume.

15   Q      Are you familiar with the term called "Write Block?"

16   A      Yes.

17   Q      Did you use Write Block when you copied those nine?

18   A      Yes, sir.

19   Q      Did you use Encase?

20   A      No, sir.

21   Q      And did you make a hash of the original of the nine?

22   A      Yes, sir, we did.

23   Q      All right.  So that's the nine from New Jersey.

24          Now, when you searched the rest of the SXP

25   computers, did you search the original hard drive or did you

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    31

1   make a copy of the hard drive?

2   A      We made an image of the others also.

3   Q      Of the others --

4   A      Well, in fact, we're still in the process of making

5   the image of some.

6   Q      Okay.  And when you've made an image of those, did you

7   use Write Block?

8   A      Yes.

9   Q      Did you make a hash?

10  A      Yes, sir.

11  Q      And did you use Encase?

12  A      Yes.

13          **THE COURT:**  What is Encase; is that a software

14  program or --

15          **(Voices off the record)**

16          **MR. GERGER:**  As I understand it, Your Honor, it's

17  a forensics software, and I'm just -- I know this is

18  fascinating but it's a forensic software that you can use to

19  search.

20          **THE COURT:**  All right.

21          **MR. GERGER:**  Okay.

22  **BY MR. GERGER:**

23  Q    You may have asked this but the 87,000 or now 17,000

24  hashes that you're searching, how long is each piece of code

25  that you're trying to match at SXP?

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                          32

1  A      Each hash has a 32 alphanumeric character so the
2  process -- I think I know what you're getting at here and
3  the process is, is that once they're imaged and once we can
4  access those images, I've got -- say, we have logical
5  volumes and just little intricacies in dealing with it --
6  with the images and the actual evidence.  Once we get past
7  that then what we'll do is: we'll do an MD5 hash of every
8  single file on each operating system.  So every single file
9  will be found in that volume.  Then we'll take that list and
10 compare it against the hash list.  Once we identify any that
11 match, we'll go back and pull those out to present back to
12 the case agent for review.
13 Q      Okay.  Now, the other agent who is here, is he the
14 case agent?
15 A      No, he is not.
16 Q      Okay.  Well, what is the other agent's job?
17 A      The other agent is a computer intrusion specialist for
18 the FBI working in Cyber.
19 Q      Does he work with you on -- in your job --
20 A      No, he does not.
21 Q       -- that you're doing?
22 A      He would be somebody that would present evidence to
23 us.
24 Q      So with -- Quantlabs might give this other agent
25 information and then that agent would present the search

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                           33

1    terms to you.

2    A     He would provide us with the request for the search

3    terms, yes.

4    Q     Were you involved in the search warrant process?

5    A     I was.

6    Q     I'm going to hand you a copy of the return and I think

7    we can -- if we can go through some of those specific

8    computers it might speed this up.

9    A     Okay.

10         **MR. GERGER:**  Your Honor, I'd like -- may I

11   approach, Your Honor?

12         **THE COURT:**  Yes, you may.

13         **MR. GERGER:**  I have a copy for you, Your Honor,

14   so you can follow along.

15         **THE COURT:**  All right.  Thank you.

16         **MR. GERGER:**  Before we go through this, how --

17   when -- let's go back to the Linux operating system on the

18   SXP computers.

19   **BY MR. GERGER:**

20   Q     You said that you're using some kind of commands to

21   search that Linux computer?

22   A     Yes.

23   Q     How long is -- does the command line take?  If that's

24   a question that makes sense.

25   A     That depends on what process you're conducting.

1   Whether it's conducting an image or whether it's searching

2   for strings or a particular search terms, it could depend on

3   the size of the hard drive, the processor speed.  There's a

4   lot of different variables that can take place to determine

5   this -- the time it would take.

6   Q    I want turn your attention to this search warrant

7   return.

8           MR. GERGER:  And this is a bunch of documents

9   that are clipped together and I'll mark that, Your Honor, as

10  "SXP Exhibit 1," I suppose, just for purposes of this

11  hearing.

12          THE COURT:  All right.

13  BY MR. GERGER:

14  Q    And would you flip forward, Agent, to the fourth page

15  which at the bottom says, "Page 33"?

16  A    Yeah.

17  Q    Do you see that where it says, "Items to be seized,"

18  that page?

19  A    Yes, sir.

20  Q    Can you look at "Items to be seized number one:

21          "Any records or documents that refer or relate to the

22          research, development, manufacture, or marketing, or

23          sale of oilfield equipment including but not limited

24          to nitrogen pumping units, stimulating systems, and

25          blenders."

1                     Is that a mistake?

2  A     I don't know, I didn't conduct the search warrant.

3  Q     Okay.  What was your role in the search warrant

4  process?

5  A     My role was to help identify computers and have them

6  bagged and tagged for the seizing agent.

7  Q     Okay.  I mean -- but from -- I guess whatever you've

8  heard, is there anything in this case that has to do with

9  oilfield equipment, nitrogen pumping units, stimulating

10 systems, and blenders?

11 A     Not that I am aware of.

12 Q     (Laughs), okay.  Would you flip over to three or four

13 more pages to -- at the bottom where it says, "Page 36"?

14                     Are you with me?

15 A     Yes.

16         MR. GERGER:  Mr. Davis, do you have a copy of

17 this?

18         MR. DAVIS:  I do, thank you.

19         MR. GERGER:  Okay, great.

20 BY MR. GERGER:

21 Q     In here is a section -- do you see in the middle of

22 page, "Procedure for searching"; do you see that?

23 A     Yes.

24 Q     All right.  And if you look under Paragraph 5(a) it

25 says in the second line:

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    36

1          "Law enforcement personnel will search the seized

2          computer hardware or will search a mirror image for

3          the evidence."

4                     Do you see that?

5    A     Yes.

6    Q     Okay.  Now will you flip over to Page 38, which is two

7   or three more pages, and you see Paragraph C at the top?

8    A     Okay.

9    Q     Do you see where it says there:

10         "Appropriately trained personnel will complete the

11         search and data retrieval process within 90 days of

12         the execution of this warrant unless an extension of

13         time is obtained"?

14   A     Yes.

15   Q     Was an extension of time obtained?

16   A     I believe so.

17   Q     All right.  Do you know when?

18   A     No, I do not know the exact date.

19   Q     How long was the extension given for?

20   A     No, I do not know.

21   Q     Who -- what Judge granted the extension?

22   A     I do not know.

23   Q     And do you know how many extensions were obtained?

24   A     No, I do not.

25   Q     Why was the original warrant application limited to

1   90 days; did you think that would be enough?

2   A     I didn't draft up this search warrant so I don't know.

3   Q     For how long has it been extended, if I didn't ask you

4   that?

5   A     I don't know.

6   Q     Okay.  Let's go to the next page -- well, before we do

7   that, was an extension obtained in every single district

8   where a computer was seized?

9   A     I don't know.

10  Q     All right.  I guess let's just turn to the next page

11  which has handwriting on it.

12              Do you see there it's the -- refers to the

13  description of items, a Seagate USB external drive?

14  A     That's correct.

15  Q     All right.  Now, here's my question:

16              Have you already made an image of this

17  computer?

18  A     I don't know if I've made am image of this

19  160 gigabyte hard drive specifically.  I believe I have.

20  Q     All right.  How long did it take to make an image of

21  that?

22  A     A hundred and sixty gig hard drive, if my memory

23  recalls, I believe that this was a Windows operating system

24  one pushed over the network.  It took probably about -- I'd

25  say about two to three hours because we also do the hash

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    38

1   verification on that.

2   Q     Okay.  And have you completed your search of this

3   computer, this Seagate USB?

4   A     No, I have not.

5   Q     Well, when did you start searching the Seagate USB?

6   A     I believe that this one was started approximately two

7   weeks ago.

8   Q     Why only two weeks ago since -- if you've had it since

9   March the 5th?

10  A     Again, the case agent brings over the computers based

11  upon their priority.  It's a -- we are a service

12  organization, in essence, and the case agent brings us the

13  computers with the request.  We process the digital evidence

14  at that time.

15  Q     All right.  So you started searching this one two

16  weeks ago.

17  A     Approximately.  We've started the imaging process.

18  Q     You started the imaging process --

19  A     Yes.

20  Q     -- two weeks ago.

21  A     Yes.

22  Q     So the imaging would've been finished about two weeks

23  minus two hours ago, right, (laughs), to image it, right?

24  A     Depends on when we get to it, yes.

25  Q     All right.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                           39

1    A      This isn't the -- our organization -- this is not the

2    only case that we have in the organization.  We have

3    approximately 80 active cases with a limited number of

4    examiners.

5    Q      All right.  So what -- have you found matches of --

6    whatever Quantlabs gave you to search for, have you found

7    matches between that and this computer?

8    A      Our first step was to go ahead and -- since this all

9    came under one request was to image everything first and

10   then we start our processing.

11   Q      All right.  Have you started processing this one?

12   A      I don't -- I cannot recall whether this exact one has

13   been started in processing.

14   Q      How many people are working with you on the 80 cases

15   that you're investigating?

16   A      We have approximately 12, but four of them also have

17   additional administrative duties.

18   Q      So how many are -- is anybody working fulltime on the

19   SXP matter?

20   A      I, myself, am working probably about 75 percent of my

21   time on it, yes.

22   Q      All right.  And is anyone else devoting significant

23   time to it?

24   A      Not at this laboratory.

25   Q      So you have one person -- at another laboratory are

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                           40

1  people doing work?

2  A     We have a group coming down September 8th through the

3  12th to help process this for the search.

4  Q     So between March the 5th of '08 and today, really

5  you've been working alone.

6  A     For the most part, yes.

7  Q     All right.  So you can't tell us if there are any

8  matches whatsoever on this computer based on what you know

9  so far today?

10 A     As far as matches for what?  The search terms and --

11 Q     For anything that Quantlabs gave you.

12 A     I am not aware of any matches at this point.

13 Q     And if there were matches, you would not be able to

14 say that it's a trade secret, right?

15 A     That's correct, that they would have to be given back

16 to the case agent to have them have it reviewed by somebody

17 who would know.

18 Q     Yeah.  And who would know?  I mean, what -- tell us

19 about the process.

20                     How are you going to determine if -- when

21 you find the word "Respectfully submitted" in my example,

22 how are you going to know if the word "Respectfully

23 submitted" is a trade secret?

24 A     That's for the case agent to call in their personnel

25 to identify it.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    41

1  Q     I know but how's he going to do that?

2  A     That's -- I don't know.

3  Q     All right.  Let's look at the -- the next page is hard

4  for me to read so let's just skip it and go to the following

5  page which says, "Six CD-ROMs, one Maxtor external hard

6  drive, and one black desktop -- is Pumer (sp.ph.)?

7  A     I believe that's PowerSpec PC.

8  Q     PowerSpec PC, okay.

9              Have these items been imaged?

10 A     We have not received any CD-ROMs.  I believe there

11 was a Maxtor external hard drive, the black desktop

12 PowerSpec.  Most of these computers that were provided to us

13 were homemade computers so there was no really identifying

14 serial number or anything like that so I imagine the person

15 that -- I'm assuming with the person that provided this just

16 took a name off of the computer itself in order to try to

17 uniquely identify it.  I do not know which one the black

18 desktop PowerSpec PC is of the number of computers that we

19 received.

20 Q     Okay.  Let's go to the next page because it'll be more

21 certain then.

22             Do you see that, "HP server"?

23 A     Yes.

24 Q     Model number, serial number listed.

25 A     Yes.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                          42

1   Q      Do you see that Model Number SR1530AH?

2   A      Yes, I do.

3   Q      And the Serial Number QSH, et cetera.

4                    When was this server imaged?

5   A      Approximately a week and a half ago.

6   Q      Why wasn't it imaged before then?

7   A      Again, it was given to me approximately about two and

8   a half weeks ago.

9   Q      Was anything imaged before we filed our motion?

10  A      On the other search warrants but not on the computers

11  apparently that you have identified so far.

12  Q      Was any computer at all, seized in Houston, imaged

13  before we filed a motion with this Court?

14  A      Yes.

15  Q      Which one?

16  A      The ones that were associated with the other search

17  warrants that are associated with this investigation.

18  Q      Seized in Houston?

19  A      Yes.

20  Q      All right.  But none from -- okay.  When I say,

21  "Search warrants," I mean -- let me back up for the Court's

22  benefit.

23                    You executed search warrants at SXP in

24  Houston, right?

25  A      Yes.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                    43

1   Q     And you also executed search warrants at other places

2   in Houston, right?

3   A     Correct.

4   Q     All right.  Now, I'm only concerned about SXP.

5   A     Okay.

6   Q     All right?  Of the many, many, many computers you

7   seized from SXP, were any of those imaged before we filed

8   our motion?

9   A     I do not know the exact date you did your motion but

10  if it was less than -- or more than three weeks ago, I would

11  say, yes, then there was nothing else imaged prior to that

12  point.

13  Q     And before a computer is imaged, obviously, it hasn't

14  been reviewed, right?

15  A     That's correct.

16  Q     So we can cut through this by saying that if I went

17  through every single computer, you would say, "It was only

18  imaged in the last week and a half or two weeks and it has

19  not been reviewed."

20  A     That is correct for SXP.  May I also state that there

21  were 64 hard disk drives associated with this culminating

22  into about 38 terabytes of hard drive space storage?  Now,

23  granted, with the RAID which is that mirroring where they

24  copy one to the other for redundancy, we've imaged

25  approximately 21.5 terabytes.  About 10 terabytes is

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                              44

1   equivalent to the current collection of the U.S. Library of

2   Congress.

3   Q     Listen, I am not on your case.

4   A     Oh, that's fine.

5   Q     I understand, you know, that you -- you don't have the

6   help you need, right?

7   A     No, that's not true.

8   Q     And when you say that you have -- you've been working

9   on other computers that have been seized from people other

10  than SXP is what you're saying?

11  A     Yes.

12  Q     Okay.  Were you even told -- when you went to SXP's

13  location in Houston, you took every computer, right?

14  A     I believe we took just about every computer, yes.

15  Q     I mean, didn't you have some sort of -- in advance,

16  some sort of way to identify which computer you were looking

17  for?

18  A     No, we did not.

19  Q     You didn't have any cause to think it might be on one

20  computer rather than another?

21  A     No, we did not.  We didn't even know how many

22  computers we were going to encounter once we got there.

23  Q     So you just took every computer.

24  A     Yes.

25  Q     Now, it's possible you have computers there that don't

1   have -- that you've seized that don't have any data on it at

2   all, right?

3   A      It's possible, yes.

4   Q      And it's possible you have computers that have only

5   historical stock information on it and nothing else, right?

6   A      I don't know what exactly is on those computers.

7   Q      So all of the discussion that you gave to the Court

8   about, you know, finding that -- whatever matches you may or

9   may not have found, et cetera, that deals with computers

10  other than the computers taken from SXP?

11  A      The ones that we've identified matches for?  Yes.

12  Q      Okay.  Now, let me -- you know, let me just ask you

13  that.  Let's talk for a minute about the computers that you

14  have searched, okay, the ones that don't -- are not SXP's

15  and I have just a -- a sort of a hypothetical question for

16  you.

17          **MR. DAVIS:**  I object, Your Honor.  That's outside

18  the scope of this hearing.

19          **MR. GERGER:**  Your Honor --

20          **THE COURT:**  Yeah, if you're going to ask --

21          **MR. DAVIS:**  This is about SXP.

22          **MR. GERGER:**  Where I'm going is --

23          **THE COURT:**  Yeah, where are you going?  You're

24  not asking about what the results of the searches of other

25  computers are you?

1        MR. GERGER:  For just one reason.  My guess is

2   that the Quantlabs is very, very smart and they could send

3   someone unwittingly on a very wild goose chase by giving

4   them 87,000 or 100,000 or 10,000 words to look for.  You

5   might find a lot of matches that have nothing to do with a

6   trade secret whatsoever and you might find -- and what my

7   question to him was going to be:

8            Have you found computers -- have you seized

9   computers where you've found no match whatsoever?

10       MR. DAVIS:  That has nothing to do, Your Honor,

11  with the return of the --

12       THE COURT:  I agree with Mr. Davis.

13       MR. GERGER:  Okay.

14       THE COURT:  I think whatever --

15       MR. GERGER:  All right.

16       THE COURT:  -- they may or may not have found in

17  other computers is really not relevant here.

18       MR. GERGER:  All right.

19       THE COURT:  So I'll sustain the objection.

20       MR. GERGER:  May I have a just a moment,

21  Your Honor?

22       THE COURT:  Yes, you may.

23       (Pause)

24  BY MR. GERGER:

25  Q    Let me ask you, because we're trying to make some

1  progress to get items back that we need to operate:

2              It would be very easy wouldn't it to take a

3  computer and identify on that hard drive of the computer

4  some things that just absolutely, positively could not be

5  Quantlabs' trade secrets wouldn't it?

6  A     That would be easy to identify something that would be

7  part of the operating system itself.

8  Q     That would be very easy to do.

9              And so it would be very easy to return to us

10  the hardware plus the operating system as a baby step,

11  right?

12  A     The -- pulling the operating system apart from the

13  rest of the information that is in the volume of the hard

14  drive would be near impossible.

15  Q     Let me ask you, I guess, finally a question about the

16  FTK, the tool kit.

17  A     Okay.

18  Q     Okay?  You're using the tool kit to search the

19  Windows; is that right?

20  A     Yes.

21  Q     Did I use the right word?

22  A     The Windows based systems, yes.

23  Q     The Windows based systems.

24              Can't you use FTK to search the Linux as

25  well?

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                                    48

1   A       FTK can search on the PXT3 partition which is

2   associated with the Linux; however, our process -- all of

3   our tools go through a testing validation.  FTK for us has

4   not been validated to be used on the Linux operating system.

5   Q       What do you mean, "Has not been validated"?

6   A       Well, we -- all of our tools that we request -- or

7   that we use go through a testing and validation process.

8   They're sent out to headquarters.  There's a list of tools

9   that we'd like to use.  They go through a testing and

10  validation to find out what the limitations are on the tools

11  and it has -- FTK has gone through that testing and

12  validation but not for Linux examinations, only for Windows

13  examinations.

14  Q       Okay.  Let me see if I understand.

15                  Before you at the FBI can use a system, it

16  has to be approved by "headquarters," for lack of a better

17  word, right?

18  A       It has to go through a testing and validation process

19  and that is a -- not just a system but a piece of software.

20  Q       Okay.  Are you -- in your opinion, does the FTK system

21  work well to search Linux as well?

22  A       I do not know.  I don't use it for -- to search Linux

23  operating systems.

24  Q       Okay.  But you're not saying it's not a good system to

25  use for that.

AGENT RYAN DUSEK -- DIRECT BY MR. GERGER                              49

1   A     That's correct, I'm not saying that.

2   Q     Okay.

3           MR. GERGER:  Your Honor, I think that's all I

4   have right now of this witness.

5           THE COURT:  All right.  Thank you, Mr. Gerger.

6   Before I let Mr. Davis ask his question, Agent Dusek, let me

7   ask you:

8                The basis for your testimony that you

9   believe that there was an extension of the 90 days process

10  or time limit to complete the search and data retrieval

11  process, what is the basis for your belief that that

12  extension was obtained?

13          THE WITNESS:  The case agent informed me of that,

14  sir.

15          THE COURT:  All right.  Well, I note -- I'm

16  looking at the Docket Sheet, Mr. Davis, maybe you can

17  enlighten me but I don't see an extension of the 90-day

18  period.

19          MR. DAVIS:  Yes, Your Honor.  We've -- actually,

20  on all the search warrants, other than New Jersey because it

21  didn't have the 90-day time limit, we received the initial

22  extension.  And then recently within, I believe, two weeks

23  we received a second extension, actually a waiver of time

24  limit on the other three search warrants.  And because of

25  the motion filed by SXP in this case, you know, obviously,

1  we didn't ask the Court who had magistrate duty at that

2  point in time to sign another extension, I mean, because we

3  knew this motion was pending.  So I have that here today

4  depending on the Court's ruling whether to extend it or

5  waive the extension of time.  And the Government did that,

6  Your Honor, knowing that we needed and had a duty to try to

7  get these things back in a timely fashion but --

8            THE COURT:  Well, I'm just asking because --

9            MR. DAVIS:  -- as you can hear from -- okay.

10           THE COURT:  -- I don't see it on the Docket Sheet

11 who issued the 90-day --

12           MR. DAVIS:  Judge Botley issued it, Your Honor.

13           THE COURT:  What -- under what case number?

14           MR. DAVIS:  Under this same case number that --

15 I believe it's that --

16           THE COURT:  It doesn't appear on the Docket Sheet

17 as far as I can tell.  I'll give you a copy of the Docket

18 Sheet that I've just printed out and you can point out to me

19 maybe where I'm missing it.

20           MR. DAVIS:  See if I can dig up my copy of it,

21 Your Honor.

22           THE COURT:  Okay.

23           MR. DAVIS:  Your Honor, what I have here is the

24 second -- well, I guess the first extension signed by

25 Judge Botley.