1              THE COURT:  All right.

2              MR. DAVIS:  I have a copy of the motion as well

3    if you'd like to see it, Judge.

4              THE COURT:  All right.  But for some reason that

5    was not docketed under -- on our docket case.

6          (Court confers with the clerk)

7                   All right.  Thank you.  Do you need this

8    or -- I'd like --

9              MR. DAVIS:  Yes, sir, please.  Thank you.

10             MR. GERGER:  May I ask Mr. Davis a question?

11         (Pause/Counsel confer)

12             THE COURT:  All right.  You may proceed,

13   Mr. Davis.

14             MR. DAVIS:  Thank you, Your Honor.

15             CROSS EXAMINATION OF AGENT RYAN DUSEK

16   BY MR. DAVIS:

17   Q    Agent Dusek, you said earlier during direct testimony

18   that you were originally given 87,879 different hash values;

19   is that correct?

20   A    Yes, it was over 87,000.

21   Q    Okay.  Now, once you started the process of looking --

22   trying to match the hash values provided by Quantlab with

23   what was on the hard drives, what did you experience?

24   A    I experienced, first of all, a long delay because

25   87,000 is -- takes a while to go through.

AGENT RYAN DUSEK -- CROSS BY MR. DAVIS                           52

1    Q     Right.

2    A     The second thing I experienced was several hits that

3    appeared to be zero-size files --

4    Q     Right.

5    A     -- and other files that I normally associate with the

6    Windows operating system.

7    Q     Okay.  And did you make any suggestion at that point

8    in order to try to expedite the matching process?

9    A     Yes, I talked to -- oh, I'm sorry.

10   Q     And what would that be, sir?

11   A     I talked to the case agent and told him -- told the

12   case agent what I had found and suggested that it'd be a

13   much more limited set.

14   Q     And did, in fact, sir, you receive a more limited set

15   of hash values subsequent to that recommendation?

16   A     Yes, I did.  I received approximately 17,000.

17   Q     Right.  Now, in regards to the time spent on imaging

18   all of the evidence garnered from the multiple search

19   warrants, how much time would you spend in a week -- in any

20   given week on that project?

21   A     I'm sorry, I don't quite understand the question.

22   Q     How much time have you spent on the SXP investigation

23   or the Quantlab investigation?

24   A     The entire Quantlab investigation?

25   Q     That's correct, yes.

1   A     Approximately -- I'd estimate approximately about a

2   full month of my time.

3   Q     All right.  Now, on to the hash values.  You said, "It

4   has to be an exact match," I believe those were your words;

5   is that correct?

6   A     That's correct.

7   Q     So if, in fact, SXP or -- on SXP's hard drive there

8   was even a change of one number or one date, would you get a

9   match from the -- looking at the hash values?

10  A     No, I would not.

11  Q     How come?

12  A     Well, the reason again is the hash set is a -- it

13  sends every on-and-off bit towards -- to this algorithm to

14  create this unique digital fingerprint in order that you can

15  identify that one file's an exact match of another file.

16  Q     Uh-huh.

17  A     When you change -- for example, if you change the

18  number 1 to a number 2 anywhere in that or you add a space

19  anywhere in that file, it'll -- changes or adds a different

20  bit that causes the digital fingerprint to be different.

21  Q     Taking a hash value of the original source code, i.e.,

22  Quantlab's source code, and changing one item on -- within

23  that algorithm or source code, would you have a match?

24  A     No.

25  Q     And is that a contingency of your search?

1   A       Absolutely.

2   Q       Why is that important?

3   A       Well, that's important because if -- in this

4   situation, if you have a piece of source code that has a

5   remark section that says, "Was written by Quantlab" or

6   "Quantlab copyright" a certain date, if you just change the

7   time Quantlab to, say, SXP, you've totally changed the MD5

8   hash of that file and it would be -- wouldn't match any of

9   the MD5 hashes that were provided to us.

10  Q       Okay.  Now, you said under the Linux environment, you

11  would have to go command line by command line?

12  A       Well, we'd have to -- each one of our steps is a

13  command line process so essentially you start up a process

14  and then you pretty much have to go away until its complete.

15  If you formed out ways to perform multiple processes at the

16  same time but it significantly slows the computer and there

17  is a -- sometimes there are steps that need to be performed

18  before the next process starts.

19  Q       Okay.  In referring to those steps, when you had

20  testified earlier about not touching the hard drive, could

21  you explain why that's important for evidentiary points?

22  A       Well, we don't want -- we want to establish the

23  integrity of that hard drive and we don't -- what comes into

24  us we want to be able to -- anything that we perform within

25  our processing, we re-perform the MD5 hash or the

1    calculation again at the end to show that we didn't change

2    anything, that everything that was -- came out was provided.

3    Q      And is that, in fact, part of your protocol?

4    A      That is correct.

5    Q      Okay.  You also testified that currently you've used,

6    I guess, a software tool known as "FTK"; is that correct?

7    A      That is correct.

8    Q      What is another commercially available forensic tool

9    that's floating around out there?

10   A      For the Windows operating system would be Encase.

11   Q      Okay.  And so why didn't you use Encase -- I believe

12   the question was something concerning whether or not you had

13   actually used Encase to match up against the various hash

14   values?

15   A      Well, for -- depending upon which operating system

16   you're talking about, the Windows or the Linux operating

17   system, in the Windows operating system, we tend to use FTK

18   as our primary tool that has a process to identify that.

19            The -- in a Linux environment, we don't use

20   Encase because Encase is, again, the non-approved tool for

21   the Linux environment.

22   Q      And again, that would be because of protocol.

23   A      That is correct.

24   Q      I see.  So is it your testimony that the RCFL has been

25   busy with forensic process of other cases and/or other

1   search warrants in the Quantlab case since March?

2   A      That is correct.

3   Q      Could you please describe for the Court -- when you

4   said that you've already imaged 21.5 terabytes of

5   information, could you please somehow describe that, put it

6   in layman's terms about how much that is?

7   A      Yes.  Again, about 10 terabytes of information is the

8   current collection of the U.S. Library of Congress.

9   Q      Okay.  So we're talking about two and a half of those;

10  is that correct?

11  A      That's correct.

12  Q      And your testimony is that even after you do that

13  portion of the forensic process, there is an additional

14  process; is that correct?

15  A      Once we perform the imaging, then the next step would

16  be the processing, searching for the search terms or hash

17  sets, and then pulling those out and providing those to the

18  case agent for review process.

19  Q      All right.  Let me ask you this:

20                  Based on your experience, can digital

21  evidence be placed or put on any type of computer?

22  A      Yes.

23  Q      All right.  So is it reasonable to just dismiss a

24  computer that appears or that was represented had not been

25  previously used?

AGENT RYAN DUSEK -- CROSS BY MR. DAVIS                    57

1  A      No.

2  Q      And why would you want to search that computer as

3  well?

4  A      Because I can't tell you everything that has ever been

5  done to that computer.

6  Q      Okay.  Has the reduction between 87,000 hash value

7  strings to 17,000 hash value strings expedited your process?

8  A      We haven't started the hash value strings on the Linux

9  systems.

10 Q      All right.  Please tell the Court what implementations

11 you have made concerning or attempting to expedite this

12 process specifically for SXP?

13         **MR. GERGER:**  I'm sorry, Your Honor.

14      **(Voices off the record)**

15              Well, somebody just entered the courtroom,

16 sorry.

17         **MR. DAVIS:**  Okay.

18         **THE WITNESS:**  I'm sorry, could you rephrase it,

19 could you repeat that?

20         **MR. DAVIS:**  I want you to tell the Court what you

21 have attempted to do to expedite this process.

22         **THE WITNESS:**  Absolutely.  We brought in one of

23 our major Linux experts from the Baltimore Field Office.

24 He's come in.  We sat down all weekend imaging all the

25 computers from SXP to include -- that we basically took our

1   classroom environment which consisted of about 20 computers

2   and started hooking them up through a network in order to

3   push all the images out as fast as we can to a external

4   server so that we have the images on the external server.

5                    Next step we did then was also move most of

6   those images to a tape for a secondary backup.

7                    And then at the same time, we've processed

8   what is called a -- it's a process in Linux that's called

9   "strings."  We searched for -- it'll go through and --

10  there's different ways that strings can work but it's a

11  command line that can -- a process that can go through and

12  pull out certain text strings.  For example, it could be

13  anywhere from just the term, say, "SXP" or "Quantlab" to an

14  entire row of strings, for example, "United States District

15  Court."  Once -- as it pulled that strings, it referenced it

16  against about approximately 124 search terms that we

17  identified to try to be as unique as possible to this case.

18                   Then the results from that were pumped out

19  to a separate file which will then be all brought together

20  to search for anything that looks particularly interesting

21  as far as source code goes and that helps us identify which

22  servers to forensically process first.

23  **BY MR. DAVIS:**

24  Q     What is "source code"?

25  A     Source code is nothing more than just a normal text.

AGENT RYAN DUSEK -- CROSS BY MR. DAVIS

1   It's -- just as this document is written as a document with

2   text, it is a -- it's text based in a manner of high-level

3   language enough that the computer is able to interpret it

4   using a compiler and bring it down into machine code so that

5   the computer knows exactly what set of sequences you want to

6   perform.

7   Q     Can you take a source -- piece of source code or the

8   whole source code from an outside environment and embed it

9   in a new environment?

10  A     I'm not sure I understand what you're meaning.

11  Q     Can you take a piece of outside source code, i.e.,

12  Quantlab code, and intermingle that or mix that in or

13  somehow hide that in other digital media?

14  A     Would the -- I guess I don't understand what you mean

15  by "hide it within other digital media."

16  Q     Can you place it in other digital media?

17  A     The source code?  Absolutely.  It's nothing more than

18  text so you could copy a group of text there and place it

19  into another file.

20  Q     Okay.  Now, the source code has algorithms in the

21  embodiment of the source code?

22  A     The source code is made up of functions which are

23  typically algorithms, steps for the computer to perform.

24  Q     Right.  And can you break up parts of the source code

25  and only use a portion of the source code and put it in

AGENT RYAN DUSEK -- CROSS BY MR. DAVIS                              60

1   other digital media?

2   A       Absolutely.

3   Q       All right.  And if there's parts of that source code

4   in several of these hard drives or computers that you're

5   doing the forensic process on, would that come up with a

6   match or a hit in your case?

7   A       If I do it by search term and we hit a unique name

8   that is in that source code, yes.

9   Q       Okay.  So then it's important not only to do what

10  you're doing now, the imaging process, matching of the hash

11  values, but you're still going to have to do the word search

12  or the search terms; is that correct?

13  A       That is correct.

14  Q       And then even -- I think I understand your testimony,

15  even after the search terms, then an FBI agent is going to

16  have to review that to identify whether or not that is

17  actually source code of Quantlab.

18  A       That is correct.

19  Q       Okay.  So the process is still going to be a while; is

20  that correct?

21  A       This is -- considering this amount of data, yes.

22  Q       Okay.  Now, why is it important that the RCFL follow

23  testing validation procedures and processes?

24  A       Well, our tools are basically -- basically, our job is

25  to forensically process information to provide testimony in

1   court.  If we have tools that have limitations and we're not

2   aware of those limitations, then those limitations could be

3   brought up and it could change the evidence from what we

4   understand it to be.

5   Q      I.e., it would change the evidence; is that correct?

6   A      Not necessarily change the evidence itself but change

7   the results of what we pull out.

8   Q      Okay.

9   A      It may not be what we thought it is.  For example, if,

10  say, FTK had a limitation where it can identify MD5 hashes

11  but some reason this file, you know, always has a problem

12  with, say, zipped up files which are compressed files, then

13  it may skip over the compressed files and we wouldn't have

14  that evidence then that -- to be able to pull out of the --

15  well, we wouldn't have that file to pull out of the evidence

16  in order to provide to the case agent to determine whether

17  it's proprietary code or not.  So that would be a limitation

18  that we would need to know about in order to be able to

19  identify that and go back after that and try to mitigate

20  that limitation.

21  Q      All right.

22  A      That's what our testing validation does; it helps us

23  identify what the limitations are of the tools.

24  Q      All right.  We call that "authentication."

25                      Now, have you sent out any of SXP's laptops,

AGENT RYAN DUSEK -- CROSS BY MR. DAVIS                          62

1   desktops, or servers to anyone else outside of this RCFL for

2   processing?

3   A      No, we have not.

4   Q      You have not?

5                  Do you have a plan to do that?

6   A      We have a backup plan that is part of the process.

7   Right now, we have a group of five other Linux examiners --

8   certified Linux examiners -- coming in the week of

9   September 8th through the 12th to work on this case.

10  Whatever we don't finish there will be -- our backup plan is

11  to possibly push some of the evidence that we have not

12  finished out to other RCFLs in order to help accomplish

13  this.

14  Q      Uh-huh.  And are you making this a special case to

15  expedite the processing of this evidence?

16  A      Yes, we are.

17  Q      Now, please explain to the Court -- well, let me ask

18  you this first:

19                  Can you image the hard drive without the

20  hardware that it's sitting in?

21  A      That depends on several factors.

22  Q      Okay.

23  A      If it's just a loose external piece of hard drive,

24  yes, we have no problem imaging that.

25                  In the situation where sometimes you get

1  into that -- what I mentioned before a RAID situation where

2  we have a mirroring, even though it's mirrored, it is not an

3  exact duplicate.  Each drive is not an exact duplicate of

4  each other.  And the whole process of creating that mirror

5  image is either done on a software level or a hardware

6  level.  If it's on a software level then, yes, we have an

7  easier time of imaging it but if it's on a hardware level,

8  we would need the piece of hardware itself to interpret the

9  connection for us in order to be able to image off of that.

10  Q    So therefore, you would need the actual -- before you

11  could return the hardware to SXP, you would need to image

12  the hard drive within that hard drive.

13  A    Yes, that -- in a RAID configuration, that is the

14  preferred method.

15  Q    Okay.  All right.

16          MR. DAVIS:  No other questions, Your Honor.

17          THE COURT:  All right.  Any redirect?

18          MR. GERGER:  A few, Your Honor, yes, please.

19          THE COURT:  All right, briefly.

20          REDIRECT EXAMINATION OF AGENT RYAN DUSEK

21  BY MR. GERGER:

22  Q    Agent -- okay.  Have all of the computers that were

23  taken from SXP in Houston already been imaged?

24  A    No, they have not.

25  Q    Okay.  Which ones have been imaged so far?

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                              64

1    A     We are sitting with approximately -- right now we're

2    going on -- I just checked this morning.  We have one

3    desktop server that is being verified -- the image is being

4    verified.

5                    We have another desktop server that has 8

6    terabytes of hard drives in it that hasn't even been started

7    yet due to a complication.

8                    And then we have another one -- I'm trying

9    to think if that's a desktop server -- that is -- I think

10   that is also a -- that's just a desktop that is being

11   verified also at this time.

12   Q     What do you mean by "being verified"?

13   A     "Being verified" is when we do the image it calculates

14   an MD5 hash of the entire drive.  Once we copy it over, we

15   do another MD5 hash of the copy to ensure that both of them

16   are exactly the same.

17   Q     So now, what you're saying is that there's one server

18   that's been imaged but you're verifying.

19   A     That's correct.

20   Q     And there's one desktop that has been imaged but your

21   verifying.

22   A     That's correct.

23   Q     And none of the other computers that were --

24   A     All the others have been finished.

25   Q     All the others have been finished.

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                    65

1  A     As far as imaging, yes.

2  Q     Okay.  And then the -- except the 8 terabyte one; is

3  that what --

4  A     That's correct.

5  Q     And what's the complication there?

6  A     It's -- we're having a difficult time getting it to

7  power on, essentially.

8  Q     And can't you tell by looking though that there is not

9  8 terabyte of data on that server?

10 A     If -- there's another server that works just like it.

11 I mean, it's also got 8 terabytes of hard drives in it.

12 When -- we had some complications with that due to -- that

13 is using a piece of hardware RAID that's -- had just come

14 out on the market not too long ago.  Our drivers which is

15 the communications that our boot CD uses to talk with the

16 computer for that piece of equipment was having difficulties

17 in making that connection to talk to the hard drives.  We

18 were successful in finally getting it to work.  That

19 8 terabytes came out to be about 100 gigs of -- gigabytes of

20 one drive, and then 5.455 terabytes of a volume which is

21 again, like I said, the RAID where they kind of make them

22 all into one big one.

23 Q     Right.  But I guess what I'm saying is -- let me back

24 up.  There were two servers taken that had 8 terabytes,

25 correct?

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                    66

1  A    That's correct.

2  Q    All right.  You have successfully imaged one of those.

3  A    Yes.

4  Q    Now, my question to you is:  On that one that was

5  successfully imaged, how much space did you find had been

6  used out of the 8 terabyte?

7  A    We haven't performed our processing for that.  When we

8  image it, we image the entire volume itself so we haven't

9  looked in to see how much space is being utilized.  We take

10  a snapshot of the entire volume.

11  Q    All right.  So you're not suggesting that there is

12  8 terabytes of data on that server that has been

13  successfully imaged that was actually used.

14  A    I would say that's correct.

15  Q    Okay.  Would you agree that you could image all of the

16  rest of SXP's computers within one week?

17  A    That's depending upon the complication of that one

18  server.

19  Q    All right.  Okay.  And would you also agree that of

20  the ones you had imaged -- let's assume you got them all

21  imaged in a week, would you agree that you could run

22  whatever words Quantlabs gave you against those computers in

23  one to two weeks?

24  A    That depends upon how much help I have and how much --

25  other intricacies that we come into.  Again, there's logical

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                      67

1   volumes which is another way of -- it's -- in Linux, you can

2   break up the -- a large partition into what are called

3   "logical volumes" to make separate hard drives appear to be

4   one big hard drive so we have that to deal with which are

5   different drivers that we need to do with that.

6              We also have -- that we've come across what

7   are called "virtual machines."  These are machines within

8   the machine.  Essentially, it's a -- you can take a piece of

9   software on -- one of the most common ones called "VMware"

10  and run it in the operating system itself and have the

11  computer think that there is another computer within there,

12  that you can actually run an entire separate operating

13  system at the same time.  And so those are more things that

14  we're going to have to go and identify, pull out, and then

15  reimage those pieces of -- and treat them just as if they

16  were computers themselves.

17  Q     Have you found that situation on the computers that

18  were taken from SXP in Houston?

19  A     Again, I haven't done the processing on them yet, the

20  computers on the SXP of Houston.

21  Q     I thought you imaged all of the SXP computers other

22  than the one you can't turn on.

23  A     That is correct; however, we haven't processed it so

24  I don't know if there are virtual machines within it or --

25  Q     So when you said you'd run into this situation, you

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                    68

1   did not mean to say you had run into that on the SXP

2   computers.

3   A       That is correct.

4   Q       Once you image a company -- if Judge Smith decides in

5   his wisdom to give us our computers back, once you have an

6   image of it you can continue whatever work you need to do,

7   correct?

8   A       In most part, yes.

9   Q       Well, why not for the entire part?

10  A       Well, we may come across a situation where the image

11  didn't copy correctly or it requires a piece of hardware

12  itself.  Then we'll go back to the original evidence and

13  attempt to obtain another copy of it.

14  Q       If Judge Smith in his wisdom says that we can have the

15  copy and you can keep the original, you could continue

16  forward on all of the work that you do.

17  A       We would have to reimage all the originals again, yes.

18  Q       All right.  That's one or two weeks of work, right?

19  A       Depending on how much help I get, yes.

20  Q       Well, you've been working on this alone and you said

21  you've spent about one month on it, correct?

22  A       Yes.

23  Q       And that one month of time covers the entire Quantlabs

24  investigation, correct?

25  A       That's correct.

AGENT RYAN DUSEK -- REDIRECT BY MR. GERGER                           69

1   Q      Not just SXP, correct?

2   A      That's correct.

3   Q      How many other computers have you been working on?

4   A      Let's see, there's 17 external loose hard drives,

5   seven laptops, I think about three desktops, and several

6   pieces of USB material, external practices of media.

7   Q      Right.  And so in one month, you've been able to not

8   only image -- one month of your time you've imaged all of

9   the SXP computers but I take it you've been really focusing

10  your time on those other computers, right?

11  A      That's correct.

12  Q      Okay.  So without any other help, you could image all

13  of the SXP things in a week or less, right?

14  A      Depends -- depending upon how much help I get and how

15  long it takes.

16  Q      Well, you've --

17  A      Imaging --

18  Q      -- done it with no help -- all those other computers

19  and SXP's in less than a month of your time.

20  A      That's not correct.  I mentioned before, I had a Linux

21  expert come down from Baltimore who helped me set up the

22  classroom in order to image multiple ones at the same time.

23  Q      Okay.  Now, you were asked by Mr. Davis about --

24         **(Pause/ERO change out)**

25               **THE COURT:**  All right.  You may proceed, Counsel.

1          **MR. GERGER:**  Your Honor, you can't leave.

2          **THE COURT:**  I'm here.

3          **MR. GERGER:**  Okay, (laughs).  You were asked by

4   Mr. Davis about the process of making matches.

5   **BY MR. GERGER:**

6   Q     Is it -- so I understand it, have you found any

7   matches whatsoever between the Quantlabs list and any

8   computer taken from SXP?

9   A     We have not made that processing yet.

10  Q     All right.  And just to be clear, if there were a

11  match you have no way to say, "Gee, that's a trade secret of

12  Quantlabs," correct?

13  A     That is correct.

14  Q     Okay.  Can you tell me when the Linux specialist from

15  Baltimore came down to help you?

16  A     Yes.  Not this last weekend but the prior weekend.  He

17  came in on Saturday morning.  He and I spent all day

18  Saturday and Sunday and most of the week until he had to

19  leave Thursday morning.

20  Q     Okay.  And --

21  A     I don't have a calendar in front of me.  I could give

22  you the exact dates.

23  Q     Okay.  We're going to get one.

24              Do you know when the extension of time was

25  obtained?

1           Do you know whether the Magistrate Court was

2   advised that the imaging process had not even started for

3   the SXP --

4   A     I do not know.

5   Q     Okay.  Does it makes sense that was the weekend where

6   Saturday was August 24th?

7   A     That's possible.  I couldn't tell you for sure without

8   looking at a calendar.

9   Q     That would not be the past weekend but the weekend

10  before.

11  A     It was not this past weekend, which was holiday

12  weekend, it was the weekend prior.

13  Q     Okay.

14          MR. GERGER:  That's all we have, Your Honor.

15          THE COURT:  All right.  Well, Agent Dusek, I have

16  a question:

17          You've been asked about looking at computers

18  with different operating systems, Linux versus Windows, what

19  is the breakdown?  I mean, do all the computers -- I assume

20  each computer has just one or the other operating system and

21  if so, how does it break down?

22          THE WITNESS:  It is a possibility they could have

23  both operating systems, again, like I mentioned with the

24  virtual machines; however, in most cases it has a main

25  operating system, either a Windows based or a Linux based.

1          THE COURT:  Okay.

2          THE WITNESS:  And the breakdown in this that I

3   have come across so far, except for the 8 terabytes on the

4   one computer, of the 21.5 terabytes that we have imaged,

5   approximately 3.6 terabytes of it is Windows based.

6          THE COURT:  So the majority of it is the Linux

7   based.

8          THE WITNESS:  That is correct.

9          THE COURT:  Okay.  All right.  Thank you, sir.

10          MR. GERGER:  Well, Your Honor, I don't --

11          THE COURT:  Briefly.

12   BY MR. GERGER:

13   Q    When you say "21 terabytes" is -- does that -- is that

14   the size of what you have imaged only from what you took

15   from SXP or --

16   A    That is correct.

17   Q    Okay.  That's not including what you imaged that you

18   took from other people.

19   A    That is correct.

20   Q    Okay.

21          MR. GERGER:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you, Agent Dusek.

23          Mr. Gerger -- you may step down, just leave

24   that there I suppose -- call your next witness.

25          **(Witness Steps Down)**

1          **MR. GERGER:**  Well, I guess I would have very

2    short testimony from the other agent, Your Honor, but I

3    don't want -- because I wanted to go through what he's

4    telling me that nothing's been done.  So I will call the

5    other agent.

6          **THE COURT:**  All right.  Come forward, sir.

7          **(Witness Sworn)**

8                All right.  Have a seat, sir.

9          **MR. GERGER:**  Good morning, Agent.

10         **THE WITNESS:**  Good morning.

11         **DIRECT EXAMINATION OF AGENT ERIC HAWKINS**

12   BY MR. GERGER:

13   Q     Would you introduce yourself to the Judge and spell

14   your name please?

15   A     Yes.  My full name is Eric, E-r-i-c, Adrian,

16   A-d-r-i-a-n, Hawkins, H-a-w-k-i-n-s.

17   Q     And what --

18   A     I'm an agent with the FBI.

19   Q     What has your role been in the SXP matter?

20   A     I haven't had much of a role.  I have just reviewed a

21   couple of testimonial documents written by other case

22   agents.

23   Q     Okay.  Are those documents that are public?

24   A     I don't know.

25   Q     Well, without -- let's take it in small steps.

AGENT ERIC HAWKINS -- DIRECT BY MR. GERGER                    74

1              In general, what do you mean by that?

2    A      They're -- when you interview people, as part of the

3    case, documentation is written and I reviewed -- we call

4    them "FD302s."  I reviewed those documentations in order to

5    come here and answer questions regarding specific portions

6    of those documents.  I don't know if they're public or not.

7    Q      Okay.  But you're here to answer questions about those

8    302s.

9    A      In a -- yeah, in a limited fashion, correct.

10   Q      Okay.  Who were they of?

11   A      They were of five individuals: Emmanuel Mamalakis,

12   Vesivi Wiley (sp.ph.), Coryn Joy (sp.ph.), Vitali Godlesky

13   (sp.ph.), and Matthew Solnick (sp.ph.), and that's it.

14   Q      Okay.

15   A      And that's it.

16   Q      I know some of those names; who is Mr. Joy?

17   A      Mr. Joy was employed by SXP as a software designer or

18   a computer programmer.

19   Q      And Mr. Solnick, who is he?

20   A      He was employed by SXP as a system administrator.

21   Q      The second you mentioned, not Vitali, but Vesivi --

22   A      Vesivi Wiley?

23   Q      Wiley.

24   A      Yes, sir.

25   Q      Who is he?

AGENT ERIC HAWKINS -- CROSS BY MR. DAVIS                      75

1   A     He was -- it sounded like an office manager but also

2   assistant computer network administrator.

3   Q     Okay.  Did you interview those people yourself --

4   A     No, sir.

5   Q     -- or you just reviewed somebody else's 302s?

6   A     Yes, sir.

7   Q     Have you had any role in the review of the computers?

8   A     No, sir.

9   Q     Did you have a role in the search warrant?

10  A     I had a role -- a partial role in the operation or

11  multiple search warrants that were executed.  My role that

12  day was involving another person who I've already forgotten

13  his name because we didn't locate him.  He was up in Seattle

14  and so I didn't have a role in any of the actual search

15  warrants.

16  Q     And do you have any information, I guess, from your

17  work on the case or the computers that, in fact, there are

18  Quantlabs trade secrets located on any of the computers

19  taken from SXP?

20  A     I can't say.

21            MR. GERGER:  I'll pass this witness, Your Honor.

22            THE COURT:  All right.

23            CROSS EXAMINATION OF AGENT ERIC HAWKINS

24  BY MR. DAVIS:

25  Q     Who is Vitali Godlesky?

AGENT ERIC HAWKINS -- CROSS BY MR. DAVIS                    76

1   A       Vitali Godlesky or --

2   Q       Uh-huh.   Yes.

3   A       He is the -- one of the co-owners of SXP.

4   Q       Did you review a 302 of Mr. Godlesky's statement to an

5   FBI agent?

6   A       Yes, I did.

7   Q       Did he make any statements regarding the time period

8   it would take to bring online the trading -- SXP's trading

9   process, more particularly the source code?

10  A       Yeah, I don't recall a specific timeframe but he said

11  the development of the source code is something that's very

12  time consuming, requires massive amounts of research and a

13  lot of patience.

14  Q       And who is Emmanuel Mamalakis?

15  A       He's one of the primary investors or a co-owner of

16  SXP.

17  Q       Do you happen to -- did you happen to review a FD302

18  of Emmanuel Mamalakis?

19  A       Yes, sir, I did.

20  Q       And what date was that interview conducted?

21  A       I think it was approximately March 3rd or March 5th

22  of '08.

23  Q       All right.  And on March 3rd or March 5th of '08, did

24  he make any representations as to SXP's operational

25  capacity?

AGENT ERIC HAWKINS -- REDIRECT BY MR. GERGER                    77

1   A     He said that SXP was not operational and furthermore

2   they had only 10 percent of their source code.

3                      At the time -- one of their primary

4   employees at the time named something-Kuharsky (sp.ph.), he

5   left and they said at that point when that employee left,

6   the source code was worthless so they had to start

7   completely from scratch.

8   Q     So at that point in time, 90 percent of SXP's project

9   was incomplete.

10  A     That's my interpretation.

11           MR. DAVIS:  Pass the witness.

12           THE COURT:  All right.

13           REDIRECT EXAMINATION OF AGENT ERIC HAWKINS

14  BY MR. GERGER:

15  Q     I want you to -- are you familiar with the civil

16  litigation that was filed by Quantlabs against Mr. Kuharsky

17  and Mr. Godlesky?

18  A     No, sir.

19  Q     All right.  Did you even know that Quantlabs had tried

20  and failed in Civil Court?

21  A     I think that was part of the search briefing but I

22  can't give any details regarding that.

23  Q     All right.

24  A     I don't recall specifics.

25  Q     And did you know generally that SXP started in

1   business around the summer of 2007?

2   A      I did not know that.

3   Q      But by the time you did your search, you're up into

4   March of '08, right?

5   A      Yes, sir.

6   Q      And if they started in July of '07, we're talking

7   about nine months after they started, correct?

8   A      Yes, sir.

9   Q      After SXP started, right?

10  A      Yes, sir.

11  Q      And don't you think if SXP had stolen somebody's

12  secret sauce that they'd be farther along than 10 percent

13  after nine months?

14  A      I'm just repeating what I read from the interview.

15  Q      Do you understand in general that the way this

16  business works is: you have computer people that are

17  reviewing a lot of historical trading data and trying to

18  draft mathematical formulas to try to explain and predict

19  the stock market?

20  A      Do I understand that's what the company was trying to

21  do?  I believe so, yes.

22  Q      Okay.  And that it takes an enormous amount of time in

23  order to come up with those mathematical formulas, correct?

24  A      Yes, sir.

25  Q      Do you still have this packet of information on the

AGENT ERIC HAWKINS -- REDIRECT BY MR. GERGER                    79

1    stand in front of you that starts off where the front page

2    is a search warrant?

3    A      I do.

4    Q      I'm going to ask you to flip to a few pages.  Like why

5    don't you look at the second to the last page?

6           MR. GERGER:  Your Honor, do you still have your

7    copy of that?

8           THE COURT:  Yeah, I do.  I do.

9    BY MR. GERGER:

10   Q      Do you have that in front of you?  It's a page of

11   handwriting that starts off "Description of Items,

12   Separation Agreement"; do you see that?

13   A      (No verbal response)

14   Q      Can you read that handwriting?  It's the second to the

15   very last page.

16   A      I have --

17          MR. GERGER:  May I help the witness, Your Honor?

18          THE COURT:  Go ahead.

19          MR. GERGER:  That's the page.

20          THE WITNESS:  I see it.

21   BY MR. GERGER:

22   Q      Would you read along with me to make sure I read this

23   right?  This is -- you recognize would reflect items that

24   were seized March 5th from SXP at their 3 Riverway office,

25   correct?

AGENT ERIC HAWKINS -- REDIRECT BY MR. GERGER                    80

1    A     Yes.

2    Q     "Separation agreement and mutual release; attorney

3          correspondence from Nancy McCoy (sp.ph.) to

4          Mr. Emmanuel Mamalakis, possible attorney-client

5          Privilege; T-Mobil phone bill."

6               And then if you go back -- if you go down to

7    the fifth line, do you see it says:

8          "Note pad and assorted notes with computations and

9          mathematical formulas."

10              Do you see that?

11   A     Yes, sir.

12   Q     What did -- what steps did the FBI take to segregate

13   out possible privileged information?

14   A     I'm not aware of specific details.  I work on the

15   squad that was investigating this case and I believe at one

16   point of time they did something called "a tank team," but

17   beyond that, I don't know any details.

18   Q     Okay.  And you know from this though that things were

19   taken other than simply computers, correct?

20   A     Yes.

21        MR. GERGER:  That's all I have, Your Honor.

22   Thank you.

23        MR. DAVIS:  Nothing further, Your Honor.

24        THE COURT:  All right.  Thank you, Agent Hawkins.

25   You may step down.

1       **(Witness Steps Down)**

2                       Additional witnesses?

3              **MR. GERGER:**  That's all I have, Your Honor, right

4       now.

5              **THE COURT:**  All right.

6              **MR. GERGER:**  We have some argument though, that's

7       for sure.

8              **THE COURT:**  Well, I'm going to give Mr. Davis --

9       do you have anything to offer, you know, in response?

10             **MR. DAVIS:**  No, Your Honor.

11             **THE COURT:**  All right.  At this point, I'll hear

12      argument.

13                      Mr. Gerger?

14             **MR. GERGER:**  I guess I go back, Your Honor, to

15      what I said at the opening that every day in this courthouse

16      matters like this are handled civilly in a procedure where

17      if a plaintiff thinks that a defendant has a trade secret,

18      the defendant keeps its computers, they're imaged, they're

19      given to a -- usually a court-appointed expert or sometimes

20      a court-appointed expert to see what's on there and if

21      there's something that's really secret, the defendant can be

22      held to pay for it.

23                      And that's what we're asking you to do here

24      is give us back our computers.  You already have seen that

25      this is a very time consuming business that my clients are

1   engaged in.  They're losing -- they've invested millions

2   of dollars and are losing millions of dollars as their

3   computers are sitting there seized.  And, you know, I have

4   the highest regard for the United States Attorney's Office

5   and the FBI but it is -- I think Quantlabs is laughing all

6   the way to the bank because having failed to even get a

7   TRO -- and I wanted to pass that to Your Honor as an exhibit

8   which I'll mark as "Exhibit 2," Your Honor.  It's simply --

9           **MR. DAVIS:**  That's fine.

10          **MR. GERGER:**  It's simply a printout of the Docket

11  Sheet for Harris County.  On the second page, you'll see

12  that they failed to get a temporary restraining order

13  against their former employees.

14          You know, most unwittingly, they -- there's

15  a risk here that they are trying to use law enforcement to

16  their commercial advantage.  If there was a theft of a trade

17  secret, which is an extraordinarily complicated thing to

18  figure out, I have a sophisticated client, he's got a pretty

19  good lawyer and we'd be foolish to use it.  And if you

20  return our materials to us, I can't imagine that any trade

21  secret would be used.  And, you know, if the Government

22  uncovers what it thinks is a trade secret and if there's a

23  case to be brought, they'll bring a case.  I'm very

24  skeptical and they can't show any evidence of that.

25          You know, Mr. Davis, in his own response to

1   our motion, Your Honor, said -- and I believe he meant this

2   in good faith -- on March 27th he wrote an email to SXP's

3   counsel, "We will certainly try with getting the computers

4   back as soon as possible."  That's on Page -- it's quoted in

5   his own motion.  I have no doubt that he meant that on March

6   the 27th.

7                    On May the 8th, he cites in his brief his

8   email, "We are working through the computer evidence as

9   quickly as possible."  I'm sure he meant that.  He might not

10  have even known -- I don't know -- that our stuff wasn't

11  even imaged yet.

12                   And so, you know, we do not have to prove,

13  Your Honor, that a search was illegal.  If you give us the

14  warrant, maybe we could prove that but we don't have to

15  prove that and I would make a request for the warrant

16  application right now and for the motion to extend.

17              MR. DAVIS:  And, Your Honor, we --

18              MR. GERGER:  But if you deny that --

19              MR. DAVIS:  I would object to that, Your Honor.

20              THE COURT:  Why?

21              MR. DAVIS:  Because we're not completed with our

22  investigation at this point in time and it's critical for

23  the motion to remain sealed so that we can continue on our

24  investigations --

25              THE COURT:  These proceedings are sealed.

1          **MR. DAVIS:**  But the warrant itself, Your Honor.

2          **THE COURT:**  The warrant for their property?

3          **MR. DAVIS:**  The affidavit, I mean.

4          **THE COURT:**  They're not --

5          **MR. DAVIS:**  I mean the affidavit on that warrant,

6   yes, sir.

7          **THE COURT:**  To get their property.  We're not

8   talking about a warrant for -- a search warrant that applies

9   to anyone else.

10          **MR. DAVIS:**  I'm talking -- that the affidavit

11   made the bases for the search warrant for 3 Riverway, that

12   that should remain sealed, Your Honor, and not unsealed.

13          **MR. GERGER:**  And I am asking for production of

14   that to us, Your Honor.

15          **THE COURT:**  All right.  I'll take that under

16   advisement.

17          **MR. GERGER:**  All right.  But without that,

18   Your Honor, it is over the line.  We've been very patient

19   and I was shocked to learn today that our -- there's been no

20   search whatsoever made of our computers.  And what I'm

21   asking you to do is to return our hardware to us and our

22   computer materials so this company can get on with its

23   business, and that will not interfere with the Government's

24   investigation one wit.

25          **THE COURT:**  All right.  Mr. Gerger, do you agree

1    with the Government that you need to show -- make a showing

2    of irreparable harm in order to get this relief?

3            **MR. GERGER:**  I don't.  And, you know, if I need

4    to come back and do that, I can certainly present evidence

5    of the hundreds of thousands of dollars that have been lost

6    due to this time delay, but we don't because every case

7    cited by the Government talks about a different fact

8    situation.  None of them talk about a case where we only

9    want a copy.  Those irreparable harm cases, as I read

10   them -- and David Isaak is the expert on these cases --

11   can -- he can address the Court -- they all deal with a case

12   where we're trying suppress the evidence or to block the

13   Government from moving forward.  We're not trying to do

14   that.  Let them go forward as much as they want, and it may

15   be six months or a year before they ever look at our stuff,

16   great.  And, you know, if we did wrong, then the Government

17   will come after us.  I don't think it's going to come to

18   that and, you know, it is possible that a presumptively

19   innocent person is innocent.  And that's what we've got

20   here.  So, no, we -- I think we could make you a showing of

21   harm but we don't have to.

22           **THE COURT:**  Well, how has your client been

23   operating without any computers over the last six months?

24           **MR. GERGER:**  He's bought new computers.  But the

25   software that we were writing ourselves was in development.

1   It's a little -- I analogize it to storming in and taking,

2   you know, Tolstoy's draft of *War and Peace*, right, and he

3   hasn't yet made a backup of it or printed copies of it, they

4   just take it all.  Well, he starts again at Page 1.  And we

5   are -- we still have scientists who are trying -- who are

6   working at recreating what they did but imagine -- you know,

7   Tolstoy may have lost a phrase or two that he had an

8   inspiration about from his own work.  And you see here, they

9   have notebooks, handwritten notebooks of our scientists.

10  It's just not computers.

11          **THE COURT:**  If your client is still able to

12  operate and assuming that the standard were irreparable

13  harm, how could you meet that standard?  I mean, Tolstoy

14  can rewrite -- maybe he'll come up with a better version of

15  *War and Peace* than the first draft without --

16          **MR. GERGER:**  Well, I --

17          **THE COURT:**  -- looking at the initial draft.

18          **MR. GERGER:**  Yeah, by that logic, I guess unless

19  we're starving, which I don't know if Tolstoy did, we could

20  never meet that standard.  I guess -- I'd like David Isaak

21  to speak to the cases.  I don't think we have to meet that

22  standard.  If you want a showing of harm, you know, I

23  suppose we could provide you with evidence of the tremendous

24  cost and the delay.  Irreparable harm is time lost and that

25  alone is irreparable harm.  We should have filed this motion

1    four months ago but we were being patient.  You can't get

2    back the life that you've lost or the months that you've

3    lost.

4            THE COURT:  Is your client -- in terms of the

5    business now, they are just in the -- they're in the process

6    of still trying to develop this software?

7            MR. GERGER:  That's correct, they're still

8    developing it.

9            THE COURT:  Trying to find this philosopher's

10   stone of the stock market so that somebody can predict what

11   to make money in six months from now --

12           MR. GERGER:  My understanding is --

13           THE COURT:  -- a year from now?

14           MR. GERGER:  -- they're still in development.

15           THE COURT:  All right.  And so he's -- there

16   wouldn't be a situation where he's lost profits at this

17   point --

18           MR. GERGER:  Well --

19           THE COURT:  -- over the six months --

20           MR. GERGER:  I don't --

21           THE COURT:  -- over this past six months.

22           MR. GERGER:  I don't know when he would have

23   finished his development if we hadn't been kicked back six

24   months and had to start over.

25           THE COURT:  I understand.  But I just want to

1   make sure I understand.  Basically, this -- your client is

2   in the startup mode and what harm he suffered -- it suffered

3   so far would be really a six-month delay in bringing this

4   product to fruition and then marketing and that sort of

5   thing; is that correct?

6        MR. GERGER:  I would -- that's part of it.  I

7   also think -- you may not have had the same first line in

8   *Anna Karenina* because, you know, it's really what it's like.

9   And so I think that the harm is also that you're not sure

10   you're going to remember every thought that you had as a

11   scientist in the past.  I mean your notebooks are taken,

12   even your handwritten notes, and the code that you've been

13   sitting there writing is taken away from you for we don't

14   know how long.  I think it's a more severe case of harm than

15   Pepsi Cola which is up and running and can get back on

16   track.

17             And, of course, Quantlabs has suffered zero

18   harm.  And if they have, there's adequate civil remedies for

19   them to go to Court and that's what they tried and failed

20   and they could try again I suppose because they non-suited

21   their case.

22        THE COURT:  So that case is no longer pending in

23   State Court.

24        MR. GERGER:  It is pending because what happened

25   was: Quantlabs sued the former employees and the former

1  employees counter-sued Quantlabs because Quantlabs had not

2  paid them is my understanding.  When Quantlabs -- Quantlabs

3  lost its effort to get an injunction or a restraining order

4  and that was then non-suited, but the employees' claim

5  against Quantlabs is continuing.

6                  Is that right, David?

7            MR. ISAAK:  That's correct, Your Honor, that --

8            MR. GERGER:  Yeah.

9            MR. ISAAK:  -- the employees are continuing their

10 counterclaims against them, last I heard anything.

11           THE COURT:  And their counterclaims are based on

12 their --

13           MR. ISAAK:  Breach of contract --

14           THE COURT:  Breach of contract, wrongful

15 termination --

16           MR. ISAAK:  Yeah, exactly.

17           THE COURT:  -- and that sort of thing?

18           MR. GERGER:  We are not -- so we're not involved

19 in that litigation about their employment contracts but

20 that's what left in that suit.

21           THE COURT:  All right.  Looking -- I have to ask

22 this: looking at this Docket Sheet, I see the name of an

23 attorney who was a former partner of mine at Fulbright and

24 Jaworski, T.J. Ray.

25           MR. GERGER:  I don't know anything about who the

1   lawyers were on that litigation.

2            THE COURT:  All right.

3            MR. GERGER:  And that litigation is sort of just

4   for the -- it's not involved in this litigation.  The point

5   is simply that they went to court.

6            THE COURT:  The point is simply that they were

7   denied that relief.

8            MR. GERGER:  Right.

9            THE COURT:  All right.  Thank you, Mr. Gerger.

10            . Mr. Davis?

11            MR. DAVIS:  Yes, Your Honor.  Thank you.

12   Your Honor, again, first of all, the argument is the fact

13   that the Movant bears that burden that the seizure first of

14   all was illegal.  We don't see that here at all.

15            THE COURT:  Well, if you're going to continue to

16   make that argument, Mr. Davis, I don't see how I can avoid

17   unsealing or at least providing them a copy with the search

18   warrant.

19            How are they going to test whether or not

20   the seizure was illegal if they can't see the supporting

21   affidavit?

22            MR. DAVIS:  I think that the Court's envisioned

23   though that there would be a situation where it would be

24   post-indictment, a motion to suppress happened --

25            THE COURT:  That's not what the rule says.

1        **MR. DAVIS:**  -- something of that nature.

2        **THE COURT:**  That's not what the rule says.

3        **MR. DAVIS:**  And I think it --

4        **THE COURT:**  And again, tell me how are they going

5   to be able to challenge the legality of the seizure if they

6   can't get the supporting affidavit establishing probable

7   cause?

8        **MR. DAVIS:**  Well, at this --

9        **THE COURT:**  I mean, that's assuming that your

10  argument is true.

11       **MR. DAVIS:**  And it's not -- and because of that,

12  it is not ripe for argument at this point in time.  In other

13  words, their motion is not ripe because the search is -- has

14  not been found to be illegal and there has not been any

15  evidence put before this Court that suggests otherwise.  In

16  the alternative --

17       **THE COURT:**  That's what they're asking for: the

18  evidence to show that.

19       **MR. DAVIS:**  But generally -- and the cases have

20  shown that it's been based on a motion to suppress or

21  something of that nature.

22       **THE COURT:**  Well, we're not at that stage and the

23  rule doesn't necessarily require it to be at that stage.

24       **MR. DAVIS:**  Yes, Your Honor.

25       **THE COURT:**  So go ahead, you know.

1          **MR. DAVIS:**  And then the other thing, if in the

2     alternative this anomalous jurisdictional view of the

3     Court's --

4          **THE COURT:**  I never heard that term before,

5     "anomalous jurisdiction"?

6          **MR. DAVIS:**  I have not either, Your Honor, but

7     there you have it.

8          **THE COURT:**  Jurisdiction is often anomalous in

9     Federal Court but I didn't know there was --

10          **MR. DAVIS:**  Based on the Fourth Amendment.

11          **THE COURT:**  All right.

12          **MR. DAVIS:**  And one is that the -- that would

13     show that the Government has callus disregard for what

14     they've conducted.  And I think clearly here, the evidence

15     from Ryan Dusek, who's over at the forensic laboratory,

16     Your Honor, has said that not just SXP but everything else

17     including all of the various warrants that were conducted on

18     Quantlab and all the material garnered from Quantlab has

19     been going through the process.

20          And clearly, as Mr. Gerger pointed out, from

21     the very get go, Your Honor, I have -- the Government has

22     tried to cooperate and let them know that we would try to

23     expedite the process as quickly as we possibly could.  And

24     what we have asked -- and I believe it's in the response --

25     is "Just let us know what particular items it is that you

1  want and we'll put those to the head of the line." And

2  those items that they gave us, we clearly did that and gave

3  that back to SXP.

4              The other thing is that this case is as

5  if -- are analogous to a case involving, say, ceramic vases,

6  that there was an allegation that the ceramic vases were

7  made out of cocaine base, and that a search warrant was run

8  and the Government acquired the ceramic vases made out of

9  cocaine base.  And then the alleged defendant at such time

10 moves for return of the vases.  The Court would look at that

11 and decide and say, "Well, the problem is is the cocaine

12 base, the fruits, instrumentality, or the contraband of the

13 crime is so intertwined with the very item that the defense

14 is asking to be returned, we can't return those ceramic

15 vases back to the defense whether or not it costs them any

16 money or anything else."  And it's the same type of case

17 that we have here where -- go ahead.  I'm sorry.

18         **THE COURT:**  Okay.  Well, I just -- I'm trying to

19 get my mind around the ceramic vases now --

20         **MR. DAVIS:**  Okay.  All right.

21         **THE COURT:**  -- an analogy.  We've gone to

22 *Anna Karenina* to ceramic vases.

23         **(Laughter)**

24              What about the response that "We make

25 copies, you give us back the copies, you still have the

1   original"?  If you want to prosecute, you've got the

2   original vase with all the cocaine there.

3        **MR. DAVIS:**  Because if you do that, Your Honor,

4   what's happening is: you are giving them back the source

5   code that belonged to Quantlab which is the bases of the

6   theft of trade secret investigation.  You're giving them

7   back the very thing for which they're being prosecuted or at

8   least investigated at this point, the same --

9        **THE COURT:**  They're presumed to be innocent at

10  this point.  There are no charges brought.  You had the

11  evidence if you're going to prosecute them criminally.  The

12  Civil Court's available to fight out the trade secret issues

13  if they still have the trade secrets.

14       **MR. DAVIS:**  Uh-huh.

15       **THE COURT:**  How is that going to interfere with

16  your investigation if you hang on to the originals?

17       **MR. DAVIS:**  Because it is contraband.  It's

18  fruits, instrumentality of the crime.  The source code

19  itself, digital evidence, is within the embodiment of the

20  hard drives and the computer evidence that we have at this

21  point in time.

22       **THE COURT:**  I didn't hear any evidence that there

23  was some match of anything yet.  I haven't heard any

24  evidence of anything suggesting a match with a trade secret.

25       **MR. DAVIS:**  Of SXP's items.

1          **THE COURT:**  Right, of SXP's items.

2          **MR. DAVIS:**  Right.

3          **THE COURT:**  So I don't have any evidence so far

4    that any -- there is any contraband here.

5          **MR. DAVIS:**  But SXP's items have only been imaged

6    at this point in time.

7          **THE COURT:**  I understand that.

8          **MR. DAVIS:**  So, I mean, it's a lengthy process,

9    it's a process that we're trying to get through as quickly

10   as possible.

11         **THE COURT:**  I understand, but ordinarily, the

12   process is done within 90 days, right?

13         **MR. DAVIS:**  Well, I think it's easier process.

14   We can generally image those hard drives and give them right

15   back to which -- you know, that's not a problem for the

16   Government.  But in this case, it is because in this case

17   the very evidence, the very nature of the offense is, in

18   fact, the hard drives, the computer, the digital evidence --

19         **THE COURT:**  That --

20         **MR. DAVIS:**  -- the source code that's within

21   that.  We're --

22         **THE COURT:**  That you're going to keep.  You're --

23   the Government's going to have and if they want to

24   prosecute, they can prosecute.  And if -- and they're at

25   risk.  If they're still using stolen code after all this,

1    then there's another count in the indictment it seems to me.

2    I mean, it doesn't interfere with the Government's

3    prosecution and that's -- at least I haven't heard anything

4    to suggest that it would for you to provide them back copies

5    of what you've got.

6            **MR. DAVIS:**  It would be giving the -- if you

7    will, the cocaine back to the defendant in this case.

8            **THE COURT:**  Well --

9            **MR. DAVIS:**  Free to use at their leisure however

10   they want, to make money or otherwise, or even better yet,

11   to market the thing, you know, on the Internet and be able

12   to get rid of that source code at a moment's notice to

13   anyone else in the world, the very thing that the law --

14   the theft of trade secret statutory violation created to

15   protect --

16           **THE COURT:**  Right, but they're still presumed --

17           **MR. DAVIS:**  -- constitutional --

18           **THE COURT:**  They're still presumed innocent.

19   There's no charges brought yet.  You've had this evidence

20   for six months; no charges have been brought.  You can still

21   bring charges based on, you know, what you've got, but allow

22   them to do their business.  Maybe they're innocent and it's

23   not -- the analogy to cocaine is not the same.  You're not

24   giving back the original -- all the contraband, assuming

25   there is any contraband there, which I haven't heard any

1    evidence that there is, so I don't think that analogy

2    follows, you know.

3           MR. DAVIS:  We simply haven't had time to process

4    the SXP information in processing all the others.  I mean,

5    if we would have processed SXP's first, we would have had

6    motions to return property by the other four.  I mean, I --

7    you know, I don't understand how that holds water as far as,

8    you know, in what line was their computers being processed.

9    The idea is is the Government received this through the

10   search warrants and we're processing all of the evidence,

11   and we're doing that as expeditiously as possible.

12          THE COURT:  All right.  Thank you, Mr. Davis.

13          MR. DAVIS:  Thank you, sir.

14          THE COURT:  All right.

15       (Pause)

16              I think at this point, I -- actually, I

17   think I would like to hear from Mr. Isaak as to why proof of

18   irreparable harm is not a requirement for the Movant in this

19   case.

20          MR. ISAAK:  Your Honor, as Mr. Gerger explained,

21   the cases that the Government cite on where the irreparable

22   harm analysis is employed are generally in cases where the

23   person moving for the property back wants all of it back,

24   originals and copies, and it doesn't want to -- and is

25   seeking to either block the Government's use of that

1   information in a criminal investigation or in a civil

2   enforcement proceeding.

3           **THE COURT:**  Are those motions brought under

4   Rule 41(g) or some other provision of the rules?

5           **MR. ISAAK:**  Well, there are some that were

6   brought under Rule 41(e) which I believe was the former

7   version of Rule 41(g).

8                   There were also that were brought -- there

9   are also others that were brought under this concept of

10  anomalous jurisdiction but keep in mind, those were all kind

11  of like pre-indictment motions to suppress.  They were

12  not -- it wasn't a situation where the Government was

13  refusing to provide copies.

14                  Now, the comments to the rule itself -- and

15  we cite those comments in our brief -- say that if the

16  Government's legitimate interest can be satisfied by giving

17  us a copy, it is unreasonable for the Government to continue

18  to hold the evidence.

19                  And, you know, one thing I would point out

20  too in these cases that the _Brown_ case, *United States versus*

21  *of Search of Law Office of Alan Brown*, which is the most

22  recent case that the Government cites, it's 341 F.3rd 404,

23  2003 Fifth Circuit case.  And that case makes clear that

24  there was no irreparable harm because the person whose

25  office had been searched was allowed access to his business

1   records.   Headnote 2 -- right after Headnote 2, it says:

2                    "Given that the Government has allowed Brown

3                    constant access to the records since their

4                    seizure and has been hospitable to his staff's

5                    copying of any needed record, Brown does not

6                    contend that the Government's possession of the

7                    seized documents does irreparable injury to his

8                    business."

9                    Well, here, we don't have access not only to

10  our software and the work we've done in the past developing

11  our system, we don't have access to a lot of our business

12  records.  I think Mr. Gerger went through the inventory and

13  there were, you know, things like phone bills taken, and

14  employment files, and handwritten notes of our developers.

15  So, you know, I think that the *Brown* case, while it doesn't

16  come out and say it, at least suggests that not giving us

17  access to our business records to allow us to continue

18  operating our business and get us to the status quo where we

19  were before the search would constitute irreparable harm.

20                   And I think the reason you don't see many

21  cases about this situation is that, as Mr. Davis said, it's

22  common practice.  When the Government comes in and seizes

23  computer information, they make a copy for the company or

24  the individual whose information was seized.

25                   So in short, I don't think that the

1  Government's cases on irreparable harm apply because we

2  don't have a situation of pre-indictment suppression or

3  asking for all of the data back including all copies.  And

4  we -- I think we meet the definition of "irreparable harm"

5  by virtue of not having access to all of the records and all

6  the data that was seized.

7         **THE COURT:**  All right.  Thank you, Mr. Isaak.

8  All right.

9              Gentlemen, I'm going to take this matter

10  under advisement.  I had not read the cases that have been

11  cited to me and I want to be sure that I'm thoroughly

12  familiar with those before I rule.  I'll try to rule on it

13  as promptly as I can get to it.  I'm not sure if there's

14  any -- if parties want to file additional briefs.  It seems

15  to me the matter's been fairly well presented so far.

16         **MR. GERGER:**  Your Honor, if we find something

17  really good we can get it to you -- today is Wednesday.  We

18  can try to get it to you tomorrow.

19         **THE COURT:**  All right.  Try to -- if you -- I'll

20  give both sides till Friday to file any supplemental

21  briefing based on the hearing and arguments we've presented

22  today.  It's a very interesting issue, Counsel, and I'll

23  look at these cases very carefully and give you a ruling as

24  soon as I can.  In the meantime, now -- I think there was

25  some suggestion early on at the beginning that perhaps the

1   parties were trying to work something out?

2           **MR. GERGER:**  Well, I was hoping that we could

3   get our -- at least our hardware.  I don't know if that's

4   agreeable or not.  That would be -- it's not much use, the

5   hardware without the hard drive but it would be something.

6           **MR. DAVIS:**  Yeah, I don't see -- yesterday we

7   discussed that would not be a problem if we can image the

8   thing with the original hardware, that we had to do that for

9   evidentiary purposes later down the road but I --

10          **MR. GERGER:**  But everything's been done except --

11          **MR. DAVIS:**  We can get that back.  And that's you

12  all's call but I don't think that your client is after the

13  hardware.

14          **MR. GERGER:**  Really it's the hard drives and the

15  other materials.

16          **THE COURT:**  All right.  Well, I'll get to it as

17  soon as I can.  I urge the parties to try to -- if you do

18  work something out, please promptly advise the Court because

19  otherwise I'm going to make a decision and probably make

20  somebody unhappy.

21          **MR. GERGER:**  The only thing I would add,

22  Your Honor, because the suggestion was made that -- and you

23  pointed out you haven't heard evidence of anything that's

24  bad as on our computers.  I think the evidence shows that

25  Quantlabs, you know -- what we know is that first they dump

1   all these search terms, tens of thousands, they can't all

2   be -- possibly be trade data and the motion gets dismiss,

3   and then they shorten their list so, I mean, I think that

4   it's way beyond what's reasonable.

5              **THE COURT:**  Thank you, Counsel.  All right.

6   We'll be in recess.  Thank you.

7        **(This proceeding was concluded at 11:33 a.m.)**

8   *I certify that the foregoing is a correct transcript from*

9   *the electronic sound recording of the proceedings in the*

10  *above-entitled matter.*

11  *lmartin*

12

13  [signature]

14  *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

15  *JTT JOB/INVOICE # 26990; 85*

16  *DATE: SEPTEMBER 5, 2008*

17

18

19

20

21

22

23

24

25                      *  *  *  *  *