IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUANTLAB TECHNOLOGIES LTD. (BVI) AND QUANTLAB FINANCIAL, LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-09-4039 |
| VITALIY GODLEVSKY, ANDRIY KUHARSKY, ANNA MARAVINA, PING AN, EMMANUEL MAMALAKIS, AND SXP ANALYTICS, LLC, | § § § § § § | JURY DEMANDED |
| Defendants. | § § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS SXP
AND MAMALAKIS'S MOTION FOR PROTECTIVE ORDER
AND
PLAINTIFFS' CROSS-MOTION FOR IMPOUNDMENT AND SEQUESTRATION ORDER**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 2

II.     NATURE AND STAGE OF PROCEEDINGS ................................................... 4

III.    STATEMENT OF THE ISSUES ...................................................................... 4

IV.     FACTS .............................................................................................................. 4

        A.    Quantlab and Its Valuable Intellectual Property ....................................... 4

        B.    Quantlab Has Registered Copyrights for Certain Software ................... 6

        C.    SXP and Former Quantlab Research Scientists, Drs. Godlevsky and Kuharsky .... 6

        D.    Quantlab's Receipt of an "Anonymous" Tip that SXP Is Using Quantlab Code ...8

        E.    The FBI's Execution of Search and Seizure Warrants ........................... 8

        F.    SXP Obtained the Return of its Seized Computers Without Notice to Quantlab, and Then Falsely Stated to Quantlab that It Did Not Have Quantlab Property ......9

        G.    The FBI Investigation Found Approximately 5,000 Quantlab Files on SXP Computers, Including At Least 70 Copies of QLT Original Works ....................10

        H.    SXP Has Filed Suit Against Godlevsky Seeking to Hold Him Responsible for the "Misconduct" of Downloading Quantlab Property to SXP Computers .........11

        I.    SXP Has Continually Refused to Return Stolen Quantlab Property But Has Already Disclosed that Property to Unknown Third-Parties Without Quantlab's Permission ....................................................................................................12

V.      STANDARD OF REVIEW ................................................................................ 13

        A.    Cross-Motion for Impoundment Order ................................................... 13

        B.    SXP's Motion for Protective Order ....................................................... 13

VI.     ARGUMENT AND AUTHORITIES ............................................................... 13

        A.    The Court Should Issue an Impoundment Order ................................... 13

              1.    Applicable Law ............................................................................ 14

              2.    Quantlab Is Substantially Likely to Succeed on Its Copyright Act Claim ..15

ii

(a).    Quantlab Owns the Copyrighted Works ........................................17

(b).    There is Clear and Direct Evidence of Actionable Copying .........17

3.    Quantlab Has Satisfied the Other Preliminary Injunction Factors ...............17

(a).    Substantial Threat of Irreparable Injury Exists .............................17

(b).    Harm to Quantlab Outweighs Any Potential Harm to
Defendants ...................................................................................19

(c).    The Requested Relief Will Serve the Public Interest,
Not harm It ...................................................................................20

4.    The Requested Impoundment Order Is Appropriate ....................................21

B.    The Court Should Also Issue a Writ of Sequestration ..........................................22

C.    SXP's Motion for Protective Order Is Groundless and Improper .........................24

VII.    CONCLUSION ..................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) ..................................................................................14, 15, 21

*Atlantic Recording Corp. v. Falgout*,
  No. 06-3784, 2007 U.S. Dist. LEXIS 86419 (E.D. La. Nov. 21, 2007) ..................................17

*Bridgeport Music, Inc. v. Justin Combs Publ.*,
  507 F.3d 470 (6th Cir. 2007) ................................................................................................14

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters*, *Inc.*,
  600 F.2d 1184 (5th Cir. 1979) ........................................................................................14, 15

*DSC Commc'ns. Corp. v. DGI Techs., Inc.*,
  898 F. Supp. 1183 (N.D. Tex. 1995) .................................................................................18, 19

*Entral Group Int'l, LLC v. New York One Cafe, Inc.*,
  No. CV-05-1655, 2007 U.S. Dist. LEXIS 99020 (E.D.N.Y. Mar. 5, 2007) ...........................21

*ESPN, Inc. v. Edinburg Cmty. Hotel, Inc.*,
  735 F. Supp. 1334 (S.D. Tex. 1986) .................................................................................14, 17

*Ferko v. Nat'l Ass'n for Stock Car Auto Racing*,
  218 F.R.D. 125 (E.D. Tex. 2003)............................................................................................13

*Flowserve Corp. v. Hallmark Pump Co.*,
  98 U.S.P.Q.2d 1979 (S.D. Tex. 2011) (Ellison, J.)...............................................16, 17, 19, 20

*Harris v. Amoco Prod. Co.*,
  768 F.2d 669 (5th Cir. 1985) .................................................................................................13

*Hoover v. Morales*,
  164 F.3d 221 (5th Cir. 1998) .................................................................................................13

*Jamison Bus. Systems, Inc. v. Unique Software Support Corp.*,
  No. 02-4887, 2005 U.S. Dist. LEXIS 45480 (E.D.N.Y. May 26, 2005) .........................17, 21

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir. 1991) ........................................................................................14, 15

*Lava Records, LLC v. Ates*,
  No. 05-1314, 2006 U.S. Dist. LEXIS 46683 (W.D. La. July 11, 2006)..................................20

*Learn2.com v. Bell*,
  No. 3:00-CV-812-R, 2000 U.S. Dist. LEXIS 14283 (N.D. Tex. July 20, 2000)..............18, 19

*MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g*,
  No. 4:04-CV-445-V, 2004 U.S. Dist. LEXIS 19274 (N.D. Tex. Sept. 28, 2004) ...................17

*Microsoft Corp. v. Comp. Warehouse*,
  83 F. Supp. 2d 256 (D.P.R. 2000).......................................................................................22

*Peel & Co. v. Rug Market*,
  238 F.3d 391 (5th Cir. 2001) .............................................................................................16

*Rhino Membranes & Coatings, Inc. v. Rhino Seamless Membrane, Inc.*,
  No. 4:06-CV-2112, 2008 U.S. Dist. LEXIS 79491 (S.D. Tex. Sept. 30, 2008) ...............15, 16

*San Antonio Area Found. v. Lang*,
  35 S.W.3d 636 (Tex. 2000).................................................................................................22

*United States v. Crist*,
  627 F. Supp. 2d 575 (M.D. Penn. 2008) .............................................................................11

*Vault Corp. v. Quaid Software, Ltd.*,
  655 F. Supp. 750 (E.D. La. 1987).................................................................................19, 21

*Warner Bros. Records, Inc. v. Briones*,
  77 U.S.P.Q.2d 1253 (W.D. Tex. 2005)..........................................................................14, 20

## STATUTES

17 U.S.C. § 503(a) ...........................................................................................3, 13, 14, 20

TEX. CIV. PRAC. & REM. CODE § 62.001(a) .........................................................................22, 3

## RULES

FED. R. CIV. P. 26...........................................................................................................13, 24

FED. R. CIV. P. 37...........................................................................................................13, 24

FED. R. CIV. P. 64....................................................................................................................22

FED. R. CIV. P. 65...........................................................................................................13, 14

FED. R. CRIM. P. 41...................................................................................................................9

v

**TABLE OF EXHIBITS**

Exhibit A        Transcript of December 21, 2011 Status Conference

Exhibit B        SXP's Responses to Quantlab's First Requests for Admission

Exhibit C        Kuharsky State Court Deposition

Exhibit D        Godlevsky State Court Deposition

Exhibit E        Godlevsky's Responses to Quantlab's First Requests for Admission

Exhibit F        Letter from AUSA Robert Johnson to Criminal Counsel

Exhibit G        Appendix I to Letter from AUSA Robert Johnson **(filed under seal)**

Exhibit H        Declaration of Bruce Eames

Exhibit I        Declaration of John Timothy Headley

Exhibit J        Copyright Registrations for QLT Original Works

Exhibit K        Copyright Registrations for QLF Original Work

Exhibit L        Transcript of January 10, 2011 Status Conference

Exhibit M        *SXP Analytics v. Godlevsky* Wisconsin State Court Complaint

Exhibit N        Maravina State Court Deposition

Exhibit O        Declaration of Andrey Omeltchenko

Exhibit P        Excerpted FBI File Listing from "filed_19175.xls" **(filed under seal)**

Exhibit Q        Excerpted File Listing from "10094 E301 File Listing.xls" **(filed under seal)**

Exhibit R        SXP's Responses to Quantlab's First Requests for Production

Exhibit S        Order Granting Return of Seized Property to SXP

Exhibit T        Affidavit of SXP Director of Trading Andrew Karrels

Exhibit U        Kuharsky's Responses to Quantlab's First Requests for Admission

Exhibit V        Kuharsky's Responses to Quantlab's Second Requests for Admission

Exhibit W        Unpublished Authorities

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

QUANTLAB TECHNOLOGIES LTD. §
(BVI) AND QUANTLAB FINANCIAL, §
LLC, §
§
§
        *Plaintiffs*, §
§
v. §                                        CIVIL ACTION NO. H-09-4039
§
VITALIY GODLEVSKY, ANDRIY §
KUHARSKY, ANNA MARAVINA, PING §
AN, EMMANUEL MAMALAKIS, AND §              JURY DEMANDED
SXP ANALYTICS, LLC, §
§
        *Defendants*. §

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS SXP AND MAMALAKIS'S MOTION FOR PROTECTIVE ORDER AND PLAINTIFFS' CROSS-MOTION FOR IMPOUNDMENT AND SEQUESTRATION ORDER

Plaintiffs ("Quantlab") oppose Defendants SXP and Mamalakis's Motion for Protective Order (Doc. #132) because it improperly requests that a competitor and its part-owner be allowed to keep Quantlab source code, electronic files, and other intellectual property. Those defendants have never had a right to possess or control that stolen Quantlab property. The Court should not give SXP and Mamalakis (collectively, "SXP") a right to do so now.

Quantlab also cross-moves for an impoundment order under the Copyright Act and for a sequestration order under the Texas Civil Practice and Remedies Code. Quantlab's cross-motion merely seeks to remove stolen Quantlab property from SXP's possession and control. To that end, Quantlab requests an order requiring SXP to turn over to a special master all copies of: (1) the materials the Justice Department's investigation has identified as belonging to Quantlab; (2) all modified or updated versions of that property; and (3) the electronic storage devices and other media containing that Quantlab property and those derivative works.

# I.
## <u>INTRODUCTION</u>

This is not merely a discovery dispute, as SXP claims.  This is a dispute over whether a competitor should be allowed to retain possession and control of stolen Quantlab materials—particularly when that competitor has: (1) consistently tried to evade the truth; (2) admittedly disclosed stolen Quantlab files to unknown third parties during this suit; and (3) already sought to place stolen Quantlab property in issue in another suit to which Quantlab is not a party.

At the December 21 status conference, the Court not surprisingly asked why Quantlab property in SXP's control had not already been returned to Quantlab.[1]  When pressed by the Court for a date when that return could happen, SXP's counsel responded by pleading for more time to "get together" with Quantlab's counsel to "work this out," which the Court allowed.  But the discussions that followed consisted of SXP refusing to relinquish control of copies of stolen Quantlab property *even to a neutral special master* and culminated in SXP filing the motion for protective order that is before the Court.

Through its motion for protective order, SXP now is trying to mislead the Court (again) regarding the Quantlab property SXP was caught possessing and using and wants to keep in its control.[2]  SXP's allegation that the Justice Department's investigation was a giant, Quantlab-orchestrated wild goose chase is pure fiction.  So is SXP's false idea that hardly any basis exists for believing SXP has any valuable Quantlab property in its possession or control.  The *truth* is

---

[1]   Exhibit A, *Transcript of Dec. 21, 2011 Status Conference*, 6:20-13:19, 16:24-17:8.

[2]   This is not the first time SXP has asked this Court to rule while withholding or misrepresenting material facts.  At the outset of this case, SXP filed a Rule 11 sanctions motion against Quantlab (Dkt. #46), professing outrage and declaring that Quantlab had recklessly dragged them into this case on what SXP repeatedly branded as "baseless claims."  However, SXP was soon forced to admit—in discovery it had aggressively tried to thwart—that it knew the FBI had found Quantlab code on SXP's computers.  *See* Exhibit B, *SXP's Responses to Quantlab's First Requests for Admission*, No. 53; Dkt. #43, *SXP and Mamalakis's Expedited Motion to Stay Discovery* (filed contemporaneously with SXP's sanctions motion).  The Court made short work of denying the sanctions motion.

that the FBI's independent investigation uncovered copies of *approximately 5,000 Quantlab electronic files in SXP's possession—including nearly 1,700 files of proprietary Quantlab source code*. There is no genuine dispute that these files are stolen Quantlab property or that—at the very least—SXP has never been authorized to possess or control that Quantlab property.[3] As the Assistant U.S. Attorney put it, "there's no good explanation for why" Quantlab's intellectual property is on SXP's computers.[4]

SXP also is blatantly misinforming the Court regarding what Quantlab wants removed from SXP's control. Contrary to what SXP alleges, Quantlab did not request at the December 21 hearing or in lawyer-to-lawyer discussions thereafter that SXP give up all copies of "Seized Property" *not* containing Quantlab code or files. Quantlab merely wants *Quantlab* property out of the hands of a competitor and its agents and representatives (including counsel). Accordingly, Quantlab is only asking that SXP be required to turn over to a special master (if not to Quantlab) all copies of *Quantlab* electronic files and documents in SXP's possession, custody, or control.

SXP's insistence on keeping stolen Quantlab property is unjustified and very troubling. In addition, Quantlab's cross-motion shows that SXP's failure to turn over Quantlab property is directly contrary to Quantlab's rights to have that property: (1) impounded under Section 503(a) of the Copyright Act; and (2) sequestered under Section 62.001 of the Texas Civil Practice and Remedies Code. SXP's motion for protective order should be denied, and Quantlab's cross-motion should be granted.

---

[3]    *See* Exhibit B, *SXP's Responses to Quantlab's First Requests for Admission*, Nos. 38-40 ("SXP admits that Quantlab never specifically authorized SXP to do anything . . . .").

[4]    Exhibit L, *Transcript of Jan. 10, 2011 Status Conference*, 5:24-6:10 (statements of AUSA Robert Johnson: "What we found is that there's a lot of Quantlab code on SXP computers. And there's not really any dispute about that, at least from our perspective. We can definitely show that that is Quantlab [code] on the computers. At least what I'm being told is that that's very significant code, that it's code that goes to the actual traded formula. The system that evaluates whether to buy or sell a stock. So that's the heart of their trade secrets. . . . [A]s far as I'm concerned, *there's no good explanation for why that code is on this rival company's computers*.") (emphasis added).

## II.
## NATURE AND STAGE OF PROCEEDINGS

Quantlab brought this suit in response to the defendants' conspiracy to copy, steal, and exploit Quantlab's highly valuable intellectual property—including the underlying trading ideas and concepts that are reflected in Quantlab's proprietary source code. The causes of action asserted by Quantlab include violations of the Copyright Act (17 U.S.C. § 101, *et seq.*) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*). Quantlab also has brought state law causes of action, including misappropriation of trade secrets, civil conspiracy, and others.

On February 15, 2012, the Court entered an Agreed Protective Order (Dkt. #140).[5] The case is now in the early stages of discovery.

## III.
## STATEMENT OF THE ISSUES

1.  Whether SXP should be allowed to retain copies of the electronic files and other property the Justice Department's investigation has identified as belonging to Quantlab, and that Quantlab has never authorized SXP to possess or control.

2.  Whether Quantlab is entitled to impoundment of unlawful copies and derivatives of its copyrighted works (and the media and electronic storage devices on which they are found) in the possession, custody, or control of SXP and its agents and representatives.

## IV.
## FACTS

**A.    Quantlab and Its Valuable Intellectual Property**

Quantlab and its affiliated companies have developed and maintain a valuable, profitable

---

[5]   Section 10(e) of that order lays out a procedure for examining highly sensitive intellectual property. The first step of that procedure requires tendering of the intellectual property to a special master for confidential handling. Quantlab expects to soon file a motion for the appointment of a special master and for confidential handling (under Section 10(e) of the Agreed Protective Order) of the Quantlab files found by the FBI on the SXP workstation of Defendant Godlevsky. Quantlab's cross-motion is not limited to the Godlevsky SXP workstation but certainly covers the files on that device.

high-frequency trading strategy and the trading technology to support it.[6]  The trading strategy

and trading technology are the result of years of collaboration among Ph.D. and Master's level

scientists and computer programmers.  Quantlab's founders have invested nearly 15 years of

effort and over $100,000,000 to fund research and development related to the trading system.[7]

A part of the trading strategy and trading technology is the valuable, internally-developed

electronic files and computer code, which embody and reflect the ideas and concepts that drive

the trading system.[8]  That code—and all other electronic files or documents that reflect

Quantlab's trading strategy and much of its technology—are confidential, and Quantlab certainly

protects them as trade secret.[9]

At least two of SXP's co-founders—former QLF scientists Defendants Godlevsky and

Kuharsky—have at least partly conceded these points, admitting in written discovery in this case

or during prior depositions that Quantlab maintains confidential and trade secret information

relating to its trading system, including its code.[10]  Kuharsky underscored the highly valuable

nature of the code during his deposition in prior litigation with Quantlab:

> Q.  What does the code do?
> A.  This -- this is the code for trading.
> Q.  How valuable is that code?
> A.  I believe it's very valuable to Quantlab Financial.
> Q.  Why is that?
> A.  Because it allows Quantlab Financial to make -- to make that much money.
> Q.  And that's something that is secret and belongs to Quantlab.  Is that correct?
> A.  That's correct.

---

[6]   Exhibit H, *Declaration of Bruce Eames*, ¶ 2.

[7]   Exhibit H, ¶ 3; Dkt. #129, *Kuharsky and Maravina's Amended Answer*, ¶ 4.

[8]   Exhibit H, ¶ 4.

[9]   Exhibit H, ¶ 4.

[10]  Exhibit C, *Kuharsky State Court Depo.*, 51:18-52:21, 98:14-101:5, 113 & exh. 5; Exhibit D, *Godlevsky State Court Depo.*, 39:20-40:6; 48:23-49:7; *see also* Exhibit E, *Godlevsky's Responses to Quantlab's First Requests for Admission*, Nos. 3-11.

* * *

    Q.  And the code is exactly how Quantlab makes money.  Correct?

    A.  That's correct.  The code, that's exactly how Quantlab makes money. [11]

Kuharsky and Godlevsky both also have admitted that Quantlab code is proprietary to Quantlab, and that they may *not* legally use it for themselves or on behalf of others, such as SXP.[12]

**B.**    **Quantlab Has Registered Copyrights for Certain Software**

Quantlab has received copyright registrations for certain proprietary code used in its trading system.[13]  The specific files that Plaintiff Quantlab Technologies (BVI) Ltd. ("QLT") has registered with the U.S. Copyright Office include:

- BookData.h;
- BookQuote.h;
- KalmanFilter.cpp;
- KalmanFilter.h; and
- Ctrl.cpp (BIN reader).

Quantlab refers to these files herein as the "QLT Original Works."  The copyright registrations for those code files are attached as Exhibit J.  In addition to registering the QLT Original Works, Quantlab considers and treats each of them as proprietary and  confidential.[14]

Plaintiff Quantlab Financial, LLC ("QLF") also has registered code files with the U.S. Copyright Office, including "Dector.h."[15]  The registration for that file, which Quantlab refers to herein as the "QLF Original Work," is attached as Exhibit K.

**C.**    **SXP and Former Quantlab Research Scientists, Drs. Godlevsky and Kuharsky**

Defendants Godlevsky and Kuharsky are  former  Quantlab  research  scientists  whose

---

[11]   Exhibit C, *Kuharsky State Court Depo.*, 51:21-52:6, 114:10-13; *see* Exhibit D, *Godlevsky State Court Depo.*, 50:9-53:24 (Godlevsky agreeing that Quantlab's recipe or combination for trading is "secret," is "very successful," and brought "extreme success").

[12]   Exhibit C, 100:10-101:5; Exhibit D, 39:20-40:6, 48:23-49:7.

[13]   Exhibit I, *Declaration of J. Timothy Headley*, ¶ 3 & attachment 1.

[14]   Exhibit O, *Declaration of Andrey Omeltchenko*, ¶ 5.

[15]   Exhibit I, ¶ 4 & attachment 2.

6

employment with Quantlab ended in March 2007.[16] A short time later, Godlevsky, Kuharsky, and Mamalakis co-founded SXP.[17] SXP is a high-frequency trading company and admittedly is a competitor of Quantlab.[18]

Godlevsky and Kuharsky each contributed substantial funds to start SXP, and each also performed substantial work toward getting SXP's trading system started.[19] Godlevsky and Kuharsky both wrote code for SXP, and each worked on developing SXP's trading strategies.[20] In fact, strategies that Godlevsky claims to have developed have been incorporated into SXP's trading technology.[21] This is the same type of work that Godlevsky and Kuharsky performed while at Quantlab.[22]

Like Quantlab's view of its trading system, SXP similarly claims to have large amounts of valuable confidential and proprietary information relating to its trading system. Specifically, SXP believes its daily trading activities, the output of its trading system, its trading strategy, and information regarding its "trading capabilities on the markets on which SXP trades" are "among the most sensitive business information SXP possesses."[23] According to SXP's Director of Trading, "disclosure of this information would harm SXP substantially," and disclosure of the trading activities and output of its trading system would allow others to misuse that "information

---

[16] Dkt. #129, *Defendants Kuharsky and Maravina's Amended Answer*, ¶ 26; Dkt. #134, *Defendant Godlevsky's Amended Answer to Plaintiffs' Second Amended Complaint*, ¶ 26.

[17] Exhibit M, *SXP v. Godlevsky Wisconsin State Court Complaint*, ¶¶ 12-14.

[18] Exhibit M, ¶¶ 2-4; *see also* Exhibit B, *SXP's Responses to Quantlab's First Requests for* Admission, No. 45; Motion for Protective Order, p. 7.

[19] Exhibit E, *Godlevsky's Responses to Quantlab's First Requests for Admission*, Nos. 55, 102-106; Exhibit U, *Kuharsky's Responses to Quantlab's First Requests for Admission*, Nos. 53, 97, 99.

[20] Exhibit E, Nos. 102-103, 105-106; Exhibit U, Nos. 97, 99.

[21] Exhibit E, Nos. 105-106.

[22] Exhibit E, Nos. 19, 21; Dkt. #129, *Defendants Kuharsky and Maravina's Amended Answer*, ¶ 27.

[23] Exhibit T, *Affidavit of SXP Director of Trading Andrew Karrels*, ¶¶ 2, 5-9.

to compete with and usurp trading opportunities identified by SXP."[24]

**D.    Quantlab's Receipt of an "Anonymous" Tip that SXP Is Using Quantlab Code**

Kuharsky left SXP in mid-January 2008.[25]  According to the deposition testimony of his wife, Defendant Maravina, Kuharsky had "some issues with his colleagues" at SXP and "wasn't happy."[26]  The FBI has reported that, before leaving SXP, Kuharsky ran data deletion software that wiped most of the information from his SXP workstation.  Kuharsky has not denied those actions; instead, he (incredibly) claims that he just cannot remember taking them or not.[27]

Within days after Kuharsky left SXP, a person using the pseudonym "Denis Davydov" sent an e-mail signed "anonymous" to Quantlab Financial CEO Bruce Eames.  The e-mail stated that its sender was a "friend" of Godlevsky and specifically said that "Quantlab code is used" at SXP.[28]  Quantlab has good reason to believe that Kuharsky sent this e-mail.  Kuharsky cannot deny that he sent the e-mail, but, once again, allegedly just cannot remember whether he was "Denis Davydov" or not.[29]

**E.    The FBI's Execution of Search and Seizure Warrants**

On March 5, 2008, the FBI executed search and seizure warrants at SXP's offices and the residences of other defendants—including Godlevsky and Kuharsky.  The items seized from

---

[24]    Exhibit T, *Affidavit of SXP Director of Trading Andrew Karrels*, ¶¶ 7, 9.  This is not surprising.  Any successful automated trading strategy will be kept secret because, if it becomes public and others begin using it, profit opportunities identified by the strategy will be lost to the other users, thereby making the strategy less valuable to the firm that invested all of the time and money to develop it.

[25]    Dkt. #129, *Kuharsky and Maravina's Amended Answer*, ¶ 78; Exhibit N, *Maravina State Court Depo.*, 229:10-230:7.

[26]    Exhibit N, 229:10-230:7.

[27]    Exhibit U, *Kuharsky's Responses to Quantlab's First Requests for Admissions*, No. 107.

[28]    *See* Exhibit H, ¶ 6 & attachment 1.

[29]    Exhibit V, Nos. 1-3.  Denis Davydov is a 19th-century Russian soldier-poet renowned for his exploits in the Napoleonic wars.  To use a local analogy, Kuharsky's alleged inability to recall whether he sent the e-mail to Quantlab using this pseudonym would be akin to a Texan not being able to deny (or remember) whether he sent e-mails to his former employer under the name "Davy Crockett."

SXP's Houston offices included a number of computers, electronic storage devices, and other media.  The SXP workstations assigned to Godlevsky and Kuharsky were among those items.[30]

The items seized from Kuharsky's Houston home included a CD entitled "Quantlab Execution Engine."  They also included various computers, hard drives, and storage devices that the FBI's forensic analysis would later reveal contained over 700,000 Quantlab electronic files—including Quantlab electronic files and source code Kuharsky had accessed and copied during the period he worked for SXP.[31]  Notably, just months before the FBI search and seizure—and while he was co-founding SXP—Kuharsky committed fraud upon Quantlab by falsely testifying during a deposition by Quantlab's attorneys that he had no Quantlab code at all.[32]

**F.     SXP Obtained the Return of its Seized Computers Without Notice to Quantlab, and Then Falsely Stated to Quantlab that It Did Not Have Quantlab Property**

In August 2008, SXP filed a motion under Federal Rule of Criminal Procedure 41 for the return of the items the FBI had seized from its offices.  SXP filed that motion in a sealed criminal case, and no notice of the motion (or any hearing on it) was given to Quantlab.  On December 17, 2008, Magistrate Judge Stephen Smith ordered that the computers seized from SXP's offices be returned to SXP.  However, Magistrate Judge Smith's order required SXP "not to take any action which would destroy, delete, or prevent the retrieval of data currently stored on the computers, so long as the case remains pending."[33]  The Justice Department retained forensic images of the returned computers.

Shortly after discovery began in this civil case, Quantlab served written requests on SXP to determine what (if any) Quantlab property SXP still had.  In particular, Quantlab served SXP

---

[30]   *See* Exhibit F, *Letter from AUSA Robert Johnson to Criminal Counsel*, pp. 2-3.

[31]   *See id.*; *see also* Exhibit N, *Maravina State Court Depo.*, 172:2-23 & depo. exhibit 39.

[32]   Exhibit C, *Kuharsky State Court Depo.*, 29:23-30:14, 50:2-8, 52:7-21, 100:19-102:15-18, 109:1-12.

[33]   Exhibit S, *Order Granting Return of Seized Property to SXP*, p. 6.

with formal requests for production for:

- all Quantlab code copied or downloaded by SXP; and

- all tangible or intangible Quantlab property in SXP's possession, custody or control.[34]

After asserting several frivolous objections, including on "vague and ambiguous" grounds, SXP

stated in response to each request that "it has no responsive documents however the request is

interpreted."[35]  There is now no doubt that these representations were false.

## G.     The FBI's Investigation Found Approximately 5,000 Quantlab Files on SXP Computers, Including At Least 70 Copies of QLT Original Works

The FBI's forensic investigation ultimately uncovered large quantities of Quantlab source

code and other electronic files within the materials seized from SXP's offices in March 2008.

The Justice Department summarized certain of those findings in an August 30, 2011, plea letter

from AUSA Robert Johnson to criminal counsel for SXP and other defendants, revealing that:

- Godlevsky's SXP workstation contains approximately 5,000 Quantlab files, including almost 1,700 files containing Quantlab's proprietary source code;

- Numerous Quantlab source code files had been accessed on Godlevsky's SXP workstation, and an attempt had even been made to compile certain Quantlab code on that SXP computer; and

- Highly sophisticated, proprietary Quantlab software named "QuoteServer4," *which Quantlab had not even begun creating when Godlevsky and Kuharsky were employed with QLF*, had been accessed on the SXP computers of *both* of those SXP co-founders.[36]

A 95-page list of approximately 5,000 Quantlab files found in SXP's possession was attached as

Appendix I to Mr. Johnson's August 30 plea letter.[37]  Among the Quantlab files found at SXP,

---

[34]   Exhibit R, *SXP's Responses to Quantlab's First Requests for Production*, Nos. 85, 86.

[35]   *Id.*

[36]   Exhibit F, *Letter from AUSA Robert Johnson to Criminal Counsel*, pp. 2-3.

[37]   Exhibit G, *Appendix I to Letter from AUSA Robert Johnson*.

the FBI's forensic investigation identified at least 70 *exact* *copies*[38] of QLT Original Works in SXP's possession, including:

- 20 copies of BookQuote.h;
- 17 copies of BookData.h;
- 17 copies of KalmanFliter.cpp; and
- 17 copies of KalmanFilter.h.[39]

In addition, Dector.h—the QLF Original Work—is part of Quantlab's proprietary QuoteServer4 software, which Godlevsky and Kuharsky each accessed on their respective SXP workstations.[40]

None of the 70 copies of the QLT Copyrighted Files in SXP's possession were made with Quantlab's authorization.[41]   Nor has Quantlab ever authorized SXP, Godlevsky, Kuharsky, or anyone to download or otherwise copy QuoteServer4 (or Dector.h) to any SXP computer.[42] Nevertheless, the SXP computers on which these Quantlab files have been found (or on which they were found to have been accessed) remain in SXP's possession or control.

## H.    SXP Has Filed Suit Against Godlevsky Seeking to Hold Him Responsible for the "Misconduct" of Downloading Quantlab Property to SXP Computers

After learning of the government's findings, SXP filed a new suit against Godlevsky in Wisconsin state court.  That suit explicitly references "mis-conduct" by Godlevsky with respect to Quantlab code and files, and alleges:

---

[38]    Quantlab determined whether a file was an exact copy by comparing the MD-5 hash value of the file found at SXP to MD-5 hash values of files created by Quantlab and stored on its network.  *See* Exhibit O, *Declaration of Andrey Omeltchenko*, ¶ 6.  "An MD-5 hash value is a unique alphanumeric representation of the data" within a file— "a sort of 'fingerprint' or 'digital DNA.'"  *United States v. Crist*, 627 F. Supp. 2d 575, 578 (M.D. Penn. 2008).

[39]    *Compare* Exhibit P, *Excerpted FBI File Listing from "filed_19175.xls", with* Exhibit Q, *Excerpted File Listing from "10094 E301 File Listing.xls" (a/k/a "Kyushu 2")*; *see also* Exhibit O, ¶¶ 5-6. Quantlab expects discovery will reveal much more Quantlab property in SXP's possession;

[40]    Exhibit H, *Declaration of Bruce Eames*, ¶ 5.

[41]    *See* Exhibit H, ¶ 7.

[42]     Exhibit H, ¶ 7.

11

> On information and belief, Godlevsky was responsible for loading those Quantlab computer code or files onto Godlevsky's SXP computer, and he subsequently accessed some of those files. . . . Godlevsky represented to SXP that he did not possess Quantlab code or computer files and would not possess any Quantlab computer code, computer files or other confidential and proprietary information *in the course of SXP's business* . . . . *Godlevsky's representations were untrue*.[43]

Quantlab is not a party to the Wisconsin case. But SXP plainly has made the stolen Quantlab property and the facts surrounding its presence on SXP computers major issues in that case. In fact, SXP's suit: (1) has placed the stolen Quantlab code and files in issue; (2) may place the trade-secret status of that Quantlab property in issue; and (3) has pleaded multiple allegations relating to the access and use (or alleged non-use) of stolen Quantlab property at SXP.[44]

**I.      SXP Has Continually Refused to Return Stolen Quantlab Property But Has Already Disclosed that Property to Unknown Third-Parties Without Quantlab's Permission**

Recently, SXP disclosed at least some of the stolen Quantlab code and electronic files to third-parties for "expert" analysis. SXP never sought or received Quantlab's permission to do so. Nor did SXP attempt to arrange for any third-party "expert" to enter into any confidentiality agreement with Quantlab as to the handling of Quantlab property. In fact, SXP will not even identify the specific Quantlab property that was disclosed or the identity of the "experts" to whom the disclosure (and likely distribution of further unauthorized copies) of Quantlab's property was made. In short, SXP is asserting control over Quantlab code and electronic files as if they were its own.

Although glad to disclose Quantlab's intellectual property to unknown third-parties, SXP has refused Quantlab's many requests to return all copies of Quantlab property to Quantlab—or to at least place that property in the exclusive possession of a special master. Those requests have gone entirely unheeded, as SXP still refuses to relinquish Quantlab's property.

---

[43]   Exhibit M, *SXP v. Godlevsky Wisconsin State Court Complaint*, ¶¶ 20-21, 41-42 (emphasis added).

[44]   *See id.* at ¶¶ 20-21, 23.

## V.
## STANDARD OF REVIEW

**A.     Cross-Motion for Impoundment Order**

Section 503 of the Copyright Act entrusts to the Court's discretion whether to order the impoundment of infringing copies and articles used in the reproduction of infringing copies. *See* 17 U.S.C. § 503(a). The preliminary injunction standard of Federal Rule of Civil Procedure 65 applies to impoundment motions, and the Court's decision on whether the elements of the preliminary injunction test are met "is reviewed only for an abuse of discretion." *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

**B.     SXP's Motion for Protective Order**

To obtain the protective order they seek, SXP first "must establish good cause and a specific need for protection." *Ferko v. Nat'l Ass'n for Stock Car Auto Racing,* 218 F.R.D. 125, 133 (E.D. Tex. 2003); *see* FED. R. CIV. P. 26(c). If SXP were able to meet this standard (which it cannot), whether to enter a protective order would lie within the Court's discretion.[45] *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985).

## VI.
## ARGUMENT AND AUTHORITIES

The bottom-line issue before the Court is simple—whether a competitor and its part-owner should be allowed to keep stolen Quantlab source code, files, and other Quantlab property that they *never* have had any right to possess or control. The law clearly says no.

**A.     The Court Should Issue an Impoundment Order**

An impoundment order under 17 U.S.C. § 503 is likely the only way Quantlab can secure its copyright-protected code and files still in SXP's control. It is, therefore, necessary and proper

---

[45]   SXP seeks a protective order under Rule 37. However, the only protective orders authorized by that rule are upon denial of a motion to compel and are governed by Rule 26(c). *See* FED. R. CIV. P. 37(a)(5).

for the Court to order the impoundment of: (1) all copies of the QLT and QLF Original Works in SXP's possession, custody, and control; (2) all updated and modified versions of those works; and (3) all electronic storage devices and media on which those original and derivative works are found.

### 1. Applicable Law

Section 503(a) of the Copyright Act authorizes the Court to impound all infringing copies of copyrighted works, as well as all articles used to produce the infringing copies. 17 U.S.C. § 503(a)(1)-(2); *see Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999). The Court may enter an impoundment order at "any time while an action under the [Copyright Act] is pending" and "on such terms as it may deem reasonable." 17 U.S.C. § 503(a).

Federal Rule of Civil Procedure 65 applies to copyright impoundment motions. FED. R. CIV. P. 65(f). As a result, courts generally apply the four-factor preliminary injunction test to decide whether to grant an impoundment order. *See id.; Bridgeport Music, Inc. v. Justin Combs Publ.*, 507 F.3d 470, 492-94 (6th Cir. 2007). Impoundment is proper under that test where the copyright owner shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the harm of not granting the injunctive relief outweighs any harm to the defendant by granting it; and (4) that the injunctive relief will not disserve the public interests. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).

Unlike most causes of action, "injunctions are *regularly issued*" under the Copyright Act due to the public's strong "interest in upholding copyright protections." *Warner Bros. Records, Inc. v. Briones*, 77 U.S.P.Q.2d 1253, 1256 (W.D. Tex. 2005) (emphasis added); *see Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979) (stating preliminary injunctions are "a common judicial response" to imminent infringement). In fact, "irreparable harm is presumed when a copyright is infringed." *ESPN, Inc. v. Edinburg*

14

*Cmty. Hotel, Inc.*, 735 F. Supp. 1334, 1343 (S.D. Tex. 1986). Thus, whether to grant injunctive relief usually rests heavily on the first factor—whether the owner will likely succeed on its copyright infringement claim. *See Dallas Cowboys Cheerleaders,* 600 F.2d at 1188 ("If the record demonstrated a substantial likelihood that the Cowboys Cheerleaders could have a valid copyright infringement claim . . . the court was well within its discretion in granting the preliminary injunction."). Quantlab demonstrates below that it has met the requirements for the impoundment order it seeks.

### 2. Quantlab Is Substantially Likely to Succeed on Its Copyright Act Claim

Quantlab need only prove two elements to succeed on its copyright infringement claims: "(1) ownership of the copyrighted material, and (2) copying by the defendant." *Alcatel USA*, 166 F.3d at 790. Quantlab has easily established a substantial likelihood of proving both.

### (a). Quantlab Owns the Copyrighted Works

A plaintiff proves copyright ownership by showing that the work is original, that the work is copyrightable, and that the owner has complied with the applicable statutory formalities. *Lakedreams*, 1107-08. Quantlab has met this burden.

There is no doubt that Quantlab has satisfied all statutory formalities for the QLT and QLF Original Works. In particular, the U.S. Copyright Office received Quantlab's applications, deposits, and fees, and issued certificates of registration covering each of the QLT and QLF Original Works.[46] The certificates of registration for those works are attached to this response and cross-motion as Exhibits J and K. *See Rhino Membranes & Coatings, Inc. v. Rhino Seamless Membrane, Inc.*, No. 4:06-CV-2112, 2008 U.S. Dist. LEXIS 79491, *43-44 (S.D. Tex. Sept. 30, 2008) (finding statutory formalities satisfied under same set of facts).[47]

---

[46]   *See* Exhibit I, *Declaration of John Timothy Headley*, ¶¶ 3-4.

[47]   Unreported authorities cited herein are attached as Exhibit W.

Quantlab also has met the other requirements for proving ownership of the QLT and QLF Original Works.  The certificates of registration that it has received are "*prima facie* evidence of the validity of the copyright[s] and of the facts stated in the certificate[s]."  *Flowserve Corp. v. Hallmark Pump Co.*, 98 U.S.P.Q.2d 1979, 1984 (S.D. Tex. 2011) (Ellison, J.).  The facts stated in the certificates for the QLT Original Works indicate their original authorship by QLT and that they were works made for hire.[48]  Likewise, the certificate for the QLF Original Work indicates its original authorship by QLF and the fact that it was a work made for hire.[49]  Nothing more is required.  *See Flowserve*, 98 U.S.P.Q.2d at 1984-85; *Rhino Membranes & Coatings*, 2008 U.S. Dist. LEXIS 79491, at *43-44.  As a result, Quantlab has made the requisite showing of ownership of the QLT and QLF Original Works.

### (b).   There Is Clear and Direct Evidence of Actionable Copying

Quantlab has two options for establishing that the defendants copied the QLF and QLT Copyrighted Works—(1) with direct evidence; or (2) by showing that "the defendant had access to copyrighted work prior to the creation of the infringing work and . . . probative similarity." *Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).  Although direct evidence of actionable copying is less common, Quantlab has demonstrated it here.

The Appendix I file-listing attached to AUSA Robert Johnson's August 30, 2011 letter reveals that the FBI found at least 70 copies of QLT Original Works on SXP computers.[50]  The matching 32-digit MD-5 hash values for the 70 copies and corresponding QLT Original Works leave no doubt that they are _exact_ SXP copies of copyrighted Quantlab files.[51]  As even the

---

[48]   *See* Exhibit J, *Copyright Registrations for QLT Original Works*.

[49]   *See* Exhibit K, *Copyright Registrations for QLF Original Work*.

[50]   Exhibit G, *Appendix I to Letter from AUSA Johnson*; *see also* Exhibits O, P, Q.

[51]   *Compare* Exhibit P, *with* Exhibit Q; *see also* Exhibit O.

16

slightest difference in the contents of the SXP copies would have caused an MD-5 mismatch, this is beyond sufficient to constitute direct evidence of actionable copying. *See Jamison Bus. Systems, Inc. v. Unique Software Support Corp.*, No. 02-4887, 2005 U.S. Dist. LEXIS 45480, *25-26 (E.D.N.Y. May 26, 2005) (finding direct evidence of copying of source code because printouts of two pages of code matched, including names, field lengths, and comments); *see Flowserve*, 98 U.S.P.Q.2d at 1985 (Ellison, J.) (granting summary judgment to plaintiff on its infringement claim when the works were "so strikingly similar as to preclude the possibility of independent creation"). Because Quantlab has established actionable copying—the second and final element of its infringement claim—Quantlab also has established a substantial likelihood of success on the merits.

### 3. Quantlab Has Satisfied the Other Preliminary Injunction Factors

#### (a). Substantial Threat of Irreparable Injury Exists

Quantlab has satisfied the irreparable harm analysis. As this Court recently held when granting an injunction under the Copyright Act, "irreparable harm is presumed when a copyright is infringed." *Flowserve*, 98 U.S.P.Q.2d at 1988 (Ellison, J.) (quoting *ESPN*, 735 F. Supp. at 1343); *see Atlantic Recording Corp. v. Falgout*, No. 06-3784, 2007 U.S. Dist. LEXIS 86419, *7 (E.D. La. Nov. 21, 2007) ("Irreparable harm is presumed in copyright infringement actions."); *MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g*, No. 4:04-CV-445-V, 2004 U.S. Dist. LEXIS 19274, *7-8 (N.D. Tex. Sept. 28, 2004) (presuming irreparable harm and granting preliminary injunction in response to unauthorized copying of plaintiff's software).

But even if irreparable harm were not presumed, Quantlab has established it here. In copyright cases involving software, the threat of harm (and the inadequacy of legal remedies) is especially steep because software:

> is easy to copy and transmit for a person having access thereto; and once copied and transmitted, it is difficult, if not impossible, for the owner to obtain the return of the misappropriated software.

*Learn2.com v. Bell*, No. 3:00-CV-812-R, 2000 U.S. Dist. LEXIS 14283, *48 (N.D. Tex. July 20, 2000). That is precisely the situation here. The thefts outlined in Mr. Johnson's August 30 letter exemplify the ease with which stolen Quantlab code can (and has been) unlawfully transferred by others.[52] And the great difficulty of getting the code back is self-apparent. In short, Quantlab has lost physical control of its code and—along with it—the ability to adequately protect and enforce its valuable copyrights in that code. *See DSC Commc'ns. Corp. v. DGI Techs., Inc.*, 898 F. Supp. 1183, 1195 (N.D. Tex. 1995) (stating that a copyright owner "loses control of its software copyright rights when an unlicensed user has a copy of that software"). There is no adequate legal remedy to address these harms. *See id.*

Other factors enhance the threat (and presumption) of irreparable harm here. Coupled with the breadth and deviousness of the conspiracy leading to this lawsuit, SXP's startling lack of candor throughout this case does not leave Quantlab (or the Court) in a position to take those competitors "at their word" as to the handling of Quantlab intellectual property. To summarize:

- SXP first claimed not to possess Quantlab code and files.

- Then it filed a Rule 11 sanctions motion against Quantlab for bringing "baseless claims" alleging they had taken Quantlab code and files.

- SXP tried to stay all discovery at the same time as its Rule 11 motion; but—when the Court denied the expedited motion to stay—SXP was forced to admit that the FBI had found Quantlab code on their computers.

- Recently, SXP transferred Quantlab intellectual property to third-parties for "expert analysis" without even seeking Quantlab's authorization. To make matters worse, SXP still refuses to even inform Quantlab who those third-parties are or what Quantlab property has been disclosed to them.

---

[52]   Exhibit F, *Letter from AUSA Robert Johnson to Criminal Counsel*, pp. 1-3.

- The FBI investigation has now revealed that there are approximately 5,000 Quantlab files—including nearly 1,700 source code files—on SXP's computers, despite SXP first claiming it had no Quantlab property.

- Now, SXP is again seemingly refusing to admit in this case that it has ever had proprietary Quantlab code or files *at the same time* it is filing lawsuits in other jurisdictions stating exactly the opposite.

Quantlab simply should not be required to trust that SXP will protect its valuable intellectual property. That is especially true when it has now filed a Wisconsin suit against Godlevsky on claims that directly place the stolen Quantlab property in issue. So long as Quantlab's code and electronic files remain with SXP, there is simply nothing to prevent those competitors from further disclosing Quantlab intellectual property to others. *See DSC Commc'ns.*, 898 F. Supp. at 1195 ("If the Court were to allow DGI to continue to possess these unauthorized copies, there is nothing to prevent DGI from disclosing the operating system software to other parties.").

No relief short of an impoundment order can allow Quantlab to regain exclusive control of its copyrighted intellectual property and protect its valuable copyrights. *See id.* (finding irreparable harm and issuing preliminary injunction requiring defendant to "turn over to the Plaintiff any copy or copies of [plaintiff's] operating system software over which it, its employees or agents exercise control"); *Learn2.com*, 2000 U.S. Dist. LEXIS 14283 at *48-49, 51-52 (finding irreparable harm and issuing preliminary injunction impounding copies of plaintiff's copyrighted software in defendant's possession). Therefore, while irreparable harm is presumed, Quantlab has also fully demonstrated it here

### (b).    Harm to Quantlab Outweighs Any Potential harm to Defendants

On this third preliminary injunction factor, the Court must the balance the likely harm to Quantlab if an impoundment order is *not* entered against any harm to SXP if it *is*. *See Flowserve*, 98 U.S.P.Q.2d at 1989. This factor rarely favors the infringer. *Vault Corp. v. Quaid*

19

*Software, Ltd.*, 655 F. Supp. 750, 758 (E.D. La. 1987) (stating that, if the outcome were different, "then a knowing infringer would be permitted to construct its business around its infringement"). This factor certainly does not favor SXP here.

The only relief Quantlab is seeking is the impoundment of infringing copies and the articles (*e.g.*, the computers and storage devices) by which those copies have been made. This relief is expressly authorized by Section 503(a) of the Copyright Act. In addition, the requested impoundment order merely seeks to have SXP comply with the law and turn over the fruits of its Copyright Act violations. *See Lava Records, LLC v. Ates*, No. 05-1314, 2006 U.S. Dist. LEXIS 46683, *12 (W.D. La. July 11, 2006) (holding that balance of hardships "weighs strongly in favor of Plaintiffs where all that is requested is that Defendant comply with the Copyright Act"). On the other hand, not issuing an impoundment order would greatly harm Quantlab by denying it the ability to regain exclusive control of its copyrighted works and to protect its intellectual property. *See Flowserve*, 98 U.S.P.Q.2d at 1989 (holding that balance weighed in favor of an injunction because, without it, plaintiff would "be denied the ability to adequately protect its intellectual property" while injunction would merely require defendant to "refrain from violating the law"). The balancing of the hardships weighs heavily in Quantlab's favor.

### (c).     The Requested Relief Will Serve the Public Interest, Not harm It

The impoundment order Quantlab seeks also will not harm any public interest. Instead, it will serve the public by removing infringing copies of stolen Quantlab property from SXP's control. *See Warner Bros. Records*, 77 U.S.P.Q.2d at 1256 (holding that "the public interest is the interest in upholding copyright protections"). SXP has no basis to argue otherwise. In fact, the impoundment order Quantlab seeks "will only require the defendants to bring their business into line with the requirements of the law" and ensure that they will "refrain from [further] violating the law by using [Quantlab's] intellectual property." *Flowserve*, 98 U.S.P.Q.2d at

1989; *Vault Corp.*, 655 F. Supp. at 757 (holding that "the public interest can <u>only</u> be served by upholding copyright protections") (emphasis added).  The only way to serve the public interest here is to issue an impoundment order.

### 4.   The Requested Impoundment Order Is Appropriate

Because Quantlab has met each of the preliminary injunction criteria, an impoundment order should issue.  As set forth above, Quantlab requests an order requiring SXP, Mamalakis, and their agents and representatives to turn over to a special master (or the Court): (1) all copies of QLT and QLF Original Works in SXP's possession, custody, and control; (2) all updated and modified versions of those works; and (3) all electronic storage devices and media on which those original and derivative works are found.  This relief is clearly authorized by the Copyright Act and is amply supported by the case law.

Section 503(a)(1) permits impoundment of "all copies . . . claimed to have been made or used in violation of the exclusive right of the copyright owner."  Quantlab's request to impound all copies of the QLT and QLF Original Works and any derivative works made or used by SXP fits squarely within this definition.  *See Jamison Bus. Sys.*, 2005 U.S. Dist. LEXIS 45480, at *22 (holding that "[i]n the case of computer programs, an updated or modified version of an original program constitutes a derivative work" and "falls within the scope of the original work's protection" to the extent it "incorporates the original copyrighted work").

Section 503(a)(2) "provides that the court may impound and destroy any articles used to make infringing copies of a copyrighted material."  *Alcatel USA,* 166 F3d at 790.  In the context of software—like the works at issue in this case—federal courts interpret this section to cover the computers, hard drives, or other electronic storage devices on which any infringing copies of the software are found.  *See Entral Group Int'l, LLC v. New York One Cafe, Inc.*, No. CV-05-1655, 2007 U.S. Dist. LEXIS 99020, *23-24 (E.D.N.Y. Mar. 5, 2007) (holding that impoundment

"may extend to any equipment used for infringing purposes," including "the means by which [the infringing works] were copied and stored, *i.e.*, the defendant's computer system"); *Microsoft Corp. v. Comp. Warehouse*, 83 F. Supp. 2d 256, 259, 262 (D.P.R. 2000) (ordering impoundment of "all computers which have installed in their hard disk any unlicensed copy of Plaintiffs' copyrighted programs"). Therefore, it is proper—and from a practical stance, likely necessary— for the Court's impoundment order to encompass all SXP computers, electronic storage devices, and other media containing infringing copies or derivative works.

**B.      The Court Should Also Issue a Writ of Sequestration**

Quantlab is entitled to avail itself of remedies available under state law providing for the seizure of property to secure satisfaction of a potential judgment. FED. R. CIV. P. 64(a). State law rules providing for "attachment," "sequestration," and "other corresponding or equivalent remedies" are specifically contemplated by this rule. FED. R. CIV. P. 64(b). In Texas, the remedy of sequestration is available when:

> (1) suit is for title or possession of personal property . . . ; and (2) a reasonable conclusion may be drawn that there is immediate danger that the defendant or the party in possession of the property will conceal, dispose of, ill-treat, waste, or destroy the property or remove it from the county during the suit."

TEX. CIV. PRAC. & REM. CODE § 62.001(a). Quantlab easily meets those two requirements here.

First, this suit is unquestionably for the recovery of personal property. *See, e.g., San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 640 (Tex. 2000) (defining personal property "broadly to include everything that is subject to ownership not falling under the definition of real estate."). Quantlab has sued, in part, to regain exclusive possession of all of its electronic files, source code, and other property that has been stolen, misused, or copied without authorization.

Regarding the second prong, Quantlab has shown that it not only owns, but actually created its trading strategy and technology—a significant part of which is at issue in this lawsuit

22

in the form of computer code that reveals trade secrets and other electronic files taken and used by Defendants.[53]  The cost for Quantlab to develop that trading strategy and trading technology has been many  millions of dollars.[54]  Quantlab considers and protects its trading strategy, which is ultimately embodied in its code and electronic files, as confidential, proprietary, and trade secret information.[55]  Quantlab has never authorized SXP—or any persons acting on its behalf— to copy, use, possess, maintain custody of, or exert any control over any electronic files, code, or other property belonging to Quantlab.[56]  Nevertheless, the FBI found SXP in possession of a large number of computer files that Quantlab considers to be confidential and proprietary.[57]  Making matters worse, Quantlab has learned that SXP continues to disseminate Quantlab's confidential code to undisclosed "experts," who may also be competitors or associated with competitors, and that SXP has instituted lawsuits where Quantlab is not a party, but Quantlab's confidential files and source code are squarely in issue.[58]

The surreptitious theft and use of Quantlab's confidential electronic files, coupled with SXP's ongoing treatment of that information as though it were SXP's own, gives rise to a reasonable conclusion that SXP will continue to disseminate, use, and otherwise ill-treat and devalue Quantlab's property during the pendency of this lawsuit, unless the Court grants Quantlab the remedy of sequestration.[59]  Accordingly, under the sequestration rules, Quantlab seeks somewhat broader relief than it requested under the impoundment rules; that is, to have

---

[53] Exhibit H, *Declaration of Bruce Eames*, ¶ 4.

[54] *Id*. at ¶ 3.

[55] *Id*. at ¶ 4.

[56] *Id*. at ¶ 7.

[57] Exhibit G; Exhibit O, ¶ 7.

[58] *See* Exhibit M at ¶¶ 20-21, 23.

[59] *See generally* Exhibit H.

this Court order SXP to surrender (or have U.S. Marshals seize) computers and electronic storage devices upon which the FBI located any code, electronic files, or other property identified as belonging to Quantlab.

**C.   SXP's Motion for Protective Order Is Groundless and Improper**

SXP's motion for protective order is procedurally improper under Federal Rule of Civil Procedure 37, because the only protective orders authorized by that rule are upon the denial of a motion to compel and are governed by Federal Rule of Civil Procedure 26(c). *See* FED. R. CIV. P. 37(a)(5). There has been no such denial here.

The motion is also without merit for several reasons, including those that entitle Quantlab to the relief sought by its cross-motion. SXP and Mamalakis—a competitor and its part-owner— have *never* been authorized to possess or control Quantlab's electronic files, including source code and other intellectual property and they offer no support for their request that the Court should create that right for them out of whole cloth. Granting the relief requested by SXP would legitimize unlawful conduct to the detriment of rights of the owner.

**VII.**
**CONCLUSION**

Based on the foregoing and the attached evidence, Quantlab requests that the Court:

(A).   deny SXP's Motion for Protective Order;

(B).   order the impoundment of: (1) all copies of the QLT Copyrighted Works and QLF Copyrighted Works in the possession, custody, or control of SXP, Mamalakis, and their agents and representatives; (2) all updated or modified versions of those works; and (3) all computers, electronic storage devices, and media on which those works and derivative works are found;

(C).   issue a writ for the sequestration of all code, files, and other intellectual property identified by the Justice Department's investigation as belonging to Quantlab, and which are in the possession, custody, or control of SXP, Mamalakis, or their agents and representatives; and

(D).   order all such other and further relief to which Quantlab is justly entitled.

24

Respectfully submitted,

/s/ *Allan H. Neighbors, IV*

Allan H. Neighbors, IV
(Attorney-in-Charge)
Texas Bar No. 24033660
S.D. Tex. Bar No. 34398
LITTLER MENDELSON, P.C.
1301 McKinney, Suite 1900
Houston, Texas 77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
aneighbors@littler.com

*Of Counsel:*

Tim McInturf
Texas Bar No. 00788020
S.D. Tex. Bar No. 18058
Simon J. Garfield
Texas Bar No. 24040957
S.D. Tex. Bar No.  634831
QUANTLAB FINANCIAL, LLC
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
713.400.5917 (Telephone)
713.400.5918 (Facsimile)
tmcinturf@littler.com

M. Scott McDonald
Texas Bar No. 13555505
S.D. Tex. Bar No. 9500                         ATTORNEYS FOR PLAINTIFFS
Tim Rybacki                                    QUANTLAB TECHNOLOGIES LTD. (BVI)
Texas Bar No. 24056248                         AND QUANTLAB FINANCIAL, LLC
S.D. Tex Bar No. 718501
Travis J. Odom
Texas Bar No. 24056063
S.D. Tex. Bar No. 997750
LITTLER MENDELSON, P.C.
1301 McKinney, Suite 1900
Houston, Texas 77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
smcdonald@littler.com

Tim Headley
Texas Bar No. 09325210
S.D. Tex. Bar No. 1003
THE TIM HEADLEY LAW FIRM
7941 Katy Freeway, Suite 506
Houston, Texas 77024
713.467.8500 (Telephone)
713.467.8501 (Facsimile)
HeadleyIPLaw@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2012, I electronically filed the foregoing document using the CM/ECF system, which will automatically send notification of this filing to the following counsel of record:

Joseph Y. Ahmad
Todd W. Mensing
Kinan H. Romman
Ahmad, Zavitsanos & Anaipakos, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010

David C. Holmes
Law Offices of David C. Holmes
13201 Northwest Freeway, Suite 800
Houston, Texas 77040

James M. Cleary, Jr.
Martin, Disiere, Jefferson & Wisdom, L.L.P.
808 Travis, Suite 1800
Houston, Texas 77002

David G. Hanson
Mark Cameli
Ryan Stippich
Robert S. Jones, Jr.
Reinhart Boerner Van Deuren, S.C.
1000 North Water Street, Suite 1700
Milwaukee, Wisconsin 53202

/s/ Allan H. Neighbors, IV
Allan H. Neighbors, IV

I hereby further certify that on February 22, 2012, a true and correct copy of the foregoing document was served on the following persons via certified mail, return receipt requested, and e-mail:

Ping An
92 N. Chandler Creek
The Woodlands, Texas 77381
PingA2018@hotmail.com

/s/ Allan H. Neighbors, IV
Allan H. Neighbors, IV

Firmwide:109452830.2 038021.1013

26