# Exhibit P

LEXSEE



Analysis
As of: Feb 29, 2012

YASUO KAMATANI, ET AL. Vs. BENQ CORPORATION, ET AL.

CIVIL ACTION NO. 2:03-CV-437

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, MARSHALL DIVISION

2005 U.S. Dist. LEXIS 42763

August 5, 2005, Decided
August 5, 2005, Filed

**SUBSEQUENT HISTORY:** Sanctions allowed by
Kamatani v. BenQ Corp., 2005 U.S. Dist. LEXIS 42762
(E.D. Tex., Oct. 6, 2005)

**PRIOR HISTORY:** Kamatani v. BenQ Corp., 2005 U.S.
Dist. LEXIS 42764 (E.D. Tex., June 29, 2005)

**CORE TERMS:** discovery, drives, correspondence,
interrogatory, joint venture, documents relating, joint
venture, deposition, diligent searches, identification,
infringement, evidencing, optical, documentation,
subroutines, supplemented, privileged, custody, disk
drive, produce documents, servo, license agreement,
emails, physical possession, supplemental, outstanding,
scheduling, producing, withheld, imported

**COUNSEL:** [*1] Robert M Parker, Mediator, Pro se,
Tyler, TX.

For Yasuo Kamatani, Plaintiff: Timothy N Trop, Trop
Pruner & Hu PC, Houston, TX; Franklin Jones, Jr, Jones
& Jones -- Marshall, Marshall, TX; Gregory M Luck,
Thomas W Sankey, Godwin Pappas Langley Ronquillo --
Houston, Houston, TX.

For LaserDynamics Inc, Plaintiff: Timothy N Trop, Trop
Pruner & Hu PC, Houston, TX; Franklin Jones, Jr, Jones
& Jones -- Marshall, Marshall, TX; Gregory M Luck,
Thomas W Sankey, Godwin Pappas Langley Ronquillo --

Houston, Houston, TX; Jeffrey Lance Johnson, McKool
Smith -- Austin, Austin, TX; Mike C Miller, Attorney at
Law, Marshall, TX; Patric Page McCallum, Drew Law
Firm, Montgomery, Tx.

For Benq Inc, Defendant: Jose Carlos Villarreal, Marvin
Craig Tyler, Wilson Sonsini Goodrich & Rosati, Austin,
TX; Danny Merle Stroup, Attorney at Law, Longview,
TX; James C Yoon, Wilson Sonsini Goodrich & Rosati,
Palo Alto, CA; N Andrew Crain, Thomas Kayden
Horsetemeyer & Risley, Atlanta, GA; Nicole W Stafford,
Wilson Sonsini Goodrich & Rosati, Austin, TX.

For Ben Q America Corp, Defendant: Jose Carlos
Villarreal, Marvin Craig Tyler, Wilson Sonsini Goodrich
& Rosati, Austin, TX; Blake Charles Erskine, Erskine
[*2] & McMahon, Longview, TX; Danny Merle Stroup,
Attorney at Law, Longview, TX; James C Yoon, Wilson
Sonsini Goodrich & Rosati, Palo Alto, CA; Nicole W
Stafford, Wilson Sonsini Goodrich & Rosati, Austin, TX.

**JUDGES:** T. JOHN WARD, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** T. JOHN WARD

**OPINION**

2005 U.S. Dist. LEXIS 42763, *2

## MEMORANDUM OPINION AND ORDER

### 1. Introduction.

In this patent infringement case, the plaintiffs, Yasuo Kamatani and Laserdynamics, Inc., sued the defendants, BenQ Corporation and BenQ of America Corporation for infringement of United States Patent No 5,587,981. [1] The patent-in-suit claims methods for discriminating between different types of optical disks inserted into an optical disk drive by reading total of contents data or processing an optical signal. Various discovery motions have been filed and heard in this case. This court issues this opinion and order to memorialize issues learned from the bench in prior hearings and to provide guidance to the parties concerning their future conduct in discovery in this case.

> 1   Unless otherwise noted, the court will refer to the defendants collectively as "defendants" or "BenQ."

[*3] Simply put, this case has been wrought with discovery disputes since discovery commenced. It would be nothing short of reckless to assume that this court could capture and resolve, in a single effort, all of the disputes the parties have raised so far in this case. The court has already held three separate discovery hearings. The court has issued sanctions against the defendants at two of those hearings. As this case demonstrates, however, the fact that the court has issued sanctions against the defendants should not be understood to mean that the plaintiffs' conduct has been pristine. It is at best an illustration of the principle that everything is relative.

Given the history of this case, it would also be wishful thinking to suppose that this particular order could, or would, settle the parties' myriad discovery contests. That the parties have asked the court to extend the trial schedule might be seen either as an effort to work cooperatively or as a joint desire to continue the fight. Nevertheless, in this order, the court will recount the history of the discovery disputes and will summarize the various rulings made during the prior hearings. In connection with that discussion, [*4] the court will set forth the court's specific findings and the sanctions the court has previously ordered, culminating with the hearing held on May 23, 2005. The balance of this opinion will attempt to address, to the extent the record allows, those issues which still exist as reflected by the parties' various reports to the court.

### 2. Procedural History and Prior Hearings.

The court held a scheduling conference in this case on September 14, 2004. The discovery process began after the scheduling conference with certain disclosures due 30 days after the conference, and the bulk of documentary disclosures due 45 days after the conference or as otherwise set forth in the court's patent rules. The discovery disputes in this case began to surface as early as November 2004.

The parties focused their efforts by addressing correspondence to the court and to each other which revealed several disputes, including the issue whether the defendants needed to produce certain documents under the court's discovery order and whether the defendants had appropriately responded to interrogatories. On February 4, 2005, the court held the first of its three hearings. At this hearing, the plaintiff [*5] addressed the following issues: (1) the defendants' failure to comply with the discovery order; (2) the defendants' use of Rule 33(d) to answer interrogatories; (3) the defendants' refusal to respond to contention discovery; (4) the imposition of an artificial time horizon (2001) before which the defendants refused to produce financial information; (5) the defendants' resistance to providing certain other financial discovery in interrogatories; (6) the defendants' refusal to produce samples of the drives; and (7) the defendants' refusal to produce documents relating to drives purchased from Pioneer and Philips and drives BenQ jointly designed with Philips through a BenQ/Philips venture known as PBDS.

It is useful to elaborate on the PBDS joint venture and why it is relevant. PBDS possesses many relevant technical documents showing the operation of several of the accused drives. Thus, documents in the control of BenQ through its participation in PBDS were relevant for purposes of infringement and for assessing the operation of accused products. But documents relating to the formation and operation of the PBDS joint venture were relevant for other reasons as well. The procedural history [*6] of this case illustrates why.

On October 14, 2004, BenQ filed a third-party claim against PBDS and Philips. On November 16, 2004, BenQ abruptly dismissed its third-party suit against Philips and PBDS and, on January 26, 2005, moved for partial summary judgment. In the motion for summary judgment, BenQ raises a license defense. BenQ relies on a licensing agreement between Philips and

Page 2

LaserDynamics. Under the license agreement, the plaintiffs have covenanted not to sue the customers of Philips and its subsidiaries for infringement of the patent-in-suit.

The agreement defines a subsidiary as a company owned at least 51% by Philips. Philips owns 51% of PBDS, although Philips and BenQ did not form PBDS until after the effective date of the Philips/LaserDynamics license agreement. BenQ asserts that it currently purchases all of the optical disk drives sold in the United States from PBDS. Therefore, according to BenQ, it is a customer of a Philips subsidiary under the terms of the license agreement and is entitled to the benefit of the covenant not to sue.

In response to the motion for summary judgment, the plaintiff maintains that the PBDS joint venture is a sham through which BenQ first [*7] sells optical disk drives to the joint venture and then re-purchases those drives from the joint venture to create customer status under the Philips/LaserDynamics license agreement. The plaintiffs assert that this arrangement is an impermissible sub-license, and therefore BenQ is not covered by the terms of the Philips/Laserdynamics license agreement. Under any view of the matter, documents related to the formation of the PBDS joint venture, the performance of the parties under the terms of the joint venture, and the relationship of the parties as litigants in this court are unquestionably relevant for discovery purposes.

At the February 4, 2005, hearing, the defendants urged that many of the problems raised by the plaintiffs were the result of the failure of its lead counsel to be more involved in addressing discovery matters. BenQ's counsel recounted efforts he had made with counsel for the plaintiffs immediately prior to the hearing, and he suggested that the defendants had, by that time, begun to comply with the court's orders and to provide the requested discovery. BenQ represented at the hearing that it would not stand on any objections to discovery requests to shield any relevant [*8] information from production, except to the extent that the information was protected by a legitimate claim of privilege.

By the conclusion of the February 4, 2005, hearing, the court had issued a modest sanction. It entailed a finding that the defendants were sanctioned for the record, based on subsidiary findings that the defendants had engaged in discovery abuse by delaying production and by taking various untenable positions. Among these

positions was the argument, reflected in the papers, that the defendants objected to providing "backup" financial information on the grounds that the term "backup" was vague and that the defendants believed they were not under an obligation to produce documents under the court's amended discovery order. Mindful of the law governing discovery sanctions, the court issued the least sanction possible -- a finding that the conduct was sanctionable. The court accepted counsel's representations that document disclosures would be made full and complete, and that interrogatory answers would be supplemented immediately. The court overruled all objections to discovery except those asserting a privilege. The court also required the defendants to file verifications [*9] that they had conducted diligent searches for the requested information and had produced the requested information. The court recessed the hearing until March 2, 2005, to allow the defendants an opportunity to bring themselves into compliance with the court's orders.

On March 2, 2005, the court held a second discovery hearing. Among the items at issue in the March 2nd hearing was whether the defendants had produced documents relating to the PBDS joint venture, and whether the defendants had produced documents related to the dismissal of a third-party claim in this court filed by BenQ against PBDS and Philips. [2] In addition, the plaintiffs complained that the defendants had not explained fully their efforts to obtain technical documents from Pioneer and Philips in the verifications filed with the court.

> 2  Also at issue was whether the defendants had produced all of the sample drives ordered at the February 4th hearing. The court ordered the defendants to produce samples of all of the relevant drives if those drives were not commercially available and to the extent those drives were in the defendants' control.

[*10] With respect to the documents relating to the PBDS joint venture, the plaintiffs challenged the sufficiency of the defendants' production. As an example, the plaintiffs pointed out that the defendants had produced only an *unsigned* copy of a Memorandum of Understanding relating to the PBDS joint venture. The actual PBDS joint venture agreement explicitly stated that a binding MOU had been concluded between the parties, and the plaintiffs were skeptical that the joint venture agreement would expressly refer to a contractual

document which had not been executed. It bears mention that all of the PBDS agreements were relevant on at least two fronts: the license defense and the scope of BenQ's right to access technical documents relevant to infringement issues. The plaintiffs urged that the MOU was particularly relevant because it suggested that both of the parties to the agreement had a right of access to certain technical documents. BenQ told the court that it had searched for a signed copy of the MOU but had not located one. BenQ thus concluded (and so represented) that the MOU had never been executed. Although the plaintiffs were skeptical, the court informed the plaintiffs that [*11] BenQ could only produce what it had and suggested that the court would address the issue further if a signed copy eventually surfaced.

With respect to the dismissal of the third-party lawsuit against PBDS and Philips, the defendants informed the court that no documents existed which related to that dismissal, and specifically, that they had withheld no such documents as privileged. *See* Transcript of March 2, 2005, Hearing, at 38 ("And if we did withhold anything, we have a log in this case, and any documents would be in the log. There aren't any"). As to the Pioneer and Philips documents, the defendants contended that prior to the formation of the PBDS joint venture, BenQ purchased drives from both Pioneer and Philips and resold those drives. In response to the court's questioning concerning whether BenQ could request the documents from Pioneer and Philips, the defendants contended they had made such requests and those requests had been refused. Although the plaintiffs expressed doubts as to the accuracy of these statements, based on the court's review of the filings made in the case, the court did not order any further sanctions at that time. [3] The court assumed, in light of [*12] the signed verifications, that the defendants had made a diligent search for all documents, that the requested materials within the defendants' possession, custody, or control had been produced, and that, to the extent the documents had not been produced, they did not exist. It must be kept in mind that, at this point in the case, nearly six months had elapsed from the date of the scheduling conference, and the defendants had filed sworn declarations attesting to the diligence undertaken to search for and produce all relevant documents.

> 3    The court did indicate it would address the plaintiffs' motion to compel further answers to certain interrogatories. As set forth in the next

portion of this opinion, it appears that the defendants have supplemented the challenged interrogatory answers.

The court also determined that the discovery problems were not limited to the defense side of the case. Given the content of an e-mail introduced by defense counsel, it appeared to the court that Mr. Kamatani had not fulfilled his obligations to tender all relevant documents to the defendants. The court admonished the plaintiffs that they, too, ran the risk of being sanctioned for discovery abuse if they failed to produce all of their client's pertinent materials.

[*13] After the court's March 2nd hearing, the plaintiffs sought to take several depositions. Immediately prior to the depositions, BenQ produced an additional 39 boxes of documents. None of the deponents could testify as to the specific contents of the boxes, the extent to which the production came from third parties, when the production first came into the possession of BenQ, or what efforts had been made to request or secure the production from third parties. Included among the documents was a signed copy of the MOU that the defendants previously represented did not exist, copies of documents relating to the PBDS joint venture, and various technical documents. Not surprisingly, the production of 39 boxes of documents over a month after the defendants had sworn that diligent efforts had been made to locate and produce documents prompted the plaintiffs to move for sanctions and to file an additional, omnibus motion to compel. At approximately the same time, the defendants filed various motions of their own, complaining of various discovery transgressions committed by the plaintiffs.

On May 23, 2005, the court conducted its third hearing. The court first addressed the defendants' motions [*14] to compel and for a protective order. The court granted the motion to compel in part, and ordered the plaintiffs to re-produce a witness who could testify factually about the damages and licensing related issues. The court also ordered the plaintiff to verify its answers to interrogatories. The court declined the defendants' request to order the plaintiffs to re-produce a corporate witness on certain technical aspects of infringement. The court also denied the defendants' motion for a protective order on the location of depositions, and ordered the defendants to re-produce a 30(b)(6) witness in Marshall,

Texas, who was familiar with the particulars surrounding the belated document production.

At the hearing, the plaintiffs also presented a motion for sanctions as a result of discovery misconduct, requesting a judgment of infringement. In the course of the proceedings, it became evident that the defendants had not acted in good faith in discharging their discovery obligations. In this regard, the court is referring not only to the duty to disclose relevant materials upon their discovery, but also to the corresponding duty to conduct a diligent search and investigation into the existence [*15] of documents relating to the issues in the case. Stonewalling discovery is a sanctionable abuse of the process. Several events led the court to conclude that BenQ's approach to discovery fits that description.

First, with respect to the signed MOU, the court suggested at the May 23rd hearing that it doubted the signed copy of the MOU to be a "critical" document in the case, or one on which liability would ultimately depend. It is, however, a relevant document to issues in the case, and the defendants represented to the court that the document did not exist without ever confirming that fact with the other party to the joint venture. This despite the plain language of the joint venture agreement which suggested the parties had entered an MOU. Although BenQ suggests that it suffered great embarrassment when it approached Philips and questioned whether the document existed, BenQ has not shown why it neglected to approach Philips (and suffer the same embarrassment) before it represented to the court at the March 2nd hearing that no such document existed. Indeed, at that hearing, in response to the court's questions concerning documents in the possession of Pioneer, Philips, and the PBDS [*16] joint venture, the defendants expressly represented that they had requested documents from those entities and had been refused.

With respect to the documents relating to the dismissal of the third-party claim against Philips and PBDS, the defendants had previously represented that no such documents (privileged or otherwise) existed. However, *after* the representations to this effect had been made at the March 2, 2005, hearing, the defendants finally conducted a search that uncovered several emails between Philips and BenQ regarding the filing of the PBDS claim and the dismissal thereof. [4] This search was ostensibly in response to one of the plaintiffs' new document requests. Again, contrary to the representations

made at the March 2, 2005, hearing, several emails relating to the filing of and the dismissal of the third-party claim did exist. It was not until the plaintiffs made a more specific request for the materials that the defendants undertook a more detailed search which ultimately uncovered the emails.

> 4   The defendants have tendered these emails to the court for *in camera* review.

[*17] Finally, with respect to the bulk of the materials in the 39 boxes, BenQ's counsel represented at the May 23rd hearing that those documents were relevant technical documents (although not necessarily "critical" documents) that had been obtained from PBDS files. According to counsel's explanation to the court on May 23, 2005, BenQ (which is a 49% owner of the PBDS joint venture with Philips), made no effort to search PBDS files initially because the employees of BenQ treat PBDS files and BenQ files differently. Counsel suggested that BenQ was finally able to obtain the documents after persuading PBDS to release its documents for production to the plaintiffs. One of the primary contacts at PBDS was Mr. T.T. Chen. Mr. Chen, until at least December 2004, was an employee of BenQ. It is incredible that BenQ could not "persuade" Mr. Chen to release these documents until April, 2005, when BenQ owns 49% of the PBDS joint venture. Again, it bears mention that as of March 2, 2005, BenQ had represented it had searched for and produced all of the relevant documents in this case. Indeed, contrary to the position taken at the May 23rd hearing that BenQ had not looked in the PBDS files because BenQ [*18] viewed PBDS to be a different company, BenQ's counsel represented on March 2nd that ". . . I can assure the Court that *we raised this exact issue in going to PBDS* and producing any of the joint venture-related documents with the clients since February 4. . . ." Transcript of March 2, 2005, Hearing, at 27, ll. 11-14 (emphasis added).

At the conclusion of the May 23, 2005, hearing, the court denied the plaintiff's request for death penalty sanctions but issued further sanctions. These sanctions resulted from the failure of the defendants to bring themselves into compliance with the court's orders issued at the February 4, 2005, hearing and for misrepresenting the status of the efforts to search for and produce documents at the March 2, 2005, hearing. The court ordered that the defendants would have one-third less time than the plaintiffs would have to address the jury in

*voir dire*, opening statement, and closing argument. The court also awarded the plaintiffs their attorneys fees incurred in presenting the motion.

At the May 23rd hearing, the court was persuaded that BenQ had not performed a diligent search for relevant documents within its control. It is well-settled that [*19] a party is obligated to produce documents within its *control*, and its obligations are not limited to those documents within the party's physical possession. *Rosie D. v. Romney*, 256 F. Supp.2d 115 (D. Mass. 2003); *Triple Five of Minnesota, Inc. v. Simon*, 212 F.R.D. 523 (D. Minn. 2002); *Comeau v. Rupp*, 810 F.Supp. 1172 (D. Kansas 1992). "Control" does not require that a party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control for discovery purposes when that party has the right, authority, or practical ability to obtain the documents from a nonparty to the suit. *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997). BenQ's counsel was undoubtedly aware of this rule, and expressed his understanding of it in the March 2, 2005, hearing. Transcript of Hearing, p. 29, ll. 7-21 (The Court: So you understand, the Court considers in your control to be more than physically in your possession. You understand that don't you? Mr. Risley: Yes, sir. . . .). What became apparent during the May 23, 2005, hearing, [*20] was that BenQ failed to discharge its obligations before representing to the court it had produced all relevant documents.

The court finds that at the March 2nd hearing, BenQ misrepresented the status of its efforts to comply with its discovery obligations. BenQ failed to conduct a diligent search to identify and produce documents in its possession, custody, or control, including documents which may have been in the technical, physical possession of a legally distinct entity. These documents include the signed MOU agreement, the emails relating to the dismissal of the third-party claim (whether privileged or not), and the technical documents obtained from the PBDS joint venture. The court further finds that BenQ made no inquiry of Philips to confirm that no signed copy of the MOU existed prior to representing to the plaintiffs and the court that the MOU had not been executed. The court also finds that BenQ made no reasonable search for documents relating to the dismissal of the third-party action against Philips and PBDS.

With respect to the documents produced from PBDS, the court finds that BenQ failed to conduct a diligent effort to obtain documents relating to the PBDS joint venture [*21] and failed to search for and obtain documents over which BenQ had the right of control and access, including documents in the physical possession of employees of the PBDS joint venture. To this end, the documents relating to the PBDS joint venture are (and always have been) within the control of BenQ for discovery purposes because BenQ has a 49% ownership interest in the joint venture. Pursuant to the terms of the joint venture agreement, BenQ has the right to appoint members to the board of directors. Under the testimony at the hearing, BenQ's employees in the Design House regularly access documents of the joint venture in the course of BenQ's business. That T.T. Chen was the contact person from whom many of the documents were obtained solidifies the court's findings on this issue. T.T. Chen was, during the pendency of this case (and throughout much of the time that BenQ should have been searching for and producing documents), an employee of BenQ. The court simply will not permit BenQ to reassign its employees to PBDS and then rely on that reassignment to avoid its production obligations in this case. Based on these findings, the court issues the sanctions announced at the May 23, 2005, hearing: [*22] that BenQ will now have one-third the amount of time allotted to the plaintiffs for *voir dire*, opening statements, and closing arguments. The court also awards the plaintiffs their attorney's fees in presenting the motion for sanctions. Any further relief sought by the motion for sanctions presented at the May 23rd hearing is denied.

### 3. Discovery Issues Identified in Reports to the Court.

The court will now turn to the discovery issues which remain in the case and those which have emerged since the May 23, 2005, hearing. At the May 23, 2005, hearing, the court instructed the plaintiffs to submit a report detailing the document discovery still outstanding and any depositions necessary to prepare the case for trial. The court has received that report, as well as additional correspondence from counsel on both sides of the case. By this order, the court has instructed the clerk to file these submissions in the record.

The starting point for the court's review of outstanding discovery issues is the plaintiffs' May 27, 2005 correspondence. However, because both sides have sent a litany of correspondence to the court with updates

and new problems, the court has attempted [*23] to distill from these submissions the discovery areas which appear to have been addressed, and those which have not yet been addressed. In addition, BenQ changed counsel in the interim, and substitute counsel has represented that his role since the substitution has been to assuage the plaintiffs' outstanding discovery concerns. As a consequence, although the court has carefully reviewed all of the correspondence and the plaintiffs' various motions to compel, the court will address the issues in the light of the plaintiffs' May 27, 2005, correspondence, the correspondence received from Mr. Tyler dated July 13, 2005, and the correspondence received from Mr. Jones on July 27, 2005.

On May 27, 2005, the plaintiffs forwarded correspondence to the court and explained what discovery was still outstanding from BenQ Corporation and from BenQ America. As against BenQ Corporation, the requested discovery fell into three broad categories-technical information, financial information, and collection of documents. As to technical documents, the plaintiffs identified 6 areas: (1) disc recognition/discrimination, as implemented in the PBE Purple Basic Engine Project; the Data Ref 5 Project; and the [*24] Data 3 Basic Engine Project; (2) start up procedure and subroutines for all DVD drives as exemplified for the Data-3 bit Engine in the document identified as BQC098438-098473; (3) BenQ Design House documentation of theory of operation for source code of all DVD drives in relation to disc recognition/discrimination, including DVD single layer/dual layer determination; (4) source code and related design documentation for disc recognition/discrimination in all DVD drives, including subroutines identified as "servo.c," "focus.c," "svr_disc.c," and "disked.c" in BenQ's supplemental responses to Interrogatory no. 4; (5) BenQ Design House implementation of servo control hardware implementing disc recognition/discrimination in all DVD drives; and (6) samples of all non-commercially available DVD drives, including those designated 1040A; 1640A2; 1648M; 2212DW; 1640T6; DW1600; 1640A; 1648A; 2108VR;8032EP; OPAL; CB482B; EW1621; and DW822A. The plaintiffs also requested 30(b)(6) witnesses to testify as to these areas, as well as the depositions of Andy Y.C. Song and Jerome Wu Stoic.

With respect to damages discovery sought from BenQ Corporation, the plaintiffs' May 27th letter sought

seven categories [*25] of information: (1) the identification of the number of DVD drives, differentiated by model and year, which BenQ has sold to Philips, PBDS, BenQ America and third parties, imported into the United States, offered for sale, and transported to Philips, PBDS, BenQ America and third parties; (2) the identification of that operating income realized by BenQ in the sale of DVD drives; (3) the identification of those costs incurred by BenQ in the sale of the DVD drives; (4) documents relating to BenQ's third party claim against PBDS and Philips; (5) documents evidencing BenQ's license negotiations with third parties; (6) the identification of all DVD drives sold, offered for sale, transported to the United States, and imported to the United States; and (7) the identification of whether BenQ obtained an opinion of counsel in this case, and when it was requested. As in the technical areas, the plaintiffs sought a 30(b)(6) witnesses to testify on these subjects.

Third, the plaintiffs sought discovery into BenQ Corporation's efforts to collect documents. Specifically, the plaintiffs sought documents evidencing when BenQ received documents from PBDS, Philips and Pioneer, and documents evidencing [*26] when BenQ made request on any third party for the production of documents in this case. Likewise, the plaintiffs sought a 30(b)(6) witness to testify as to BenQ's efforts to obtain documents in this case from PBDS and all third parties.

With respect to BenQ America, the plaintiffs sought discovery into two areas-technical and financial. Specifically, the plaintiffs' May 27th correspondence requested technical discovery with respect to drives sold, offered for sale, or imported into the United States by BenQ America to the extent the drives were different from those addressed in connection with BenQ Corporation. As to financial discovery, the plaintiffs desired a full and complete response to Interrogatory Nos. 8, 15, 16, and 17. The plaintiffs also demanded an identification of the number of DVD drives, differentiated by model and year, which BenQ America has sold, imported into the United States, and offered for sale. As to these categories of financial information, the May 27, 2005, correspondence indicated a need for 30(b)(6) depositions on damages. The correspondence also stated that no depositions of BenQ America (presumably on technical issues as well) had been conducted.

[*27] On July 13, 2005, the defendants' new

counsel sent correspondence to the court in response to the plaintiffs' motions to compel and the plaintiffs' May 27th report. [5] Although the July 13th letter itemizes several distinct responses, the court has attempted to distill those responses to correspond to the plaintiffs' requests. In addition, on July 27, 2005, the plaintiffs responded to the defendants' July 13th correspondence. In light of these events, the court will now issue orders, to the extent possible, on the various items identified in the plaintiffs' May 27th report as well as in the most recent submissions. These rulings will attempt to track the areas identified in the plaintiffs' May 27, 2005, correspondence.

> 5   Between May 27, 2005, and July 13, 2005, the parties sent several other letters to the court in response to and in reply to the issues raised in the plaintiffs' May 27, 2005, report. The court has considered that correspondence in connection with this order. The court will focus on the issues as they now exist, as reflected in the parties' most recent submissions.

[*28] As to technical documents of BenQ Corporation, the defendants state that not all source code for the DVD drives at issue implements the PBE Purple Basic Engine, Data Ref 5 Project and Data 3 Basic Engine Technology. However, for the DVD drives that BenQ is aware implements such technology, source code has been produced. Based on the submissions, the court orders the production of all documents in the possession, custody, or control of the defendants which reflect disc recognition/discrimination, as implemented in the PBE Purple Basic Engine Project; the Data Ref 5 Project; and the Data 3 Basic Engine Project. The court also orders the defendants to produce all documents within their possession, custody, or control showing source code and related design documentation for disc recognition/discrimination in all DVD drives, including subroutines identified as "servo.c," "focus.c," "svr_disc.c," and "disked.c" in BenQ's supplemental responses to Interrogatory no. 4.

With respect to start-up procedure and subroutines for all DVD drives, BenQ represents that all of the documents "found to date" related to start-up procedures and subroutines for DVD drives at issue have been produced. Based [*29] on the submissions, the court orders the defendants to produce all documents which reflect start up procedure and subroutines for all DVD

drives as exemplified for the Data-3 bit Engine in the document identified as BQC098438-098473 and other similar documents. The court's review of this document reveals that it and others like it are highly relevant to the technical aspects of this case. That this document was not produced until April (after the parties had staked out their claim construction positions) is inexcusable.

Next, as to BenQ Design House Documentation on Theory of Operation re: Disc Discrimination/Recognition and implementation of servo control hardware implementing disc recognition/discrimination in all DVD drives, BenQ asserts that "[d]ocuments from the BenQ Design House for the drives at issue have been produced since at least the April 2005 time frame." Based on the submissions, the court orders the defendants to produce all BenQ Design House documentation of theory of operation for source code of all DVD drives in relation to disc recognition/discrimination, including DVD single layer/dual layer determination as well as all documentation reflecting the implementation [*30] of servo control hardware implementing disc recognition/discrimination in all DVD drives. [6]

> 6   BenQ has represented that it has offered to produce samples of all DVD drives at issue in their possession, custody, or control-whether commercially available or not. The court accepts that these drives have been produced. BenQ, however, is reminded that drives within its control would include drives within the control of affiliates.

As to the damages-related documents, the court prefaces this discussion with the observation that all of the areas identified by the plaintiffs are relevant for discovery purposes. With respect to specifics, the defendants contend that they disclosed to the plaintiffs all shipments from BenQ's manufacturing facilities into the United States, regardless of whether BenQ considers such shipments to "sales" made in the United States. [7] BenQ states that it has not produced documents showing sales to third parties other than PBDS, where BenQ has not shipped product to the United States, on [*31] the grounds that those documents are not relevant to any claim or defense of any party. The plaintiffs' July 27th correspondence does not argue that the plaintiffs are entitled to this information, so the court will assume that it need not resolve this issue.

> 7   The parties dispute whether, for purposes of

royalty calculations, certain "shipments" into the United States constitute sales of the accused devices.

The defendants also contend that they have now identified their costs and operating income for BenQ in Defendants' Seventh Supplemental Response to Interrogatory Nos. 16 and 17. The plaintiffs' July 27, 2005 correspondence concedes that these Interrogatories have been supplemented. Based on the submissions of the parties, the court assumes, aside from the timeliness of the supplementation, that the issue has been resolved.

With respect to documents related to BenQ's third-party claim against PBDS and Philips, BenQ notes that the court ordered the defendants to tender certain e-mails in camera to the court [*32] to assess whether those e-mails are privileged. The defendants have tendered those documents and represent implicitly that no other documents exist. The court has previously determined that such materials, to the extent they are not privileged, are relevant and must be produced. The court has reviewed the documents tendered in camera. As to the contention that a joint defense privilege exists, the defendants are ordered to tender in camera within ten (10) days any joint defense agreement relied on to support that assertion. In addition, the defendants shall tender, within (10) days, any declarations tending to show that the withheld materials are privileged.

The court next addresses the opinion of counsel issue. The defendants contend that no discovery into the existence of opinions of counsel should have occurred before the P.R. 3-8 deadline of July 29, 2005. The defendants also asserted that as of that date, they would identify, at a minimum, any the existence of any opinions of counsel and the dates on which the defendants sought those opinions, together with the items required by P.R. 3-8. That date has now passed, and the court need not reach the issue whether, in light of P. [*33] R. 3-8, a defendant in a patent suit is required to identify the existence and date of any opinion of counsel earlier than the deadline set for disclosing the opinion itself. The court assumes that the defendants have now provided the information, and, to the extent they have not, they are ordered to do so.

As to documents evidencing when BenQ requested and received documents from third parties, BenQ states it has produced those documents it has located. The court finds that these documents are discoverable given the

history of this case and orders that they be produced.

The court now considers the discovery requested from BenQ America. The defendants state that BenQ America is a sales and marketing company "that is not intended to generate" technical documents and that the defendants have agreed that BenQ Corporation's corporate technical deposition would also bind BenQ America. This is insufficient. To the extent any of the technical material ordered to be produced from BenQ Corporation or requested by the plaintiffs with respect to BenQ America is within the control of BenQ America, the court orders it to be produced.

As to damages information, BenQ America states it has supplemented [*34] interrogatories 8, 15, and 16 and is confirming whether BenQ America keeps records of incremental gross profit realized by BenQ America. If such records exist, then BenQ America contends it will supplement its response to interrogatory No. 17 as well. Although again challenging the timeliness of the supplementation, the plaintiffs appear to concede that BenQ America has supplemented its interrogatories. Aside from the timeliness, the court assumes that this issue has been resolved.

Notwithstanding these rulings, the plaintiffs' July 27th correspondence sets forth several areas which, even in light of the representations made by the defendants' July 13th letter, still need to be addressed by this court. The plaintiffs continue to assert that BenQ has not produced technical documents relating to certain drives manufactured by Pioneer and Philips, although the plaintiffs note that BenQ witnesses have suggested that Philips and Pioneer have never "refused" a demand for technical documents by BenQ. The plaintiffs also argue that the defendants have produced many documents which are only tangentially relevant and have produced several blank pages of material, suggesting that the defendants' [*35] production tactic has now shifted to an effort to bury relevant material in a sea of production which includes many irrelevant documents. The plaintiffs also state that the defendants are continuing to produce materials that should have been produced no later than February 2005, when the defendants had stated they had undertaken a diligent search for documents. The correspondence reflects that the plaintiffs were prejudiced in taking their damages depositions because of the late supplementation of interrogatory responses. As an additional example, the plaintiffs note that the defendants

supplemented their responses to Interrogatories Nos. 15 and 16 to disclose operating expenses and operating income for DVD drives sold during the *1999-2000* time frame. In addition, the defendants only recently agreed to produce documents relating to the licensing of DVD technology. Finally, and most troubling, the plaintiffs contend that the defendants recently disclosed that they have been selling and offering for sale in the United States, since 2004, seven additional models of DVD drives. [8]

> 8 Depending on how one reads counsel's July 27, 2005, correspondence, the defendant disclosed the existence of these drives either on July 8, 2005 or in supplemental responses to interrogatories served on July 12, 2005. This distinction is not material. Either way, interrogatories requesting this information were originally propounded to BenQ Corporation on September 15, 2004, and to BenQ America on December 16, 2004.

[*36] The court first considers the production (or lack thereof) of technical documents showing the operation of drives manufactured by Philips and/or Pioneer. Throughout this case, BenQ has taken the position (wrongly, as it turns out with respect to PBDS) that it has no control over documents in the possession of third parties. BenQ has affirmatively represented that drives sold by BenQ prior to the formation of the PBDS joint venture were manufactured by either Pioneer or Philips. For several years, BenQ purchased and sold large quantities of these drives. Given this relationship, the plaintiffs doubt that BenQ does not have access to or the legal right to demand documents demonstrating the operation of those drives. At the February hearing, the court suggested that it had confronted similar arguments, and the court would simply question the corporate representative with the most knowledge of the commercial relationships between the parties.

The plaintiffs suggest in their July 27th letter that sufficient evidence exists at this time for the court to sanction BenQ for its failure to produce technical documents from Pioneer and Philips. The plaintiffs have offered testimony from BenQ's [*37] witnesses which suggests that those witnesses are unaware of any situation in which Pioneer or Philips have refused a demand for documents. But commercial cordiality is not the same as control in the sense required to hold BenQ responsible for documents in the possession of these third parties. Thus,

although the plaintiffs have not persuaded the court that the Pioneer and Philips documents referenced in counsel's July 27th letter are necessarily within the control of BenQ at this time, neither is the record sufficient to reach a contrary conclusion. This court is therefore persuaded that BenQ should sponsor a witness in court to answer the court's inquiries as to the commercial relationship between these parties so that the court may determine with some assurance the scope of technical documents that fall within or without the control of BenQ.

Accordingly, BenQ shall designate a 30(b)(6) witness(es) to testify in court as to the following areas: the complete details of the commercial relationship between BenQ, Pioneer and Philips from 1999-the present; any written and/or oral agreements governing the purchase or sale of products between the companies; the revenues derived from 1999-the [*38] present from the commercial relationship between the companies; any requests by BenQ to Pioneer or Philips for technical documents showing the operation and functionality of any optical disk drive during the course of the commercial relationship between BenQ and Pioneer or BenQ and Philips from 1999-present together with the responses to such requests; any requests for documents between the two parties relevant to this litigation; the identities of all employees of BenQ involved in making such requests; and the content of any responses to those requests.

As for documents, BenQ shall also produce to the court all written contracts evidencing any commercial relationship between BenQ, Pioneer, and Philips from 1999-present. BenQ will also produce any and all written requests for technical documents showing the operation and functionality of any optical disk drive during the course of the commercial relationship between these companies from 1999-present. Likewise, BenQ will produce any and all written requests for documents made by BenQ to either Pioneer or Philips during the course of this litigation and will produce any written documents evidencing Pioneer's or Philips' response to [*39] these requests. Finally, BenQ will produce any documents, such as telephone records, evidencing the timing of any oral requests for documents made during the course of this litigation. The court will conduct this examination on August 31, 2005. The parties will be invited to question the witness(es) as well. If the court determines, at the conclusion of the hearing, that BenQ did in fact have the right of access to or control over these documents, BenQ

will then necessarily be in violation of several orders compelling production of all material in its possession, custody, or control, and additional sanctions would be warranted.

In addition, the court will consider whether to re-open any depositions based on late production at the August 31, 2005 hearing. Despite the plaintiffs' complaints concerning timeliness, the court is able to cure any prejudice from late supplementation of damages information by re-opening deposition discovery and charging the costs to the defendants. The court will consider the extent to which it will grant such relief on August 31st.

The court next considers the plaintiffs' complaint that the defendants are "over-producing" documents to hide relevant material. [*40] This record is insufficient for this court (or any court) to judge this type of complaint. At the most fundamental level, this court does not have before it the complete production to assess what portion is relevant and what is not. Moreover, given the numerous complaints by the plaintiffs about the lack of information produced by the defendants, it is not surprising that the defendants would opt for a broad view of relevancy (as the court has indicated is appropriate). The court certainly does not condone the "needle in the haystack" approach. But just as it is improper for a producing party to bury a relevant document in a hoard of irrelevant material, it would be equally improper for this court to condemn a party's entire production based on a few blank pages attached to a submission, without considering the entirety of the production itself.

The most troubling aspect of the plaintiffs' July 27th correspondence is the plaintiffs' statement that BenQ recently identified seven additional models of drives sold in the United States since 2004. Quite obviously, this information did not come to BenQ from a third party-it is BenQ who has been in possession of this information. [9] Moreover, [*41] the identities of drives sold into the United States have been at issue since the very first discovery requests served by the plaintiffs. All that follows, including technical information, sales data, and cost information, depends on an accurate identification of the models of drives sold into the United States. The court can only conclude that, if BenQ in fact only recently disclosed the existence of these drives, that this information was withheld in an attempt (a) to shield BenQ from liability findings as to those drives or (b) to

delay the trial. If the record bears this out, such conduct warrants additional sanctions.

> 9  BenQ is not in a catch-22, and the court rejects any such suggestion advanced in BenQ's most recent correspondence to the court. BenQ's obligations were to search for and disclose all relevant materials long ago. The court granted BenQ a reprieve until early March, 2005, to bring itself into compliance with the court's orders and the plaintiffs' discovery requests. BenQ represented it had conducted diligent searches for documents, yet it continues to locate and produce materials it should have produced long ago.

[*42]  The court, *sua sponte*, orders BenQ to show cause why the court should not issue a preliminary injunction against BenQ to cease any efforts relating to the sale, offer for sale, or use of these recently identified products through the PBDS joint venture or otherwise to entities for importation to the United States market. *Cf. Aurora Bancshares Corp. v. Weston*, 777 F.2d 385 (7th Cir. 1985)(suggesting that plaintiff's abuse of the pre-trial discovery process provides sufficient justification for striking plaintiff's preliminary injunction request). If the court ultimately determines that BenQ wrongfully withheld the identities of these drives during the discovery process, the court would find this sanction to be appropriate under the circumstances. Discovery misconduct would suggest to a court sitting in equity that a party is not comfortable with its position on the merits. *See Residential Funding Corporation v. Degeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)(approving adverse inference instruction when a party was purposefully sluggish in producing relevant materials in discovery on grounds that delay warranted inference that the materials [*43] were harmful to a party's case). The prejudice flowing from discovery misconduct which has the practical effect of delaying trial on the merits of an intellectual property right could be sufficiently cured with preliminary injunctive relief. The court sets this show cause hearing for August 31, 2005, at 2:00 p.m., in Marshall, Texas. The court will take up the additional discovery issues identified in this order after the conclusion of that hearing. Based on the parties' joint motion to modify the scheduling order, the court will continue this case. The court will set a new schedule at the August 31, 2005, hearing.

SIGNED this 5th day of August, 2005.

2005 U.S. Dist. LEXIS 42763, *43

T. JOHN WARD                                          UNITED STATES DISTRICT JUDGE