# EXHIBIT C

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

In the Matter of

    **SXP ANALYTICS LLC,**                      **Case No. 12-25297-MDM-11**

    **Debtor.**
_____

### MOTION FOR AUTHORITY TO OBTAIN DOCUMENTS
### AND TAKE EXAMINATIONS PURSUANT TO RULE 2004
_____

SXP Analytics LLC, the debtor in this case, moves, pursuant to Fed. R. Bankr. P. 2004, for authority to (i) orally examine Dr. Andriy Kuharsky on certain matters described on Addendum 1, and (ii) require production of certain non-confidential records of securities transactions executed from August 27, 2002 through December 31, 2008 as more particularly described on Addendum 1.   The information sought is necessary for SXP to formulate and negotiate a plan of reorganization that allows it to continue operating its business, retain its employees and, meet its obligations to creditors.   In support of this motion, SXP states as follows:

### *Jurisdiction*

1.      SXP filed for relief under Chapter 11 of the Bankruptcy Code on April 17, 2012 and continues to operate its business pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

Jerome R. Kerkman
Joseph R. Cincotta
Kerkman & Dunn
757 N. Broadway, Suite 300
Milwaukee, WI 53202
Ph: 414.277.8200
Fax: 414.277.0100
Email: jkerkman@kerkmandunn.com

3.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B) as a matter concerning the administration of the estate and allowance or disallowance of claims against the estate.

### *Summary Factual Background*

4.    SXP filed this chapter 11 case because litigation costs were consuming all its profits and then some.  As described later in the motion,[1] SXP became embroiled in litigation with Quantlab Financial Services LP and its affiliated companies (collectively, "Quantlab") and Dr. Vitality Godlevsky over Quantlab's allegations that Dr. Godlevsky took certain proprietary information.  Quantlab filed a case in Federal District Court located in Houston and persuaded the FBI to investigate SXP for its alleged role in working with Dr. Godlevsky.

5.    Dr. Godlevsky also sued SXP.  SXP had employed Dr. Godlevsky after Quantlab fired him in March 2007.  Dr. Godlevsky and Emmual Mamalakis formed SXP in August 2007.  Dr. Godlevsky lent approximately $480,000 to SXP.  Dr. Godlevsky also introduced Dr. Andriy Kuharsky to Mamalakis and SXP during 2007.  Dr. Kuharsky had been fired by Quantlab at the same time as Dr. Godlevsky.  Drs. Godlevsky and Kuharsky made written and oral representations to Mamalakis at the time they joined SXP that they had no proprietary information of Quantlab.[2]

6.    After Quantlab sued SXP, in the spring of 2010, Mamalakis quizzed Dr. Godlevsky on why Quantlab and the FBI would believe SXP had misappropriated Quantlab's proprietary information.  Mamalakis learned from Dr. Godlevsky that Quantlab was defrauding

---

[1]  SXP is setting forth a more detailed description of the factual basis later in the motion in order to provide the Court with a better understanding of the complexity and resulting enormous cost threatening SXP's business.  The facts in this section  are provided in summary fashion so that the Court has a simple version of why the relief requested is necessary.

[2]  Mamalakis was on guard for this issue because he knew that Quantlab had sued Godlevsky to enforce a confidentiality agreement.

investors by "front-running" its third party security customers. Quantlab feared it would be exposed by SXP because of Mamalakis' background as a securities litigation lawyer. The only reasonable explanation is that Quantlab attacked SXP with the intent to shut SXP's business down and prevent Quantlab's securities fraud from being discovered.

7.    Drs. Godlevsky and Kuharsky are no longer associated with SXP. However, the aftermath of their involvement is "scorched earth litigation" to put SXP out of business. During the last six months since the Texas litigation ramped up after being stayed (August 2010 – December 2011), SXP has incurred legal costs of $901,514. SXP's net profits during the same period were $(2.2) million. SXP's lawyers forecasted litigation expenses to run approximately $150,000 on average per month. The "handwriting is on the wall": at this rate SXP will run out of money and its business will close.

8.    SXP faced being driven out of business by litigation costs. It sought chapter 11 protection to manage the litigation costs and, if claims were owed, to structure payment of claims in a way that preserved SXP's business and retained its 28 employees (down from 60 employees 12 months ago).

9.    In order for SXP to propose a plan and pay the maximum to creditors, it needs certain information relating to the amount of several claims, the value of causes of action that are assets of SXP's estate, and contingent creditors of SXP, so that proper notice can be given.

### *Legal Basis for Motion*

10.    Rule 2004 authorizes the Court to enter an order permitting a debtor or other party in interest to examine any entity, including third-parties, during a bankruptcy proceeding. The rule allows for investigation of a debtor but is also designed to allow a debtor, in particular as part of a chapter 11 reorganization, to investigate matters related to the financial condition of the

3

estate.  These include reviewing claims or potential claims against the debtor, the identity of potential creditors, and assets in the form of meritorious court actions or claims.  Third-parties may be compelled to produce records pursuant to a subpoena issued under Rule 9016.

11.   Rule 2004 examinations are favored and broad.  Granting an examination request is within the discretion of the court.  *See, In Re International Fibercom Inc.,* 283 B.R. 290, 292-93 (Bankr. D. Ariz. 2002).  When considering a Rule 2004 request, the Court views the predicate facts in the motion in favor of the movant by putting the burden to prevent the examination upon objectors.  *See, In Re Buick*, 174 B.R. 299, 304 (Bankr. D. Colo. 1994).

12.   Pursuant to the broad scope of Rule 2004 examinations, courts are inclined to allow Rule 2004 examinations, in particular when they are aimed at aiding the Debtor in discovering facts related to its financial circumstances.  *In Re Ionosphere Clubs Inc.,* 156 B.R. 414, 432  (S.D.N.Y. 1993), *aff"d,* 17 F.3d 600 (2d Cir. 1994) ("because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation).

13.   The nature and scope of information that may be sought under the Rule is sometimes referred to as a "fishing expedition."  *See, e.g., Bank One, Columbus, N.A. v. Hammond,* 140 B.R. 197, 201 (S.D. Ohio 1992).  SXP already has some evidence; it is seeking additional evidence on contingent creditors, assets of the estate and amounts of claims, all of which is necessary for it to file a plan and exit chapter 11.  *See, In re Bennetton Funding Group, Inc.,* 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996); *In Re Washington Mutual* 408 B.R. 45, 53 (Bankr. D. Del. 2009) (one of the primary purposes of a Rule 2004 examination is as a pre-litigation device).

*Information Needed for Plan Purposes*

14.      Quantlab and Dr. Godlevsky hold the two disputed claims driving SXP's litigation costs that required the chapter 11 filing.  Quantlab has never quantified its claim.  Dr. Dr. Godlevsky alleges he is owed $1.8 million.  Additionally, the facts known to SXP show that Dr. Godlevsky's claim arises from money on which third parties can claim a constructive trust. To the extent that his claim is viable, other third parties have a right to receive notice of their interest in the claim. SXP needs to provide this notice so that it does not face those claims later.

15.      Determining liability for Quantlab's claim as part of defending the Texas lawsuit would be extremely expensive.  As is readily apparent from the detailed statement of facts that follows, discovery will entail many depositions at multiple locations around the country, retention of expert witnesses and thousands of pages of documents.

*The Need for Information to Quantify Quantlab's Claim*

16.      Quantlab's claims against Debtor are left open-ended in Quantlab's pleadings. The only specific amount sought to date is $5,000 for investigation of the allegedly wrongful downloading of computer code by Drs. Godlevsky and Kuharsky.  SXP assumes Quantlab seeks more than $5,000 given the amount it is spending on litigation.  Quantlab's legal theory is misappropriation of trade secrets and the claims flowing from it.  The "amount at stake" is frequently the starting basis for resolving treatment of claims in plans of reorganization.  For example, if the maximum of Quantlab's claim is $10,000, SXP could very well decide to simply pay the claim and be done with it.

17.      Rule 2004 provides a tool in a chapter 11 proceeding to get to the bottom line: how much is at stake here. The amount of a claim for misappropriation of trade secrets in Texas is the value of a "reasonable royalty" or "fair licensing price."  In determining those damage

5

amounts, the trier of fact considers "the total value of the secret to the plaintiff." *Calce II v. Dorado Exploration, Inc.,* 309 S.W.3d 719, 738 (Ct. App. Tex. 2010). Other claims that Quantlab has asserted include tortious interference with contractual relations. Damages in that claim are derived from a plaintiff's (i.e. Quantlab's) lost profits. An unjust enrichment measure of damages is available only "where the plaintiff's lost profits are not readily ascertainable." *Sandare Chemical Co., Inc. v. WAKO Intern., Inc.,* 820 S.W.2d 21, 23 (Ct. App. Tex. 1991).

18.    SXP asserts, based upon the information detailed in the facts that follow, that the trade secrets Drs. Godlevsky and Kuharsky allegedly misappropriated have no value. This is because even if the computer code that Drs. Godlevsky and Kuharsky took was used in SXP's operations, Quantlab's revenues and profits appear to have been wholly or substantially derived from its fraudulent securities "front running" not the allegedly proprietary nature of its code.

19.    SXP's proof that Quantlab's damages are from illegal profits requires the disclosure of information that is ***not confidential*** and can be ***accessed with minimal effort.*** Quantlab has destroyed the evidence by failing to keep required records (for which it has been sanctioned) so the information must be obtained from third parties. The information sought will show the ordering and execution of securities transactions. Companies executing the trades are required to maintain information showing the subject and timing of their orders for a stock purchase or sale. The information sought consists of (i) the securities transactions being ordered (ii) the order price (iii) trades that Quantlab ordered on its own behalf and, (iv) trades that Quantlab executed on behalf of its third party customers on securities Quantlab had ordered or sold. Obtaining the information is not burdensome: it is a matter of electronically sorting and downloading information residing on the computer servers of third parties. SXP will pay any costs incurred by the third parties to provide the information. SXP also needs the identity of the

6

pneumonics (i.e. the trading symbols) that Quantlab traded under and the exchanges on which it traded during the time so the records can be interpreted.

20.     Once it has this information, SXP can confirm whether or not the allegedly proprietary information that Drs. Godlevsky and Kurharsky are supposed to have taken (and for which Quantlab decided to sue SXP) has any *legal* value.

### The Need for Information to Determine Whether SXP Has Affirmative Claims Against Quantlab

21.     Quantlab's actions to engage SXP in sham litigation and encourage a fruitless FBI investigation against SXP – and to misrepresent the facts in order to do so – have cost the SXP inordinate sums on litigation costs and expenses.  These actions create a basis for SXP to pursue claims for anti-competitive behavior and restraint of trade under federal law.  *See, e.g. Alternative Electrodes, LLC v. EMPI, Inc.*, 597 F. Supp. 2d 322, 330 (E.D.N.Y. 2009) ("[t]here is no question that the pursuit of litigation may, in some circumstances constitute a form of anti-competitive activity and be actionable under 15 U.S.C § 1").

22.     In addition, SXP may have a claim under Wisconsin law for conspiracy to injure SXP's business reputation based on Quantlab's use of knowingly false statements in its Texas pleadings.  *Wis. Stat.* § 134.01; *see also Radue v. Dill*, 74 Wis. 2d 239 (1976) (false statements in court pleadings may form basis for claim for conspiracy to injure on behalf of victim of such statements – immunity of pleadings rule inapplicable).  Under Wisconsin law, when two or more persons combine for the purpose of injuring a person in its business reputation, such conduct is actionable for conspiracy to injure under *Wis. Stat. §* 134.01.  *Radue*, 74 Wis. 2d at 244.

23.     Quantlab's actions to encourage a wasteful and ultimately fruitless federal criminal investigation, and to use knowingly false statements in its federal court pleadings against SXP raise a claim for conspiracy to injure under Wisconsin law.  This potential claim of

7

SXP arises directly from the purpose of its Chapter 11 petition and need to reorganize – to avoid costly and vexatious litigation that is draining the company.  SXP needs to investigate, assess, and potentially prosecute its potential claims against Quantlab and its affiliates for antitrust violations and conspiracy to injure.

24.    A debtor-in-possession pursuing reorganization under chapter 11, like a trustee, is under a duty to investigate any claims that may be assets for the estate.  *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. S.D.N.Y. 1983) (the trustee has an affirmative duty to discover assets).  Potential legal claims against third parties are well understood as property of the estate.  As courts have noted, even contingent claims that a debtor may have from acts arising pre-petition are property of the estate.  *See, e.g., In re Tajonji*, 174 B.R. 964, 969 (Bankr. N.D. Ill. 1994) (property of the estate includes "interests of all types and degrees of contingency").

25.    Rule 2004 is designed to provide the tools for a debtor and other parties to investigate such claims.  The pursuit of a legal claim that could augment the estate is a common and widely accepted use of the Rule 2004 examination.  *In Re Mittco,* 44 B.R. 36 (Bankr. E.D. Wis. 1984) (Rule 2004 examination seeking to investigate potential prosecution of claims and whether any assets of debtor are undisclosed and not accounted for is a proper area of inquiry as it pertains to debtor's financial affairs and affects administration of debtor's estate).

### The Need for Information Relating to Dr. Godlevsky

26.    Dr. Godlevsky claims that he is owed $1.8 million on account of his SXP capital account.  (Declaraton of D. Adams at Exhibit 10: Texas Complaint at ¶ 13). He claims to have invested $500,000 into SXP that apparently grew to the $1.8 million.  (*Id.* Texas Complaint at ¶10).  SXP needs information about the fraudulent securities trading for three reasons.

8

***The Need to Identify Creditors Entitled to Notice of This Case***

27.    If the money Dr. Godlevsky used to invest in SXP was from ill-gotten profits of an illicit securities fraud scheme and Dr. Godlevsky used SXP to hide the money from victims of the fraud, the victims would have a claim against any amount due Dr. Godlevsky on his claim as part of a disgorgement of his profits.  *See, FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997) (upon finding of unfair and deceptive practices, defendants must reimburse victims for their losses); *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1474 -1475 (2d Cir. 1996) (once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits); *see, e.g., SEC v. Lorin,* 76 F.3d 458, 461–62 (2nd Cir. 1996) (per curiam).  A constructive trust is imposed when property that is in the possession of a party was not properly vested in that person. *Connecticut General Life v. Merkel*, 90 Wis. 2d 126, 130 (1979) ( "[w]here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises").

28.    Because SXP has knowledge that there are potentially claims to the payments that may be made on Dr. Godlevsky's claim, SXP could be held accountable to the victims for failing to hold the funds for their benefit.  *Id*.

29.    The investigation of a debtor's exposure to claims or potential claims is a proper purpose for pursuing discovery under Rule 2004.  *In Re Washington Mutual*, 408 B.R. 45, 53 (Bankr. D.Del. 2009) (legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred).

30.    Additionally, a debtor is required to provide notice to all parties in interest of which it has knowledge so they protect their rights.  11 U.S.C. § 521(a)(1)(A); Fed. R. Bankr. P

9

1007(a)(1).

31.     To meaningfully assess its exposure to potential disgorgement claims and manage any likely claims as part of its reorganization, SXP must be allowed to determine whether Quantlab's and Dr. Godlevsky's activities have put SXP at risk.

### The Need to Determine SXP's Defense to Dr. Godlevsky's Claim

32.     In addition to Dr. Godlevsky's misrepresentations to SXP that he had no proprietary information of Quantlab (if the allegation is true), SXP also has a defense to Dr. Godlevsky's claims under the rule of unclean hands.  "The clean hands doctrine refers to the equitable doctrine that a plaintiff who seeks affirmative equitable relief must have clean hands before a court will award such relief." *S & M Rotogravure Service v. Baer*, 77 Wis. 2d 454, 446 (1977).  Relief is denied to a claimant where the conduct constituting unclean hands is the cause of the harm that the claimant seeks to remedy.  *Id.; see also, Lebedinsky v. Akhmedov*, 321 Wis. 2d 748, ¶ 10 (Ct. App.2009) (Declaration of D. Adams at Exhibit 19: Copy of Court of Appeals Decision, Unpub.).

33.     Dr. Godlevsky used ill-gotten gains from securities fraud to invest in SXP and hide the money from victims of the front running fraud.  He cannot claim profits from SXP based upon dirty money that he put into SXP.

### The Need to Investigate Causes of Action Against Dr. Godlevsky

34.     As a result of Dr. Godlevsky's actions and omissions, SXP also has potential claims against him for damages equal to the litigation costs it has incurred in the Texas matter. *Meas v. Young,* 142 Wis. 2d 101, 105-07 (Ct. App. 1987) (citing *Weinhagen v Hayes*, 176 Wis. 62 (1922)) (attorney's fees awarded as damages when third party has embroiled party in litigation).  This asset of SXP (the claim against Dr. Godlevsky) must be investigated to

10

determine if it has value.

### *The Need to Examine Dr. Andriy Kuhasky*

36. In addition to the documents identified, SXP also needs to orally examine Dr. Andriy Kuharsky in a deposition format.  He has first-hand knowledge of the front running securities fraud and he is a neutral person who has not asserted a claim against SXP so he should give credible testimony.

### *Quantlab's Anticipated Objection to this Motion*

36. SXP anticipates that Quantlab will claim that the district court judge in Texas has ruled on this issue – the relevance of the trading information to the claims in that case – as it alleged in its motion to dismiss these proceedings. (Dkt. 48 at ¶27).  This argument fails however for two reasons.

37. The Texas court held the information sought was not relevant at that point in the case.  That does not mean it is not relevant in this matter.  The Court also left the issue open to be re-visited regarding other parties in the case.  (Declaration of Dan Adams at Exhibit 20: Order on Motion to Compel at p.5, n.1, Exhibit 13: Trans., of Hearing on Motion to Compel at pp. 23, 27 and 38).

38. Additionally, a Rule 2004 examination is different than a discovery request. Although information sought pursuant to the Rules of Civil Procedure may not be discoverable, Rule 2004 is broader in scope.  The existence of another ongoing court proceeding involving a debtor or a target of a Rule 2004 exam is not a basis to preclude such an examination.

> A handful of decisions have considered the allowable scope of a Rule 2004 examination where related civil or criminal proceedings are taking place or are likely to occur in another court.  The general rule in these cases is that the existence of, or potential for, collateral litigation is insufficient reason to deny examination. *See, e.g., In re Coffee Cupboard, Inc.,* 128 B.R. 509 (Bankr.E.D.N.Y.1991). Where the primary purpose is to benefit the bankruptcy

11

estate, "the fact that [an] examination may also produce information which in turn may collaterally be used by third parties in separate litigation outside of the bankruptcy case [ ] is no reason to restrict its use or to shield parties ... from such possible litigation."

*In Re Lufkin,* 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000) (quoting *In Re Mittco* 44 B.R. 35, 38 (Bankr. E. D. Wis. 1984) (Shapiro, BJ).[3]

### *Summary of Reasons to Grant the Rule 2004 Motion*

39.     SXP seeks information that is easily provided by third parties through a minimal effort of downloading defined data electronically.  The information sought is not confidential.  The minimal cost of providing the information (which SXP agrees to bear) provides a substantial benefit to SXP's bankruptcy estate.  It allows swift evaluation of potential defenses and claims at a minimal cost so that SXP (and other parties) can evaluate the cost of litigation.  It will also inform SXP and the Court of whether additional parties should receive notice of Dr. Godlevsky's claim before any distribution is made so that those parties can share in the distribution if they assert their rights after notice.  The examination of Dr. Kuharsky is also not unduly burdensome.  He will have all the protections afforded a witness being subpoenaed.

### *Detailed Statement of Facts*

#### *Debtor Formation*

40.     Mamalakis met Dr. Godlevsky in April 2007.  (Declaration of E. Mamalakis at ¶1).  Prior to meeting Mamalakis, Dr. Godlevsky was fired by Quantlab in March 2007.  Quantlab is comprised of a syndicate of companies that are "headquartered" offshore in Bermuda

---

[3] Judge Shapiro's 1984 decision in *Mittco* was an early application of the new Rule under what was then the relatively new Bankruptcy Code.  44 B.R. 35.  The decision has been subsequently followed. *See, e.g., In Re Washington Mutual* 408 B.R. 45, 50 (Bankr. Del. 2009); *In Re Lufkin* 255 B.R. 204,  208 (Bankr. E.D. Tenn. 2000); *Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995); *Matter of Sutera*, 141 B.R. 539, 541 (Bankr. D. Conn. 1992); *Matter of Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985); *see also* 9A Am. Jur. 2d *Bankruptcy* § 1119 (2012).

and operate in Houston.

41.     Dr. Godlevsky is a quantitative research scientist, who worked on mathematical algorithms for Quantlab.  Quantlab was, and still is, in the business of high-speed electronic stock trading, or high-frequency-trading ("HFT").

42.     HFT uses complex mathematical algorithms that are incorporated into computer programs to execute high volumes of securities trading.  The algorithms predict price movements of publically traded stocks.  The algorithms consider factors which have historically been tied to stock price movements.  When factors are present that suggest an imminent movement of a stock price, the firm executes an appropriate transaction to profit from the expected price movement.  Ideally, each trade generates a small profit. The large volume of executed trades results in meaningful profits over time.  The buying and selling of a stock can be a matter of seconds or even milliseconds.

43.     While working at Quantlab, Dr. Godlevsky's primary compensation was from participation in the company's trading accounts and performance.  (Declaration of D. Adams at Exhibit 1: Deposition of Godlevsky at 75:15-24).  Dr. Godlevsky gained profit participation after a period of stagnant profits at Quantlab from 2000 – 2002.  This was before Quantlab began a new securities trading execution service for third party customers in August 2002 ("execution service").  (*Id.* at Exhibit 1 at 72:20-25). During this time, due to his participation, Dr. Godlevsky knew about and directly participated in any securities fraud scheme involving Quantlab.

44.     Dr. Godlevsky introduced Mamalakis to Dr. Andriy Kuharsky, who had also been fired by Quantlab in March 2007.  In July 2007, Mr. Mamalakis formed SXP.  Later in 2007, both Drs. Godlevsky and Kuharsky lent capital to the enterprise.  (Declaration of E. Mamalakis at ¶3).

13

45.     Quantlab sued both Drs. Kuharsky and Godlevsky in mid-2007 to enforce confidentiality agreements.   However, Quantlab failed to obtain the preliminary injunctions they sought against both men, and thereafter non-suited both cases.  (Declaration of D. Adams at Exhibit 16).

46.     During the litigation to enjoin its former employees, Drs. Godlevsky and Kuharsky, Quantlab learned that they had joined Mamalakis, and that Mr. Mamalakis was a successful securities attorney.  (Declaration of D. Adams at Exhibit 1: Deposition of V. Godlevsky at p. 11).

47.     At the time of SXP's formation, Mamalakis, Dr. Kuharsky and Dr. Godlevsky agreed that no Quantlab computer code, computer files or other potentially confidential or proprietary Quantlab information would be used in Debtor's business.  Dr. Godlevsky represented to Mamalakis that he did not possess Quantlab computer code or files, and would not use any of Quantlab's confidential and proprietary information in the Debtor's business. (Declaration of E. Mamalakis at ¶ 4).

48.     SXP began its business operations in August 2007.  Drs. Godlevsky and Kuharsky resided and worked in Houston.  Mamalakis resided in Milwaukee and led SXP's legal and business operations. (*Id.* at ¶5).

### *Dr. Kuharsky Quits SXP*

49.     Dr. Kuharsky terminated his relationship with SXP in January 2008.

50.     In March 2008, Debtor hired Steve Lavdas and Dean Lavdas.  Neither one had worked for Quantlab.  Shortly thereafter on March 5, 2008, the government began a criminal investigation that is described below.

51.     By September 2008, SXP created the trading strategies and corresponding

14

software for its HFT business. SXP began profitably trading in October of 2008.  (Declaration of E. Mamalakis at ¶¶s 6-9).

### *Quantlab Misleads Government into Investigating Debtor*

52.      In March 2008, Quantlab successfully persuaded the FBI to investigate SXP for trade secret misappropriation.  On the basis of Quantlab's allegations, the FBI executed several search warrants and seized all of SXP's and then-former-employee Dr. Kuharsky's computing devices and media.  (Declaration of E. Mamalakis at ¶ 7).  In total, the FBI seized over 100 computing devices and media. (*Id.*)

53.      Quantlab provided the FBI with a list of 87,000 "hash values," that Quantlab asserted would identify its trade secrets on SXP's computing devices.  Once those hash values were analyzed by the FBI, it became apparent that the majority of the hash values provided by Quantlab were actually *Microsoft computer code and other files that could not be Quantlab proprietary code.*  (Declaration of D. Adams at Exhibit 3: September 3, 2008 Hearing Trans. on Motion for Return of Property in *U.S. v. SXP Analytics* at pp. 18-22).

54.      Quantlab, caught providing false information to the FBI, then gave a significantly smaller list of 17,000 hash values to the government. (*Id.* at p. 21.)  This is an approximately 80% reduction in the number of hash values originally claimed by Quantlab as identifying its code. After reviewing the remaining items, *the ultimate conclusion of the government was that charges could not be filed.* (Declaration of D. Adams at Exhibit 5: Status Report of AUSA R. Johnson of December 2, 2011 declining prosecution of SXP).

55.      During the middle of the FBI's investigation, SXP petitioned a federal magistrate judge to return its seized property. The Magistrate agreed with SXP's argument that the government had no rationale for keeping SXP's property and ordered the government to return

15

SXP's property immediately. (Declaration of D. Adams at Exhibit 4: Order of Magistrate Judge on Return of Property). This was an extraordinary act by a Magistrate during the course of an on-going investigation. If SXP actually possessed a misappropriated trade secret, the return of property would have been akin to giving a jewelry thief back stolen diamonds.

56.     Several months later, after the FBI had "conduct(ed) a thorough criminal investigation" and after an "extensive review" by the United States Attorney's Office, the government followed the Magistrate's lead and declined to issue charges. (Declaration of D. Adams at Exhibit 5: Status Report of AUSA Robert Johnson, December 2, 2011). Given the enormous expenditure of taxpayer resources on the investigation, the government's declination of charges constituted a striking vindication.

***Quantlab Sues Debtor Only to Stay Case***

57.     In December 2009, while the government's investigation was on-going, Quantlab sued SXP, Mamalakis, Dr. Kuharsky, Dr. Godlevsky and Dr. Kurharsky's girlfriend, Ana Maravina, in the United States District Court for the Southern District of Texas in Houston, alleging among other things, copyright infringement, misappropriation of trade secrets, and computer fraud.[4]

58.     During the late spring of 2010, Mamalakis and Dr. Godlevsky spoke several times about why Quantlab and the government believed that Debtor had misappropriated Quantlab trade secrets. (Declaration of E. Mamalakis at ¶¶ 10 - 14). During these conversations, Mamalakis learned of Quantlab's execution service on behalf of third party customers and that the service was used to engage in large-scale securities fraud. (*Id.*) Dr. Godlevsky informed Mamalakis that the customers he could remember that were harmed from or participated in the illicit scheme were "Wolverine" and "Rock Island." (Declaration of E. Mamalakis at ¶ 12).

---

[4] *Quantlab Technologies Ltd. (BVI) et al. v. Vitaliy Godlevsky et al*, Case No. H-09-4039.

59.    Upon learning of the scheme, SXP and Mamalakis made a demand for an immediate litigation hold for all records for all parties in Quantlab's federal case against SXP. (Declaration of E. Mamalakis at ¶ 20).  SXP and other defendants then sought to depose Dr. Andrey Omeltchenko, Quantlab's head of trading strategies regarding the front running described by Dr. Godlevsky.  The defendants sent Quantlab a letter informing them they would be asking about "Wolverine and "Rock Island."  (Declaration of D. Adams at Exhibit 6: Letter to A. Neighbors).  In response to the deposition request, Quantlab immediately lobbied the FBI to stay Quantlab's own case. (Declaration of E. Mamalakis at ¶ 21).  The FBI agreed and the case was stayed through December 2011 pending resolution of the government's criminal investigation. (Declaration of D. Adams at Exhibit 7: ECF Dkt #76 in Case No. H-09-4039).

### *Dr. Godlevsky Explains Quantlab's Illicit Securities Fraud (Front-Running)*

60.    In the Spring of 2010, Dr. Godlevsky explained to Mamalakis that Quantlab had provided execution services to third party customers as a "broker-dealer." (Declaration of E. Mamalakis at ¶ 10-14 and attachments).  Essentially, a third party customer would order a stock to be purchased or sold, and Quantlab would execute this order on a stock exchange.  This arrangement created a reoccurring conflict-of-interest, as the third party customers and the Quantlab proprietary accounts would often submit the same orders to be executed.  (Declaration of E. Mamalakis at ¶ 13 and Attachments B and C ).

61.    There is a bright-line rule that where a broker-dealer and customer's order are for the same transaction, the customer's order is filled first.[5]  However, Dr. Godlevsky explained that *as a matter of company policy* Quantlab's proprietary trades would be executed before those

---

[5] FINRA RULE **5320.** Prohibition Against Trading Ahead of Customer Orders (a)  Except as provided herein, a member that accepts and holds an order in an equity security from its own customer or a customer of another broker-dealer without immediately executing the order is prohibited from trading that security on the same side of the market for its own account at a price that would satisfy the customer order, unless it immediately thereafter executes the customer order up to the size and at the same or better price at which it traded for its own account.

of the third party customers.  (Declaration of E. Mamalakis at ¶ 13). This policy not only violates regulatory rules, but essentially steals better-priced trade opportunities from the third party customers.  A short explanation of this "front-running" or "trading ahead " practice is attached. (Declaration of E. Mamalakis at ¶ 13 at Attachments B and C).

62.    Dr. Godlevsky stated that Quantlab always traded ahead of customer quotes if a valuable quote was identified by the company's trading system.  (Declaration of E. Mamalakis at ¶ 13).  In addition, Dr. Godlevsky described other improprieties, such as how Quantlab used clients' trading activity as indicators, and illegally received information feeds in Chicago and traded based on this non-public information, which constitutes insider trading.  (Declaration of E. Mamalakis at ¶ 14).

### *Dr. Godlevsky Explains Quantlab Covered-up Its Fraud and It Is Corroborated by Public Record*

63.    To mask the front-running behavior, Dr. Godlevsky explained that Quantlab willfully and systematically altered or obfuscated direct evidence of the practice so to avoid detection during ordinary regulatory audits. (Declaration of E. Mamalakis at ¶ 15).  There are hard facts that back up this assertion.

64.    To cover-up a large securities fraud scheme, a dealer-broker would have to manipulate the Order Audit Trail System (OATS) and/or Order Tracking System (OTS) reports that every broker-dealer is required to submit to FINRA.  The OATS/OTS reports allow FINRA and the SEC to piece together the past actions of a broker-dealer to ensure compliance with federal regulations.  Each transaction provides a "time stamp" of when the customer ordered the transaction, and when the transaction was actually executed for a customer or for the broker-dealer's own proprietary accounts.  (Declaration of E. Mamalakis at ¶16).

18

65.    During the period of Dr. Godlevsky's and Dr. Kuharsky's employment with Quantlab, when they were in a position to know of Quantlab's front-running practice, Quantlab paid at least $100,000 in civil fines to FINRA for OATS reporting violations. (Declaration of D. Adams at Exhibit 11; FINRA Broker Check Report). Quantlab simply accepted these fines as a cost of doing business, as shown by its actions to continue to commit essentially the same OATS reporting violations during every single audit from 2002 through the end of 2007.[6]

66.    Quantlab abandoned its trade execution service for third party customers starting in late 2007, which coincides with FINRA ending its enforcement actions of Quantlab. (Declaration of D. Adams at Exhibit 18; Declaration of D. Hanson at ¶ 8). Quantlab's actions to abandon its third party execution service also occurred at about the same time the company asked the FBI to investigate SXP, Mamalakis, Dr. Godlevsky and Dr. Kuharsky obviously knowing it would discredit them. Compared to the fines for faulty OATS reports, fines for broker-dealers who intentionally front-run their third party customers can be massive.[7]

### *Unbeknownst to Debtor, Dr. Kuharsky Details Exact Allegations in 2008 and Reiterates Them in 2012*

67.    Recently, SXP learned that Dr. Godlevsky's explanations of Quantlab's illicit practices were corroborated by Dr. Kuharsky as early as 2008, after his departure from SXP. On February 22, 2012, Dr. Kuharsky's attorney provided SXP with an SEC complaint filed by Dr. Kuharsky in the spring of 2008. (Declaration of D. Adams at ¶¶s 18-20, Exhibit 9 SEC

---

[6] The audit periods which resulted in Quantlab's fines were: October 1, 2002 through December 31, 2002; July 1, 2003 through September 30, 2003; October 1, 2004 through March 31, 2005; April 2005 through June 30, 2005; January 1, 2006 through March 31, 2006; August 1, 2006 through December 31, 2006; April 1, 2007 through June 30, 2007; and September 1, 2007 through December 31, 2007. (Declaration of D. Adams at Exhibit 11)

[7] Diana B. Henriques, Article, *14 Trading Firms Settle Charges for $69 Million*, N.Y. Times, (March 4, 2009) at B1. (Accessed April 24, 2012 at http://www.nytimes.com/2009/03/05/business/05specialist.html). (Declaration of D. Adams at Exhibit 14).

19

Complaint by Dr. A. Kuharsky).  The complaint corroborated, with detail, Dr. Godlevsky's explanations to Mamalakis about Quantlab's front-running.  (*Id.*)

68.    In short, Dr. Kuharsky's 2008 SEC complaint shows the intentional nature of the front-running, as the computer code that executed its trading was programmed with thresholds that directed Quantlab's proprietary accounts to take profitable price quotes at the expense of third party customers. Furthermore, Dr. Kuharsky named victimized customers including Wolverine, Piper Jaffray, and E*Trade.  "Rock Island," the victimized customer Dr. Godlevsky had mentioned to Mamalakis, became E*Trade in 2005.

69.    Dr. Kuharsky has reiterated his allegations of Quantlab's front-running and has cited the practice in recent court pleadings.  In a pleading filed on January 30, 2012 he stated that "Quantlab violated SEC regulations by putting its own interests ahead of the interests of its broker-dealer customers, defrauding the customers." (Declaration of D. Adams at Exhibit 8: Amended Answer of Kuharsky at ¶ 133).  Even more recently, Dr. Kuharsky explained that the allegations made by SXP and Mamalakis regarding Quantlab's front running "were true." (Declaration of D. Adams at Exhibit 15: Reply Brief on behalf of A. Kuharsky at 2).

70.    Taken together, this profit-triggered threshold and the continual practice of submitting faulty OATS reports may demonstrate a very large securities fraud scheme.

### *Quantlab Nears End of Liability for the Securities Fraud Scheme*

71.    Quantlab is nearing the end of civil liability for any securities fraud actions relating to its 2002 – 2007 "front running" of its third-party customers.  SEC Rule 10b allows for civil actions based on claims of fraud, deceit, or manipulation of federal securities law. 28 U.S.C. § 1658(b).  Rule 10b has a hard and fast five year statute of limitations from the time of the offense.  The rule does not allow for equitable tolling of the statute of limitations based on lack

of discovery by a harmed party. *See Merck & Co., Inc. v. Reynolds,* 130 S.Ct. 1784, 1795 (2010). In addition, the SEC's own ability to undertake an enforcement action also has a five year statute of limitations.  28 U.S.C. § 2462.

72.    Running the clock on the statute of limitations for securities actions explains why Quantlab asked the government to stay its own case shortly after it filed it, and immediately after SXP raised the issue of Quantlab's illicit activities.

### Dr. Godlevsky Hid Ownership in SXP to Protect Proceeds of the Scheme

73.    Dr. Godlevsky admitted to knowing of the securities fraud being performed by Quantlab. (Declaration of E. Mamalakis at ¶¶ 11-15).  Further, he must have known of his own culpability in the scheme, and that he had derived substantial profit from the scheme based on his participation in Quantlab's capital accounts and performance.  Dr. Godlevsky's increased responsibility in Quantlab's securities operations came at the same time he took a performance participation stake in the company (i.e. profit sharing).  (Declaration of D. Adams at Exhibit 1; Deposition of V. Godlevsky at pp. 74:19-25, 75:1-7, 15-24).  This time also coincided with the beginning of the front-running scheme.  (*Id.*)

74.    Upon joining SXP, Dr. Godlevsky did not disclose Quantlab's front running nor his participation in the practice while at Quantlab.  (Declaration of E. Mamalakis at ¶ 17).  However, he did make sure that all bank accounts, trading accounts and public registrations, were in Mamalakis' name.  (Declaration of E. Mamalakis at ¶ 19). This desire to be unnamed continued after Quantlab sued SXP.  (*Id.*)  Dr. Godlevsky specifically requested that Mamalakis keep company accounts such that they did not include Dr. Godlevsky in any capacity. (Declaration of E. Mamalakis at ¶¶ 17 and 19).  Additionally, no public documents list Dr. Godlevsky as an owner of SXP.  Importantly, in a 2007 deposition, Dr. Godlevsky stated that he

21

did not have an ownership interest in SXP.  (Declaration of D. Adams at Exhibit 1: Deposition of V. Godlevsky 9:8-11, 13:15-19).  Because of Dr. Godlevsky's actions to shield his interest in SXP, in the event that Quantlab's securities fraud (and Dr. Godlevsky's involvement in it) was discovered.  Dr. Godlevsky's interest in SXP would not have been apparent to victims/customers of Quantlab, resulting in them being hidden from disgorgement claims.

### Dr. Godlevsky's Claim Based on Rights Acquired with Unclean Hands

75.    In February 2011, Dr. Godlevsky quit SXP.  He then sued SXP and Mamalakis in Texas state court seeking an accounting and damages relating to his alleged ownership interest in SXP.  The Texas Court of Appeals granted a writ of mandamus on the grounds of improper venue, and issued an order on April 13, 2012 directing the trial court to dismiss the case. (Declaration of D. Adams at Exhibit 12: Docket entry in *Godlevsky v. SXP* Case No. 14-11-1039-CV).

76.    Dr. Godlevsky's claim is based upon the ownership interests he hid from outside parties.   Dr. Godlevsky also did not disclose to Mamalakis and SXP how Quantlab and he made its profits and how he was able to invest in SXP.  (Declaration of E. Mamalakis at ¶ 17). Mamalakis, as a former securities attorney, would not have allowed ill-gotten gains from a securities fraud scheme to be used to form the basis for his company had he known.  Being experienced in securities law, he was well aware of the rules and practice of requiring disgorgement of such funds back to victimized customers. (Declaration of E. Mamalakis at ¶ 18).

77.    Additionally, neither SXP nor Mamalakis would have included Dr. Godlevsky in SXP had they known of his now apparent past conduct and his intimate knowledge of Quantlab's illegalities. Dr. Godlevsky's failure to disclose these facts for several years led directly to the FBI criminal investigation of, and subsequent and on-going federal civil case against, SXP and

22

Mamalakis.

78.    SXP and Mamalakis knew that Quantlab had sued Dr. Godlevsky in 2007.  When forming SXP, Mamalakis took steps to protect himself and SXP from further entanglement in Quantlab's litigation strategy against Drs. Godlevsky or Kuharsky *based on the facts it knew at the time, which did not include that Quantlab had engaged in front running*.  (Declaration of E. Mamalakis at ¶¶ 11-17).  Both men signed agreements that Mamalakis and the newly formed SXP would not be using any Quantlab code.  (Declaration of E. Mamalakis at ¶¶ 4-6; copy of agreement at Attachment A).  Mamalakis wanted SXP on a clear footing and wanted to avoid any litigation arising from Drs. Godlevsky and Kuharsky being part of SXP.  Mamalakis and SXP would not have involved Dr. Godlevsky had Mamakis been made aware of Godlevsky's involvement with improper front running and his intention to use SXP to hide his ill-gotten proceeds.  (Declaration of E. Mamalakis at ¶ 18).

### *Conclusion*

79.    SXP respectfully requests that the Court enter an order pursuant to Rule 2004 for (i) the examination of Dr. Andriy Kuharsky on a date within 15 days of an order granting this motion where depositions are permitted under the Rules of Civil Procedure, (ii) the production of all documents listed on the attached Addendum 1, and (iii) any other relief as the Court deems just and appropriate.

Dated:  May 4, 2012.

*/s/ Joseph R. Cincotta__*
Jerome R. Kerkman
Joseph R. Cincotta
Kerkman & Dunn

Attorneys for SXP Analytics, LLC

P.O. Address:

23

757 N. Broadway, Suite 300
Milwaukee, WI 53202
Phone: 414.277.8200
Fax: 414.277.0100
Email: jkerkman@kerkmandunn.com

24

## Addendum 1

(1)     The deposition of Mr. Andriy Kuharsky related to his knowledge of the activities of Dr. Godlevsky and Quantlab while he worked at Quantlab and thereafter, and

(2)     A subpoena to be issued requiring production of documents and records held by the Financial Industry Regulatory Authority ("FINRA") including:

   (a)     Records identifying the third-party commercial customers that Quantlab traded on behalf of, routed orders for, and/or received order flow from, during the period of August 27, 2002 through December 31, 2008,

   (b)     Time-stamped OATS/OTS reports from the customers identified in (a) submitted to FINRA (and its predecessor regulators NYSE and NASD) that indicate equity orders sent to Quantlab, and the corresponding order confirmation, execution, and cancellation reports,

   (c)     Records identifying any and all market participant identifiers "MPIDs" (i.e. mnemonics) used by Quantlab to trade during the period of August 27, 2002 through December 31, 2008,

   (d)     All time-stamped OATS/OTS reports submitted to FINRA (and its predecessor regulators NYSE and NASD) from the MPIDs listed in (c) during the period of August 27, 2002 through December 31, 2008,

   (e)     Records identifying which securities exchanges Quantlab traded on during the period of August 27, 2002 through December 31, 2008.

(3)     A subpoena requiring production of records from (i) E*TRADE Financial Corporation and/or E*TRADE Clearing, LLC and/or E*TRADE Securities, LLC, (ii) Piper Jaffray & Co., and (iii) Wolverine Trading Partners, Inc., including the time-stamped OATS/OTS reports reflecting each entity's trade orders sent to Quantlab for trade execution, and the associated trade confirmation, execution, and cancellation reports, during the period August 27, 2002 to December 31, 2008.

(4)     From the securities exchanges listed in (2) (e), all time-stamped execution records for securities transactions performed by the entities listed in (2)(c).

# # #

25