UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| QUANTLAB TECHNOLOGIES LTD. (BGI) AND QUANTLAB FINANCIAL, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> VITALIY GODLEVSKY, ANDRIY KUHARSKY, ANNA MARAVINA, PING AN, EMMANUEL MAMALAKIS, AND SXP ANALYTICS, LLC, <br><br> Defendants. | § § § § § § § § § § § § § § § § § <br><br> CIVIL ACTION NO. 4:09-cv-4039 |

## MEMORANDUM & ORDER

As trial approaches in this long-running trade secrets case, Plaintiffs Quantlab Technologies Ltd. (BGI) and Quantlab Financial, LLC (collectively, "Quantlab") have asked the Court to revisit the issue of sanctions. In particular, Quantlab has presented the Court with new evidence of litigation misconduct by Defendants Vitaliy Godlevsky and Andriy Kuharsky. (Doc. Nos. 501, 551.)

The Court has already imposed an adverse inference instruction on Defendants Mamalakis, Godlevsky and Kuharsky for willful spoliation of evidence. *See Quantlab Technologies Ltd. (BGI) v. Godlevsky*, No. 4:09-cv-4039, 2014 WL 651944 (S.D. Tex. Feb. 19, 2014) (hereafter "Sanctions Order"). At that time, the Court declined to impose more severe sanctions against Defendants, but noted that it would reconsider that decision in light of new evidence. *Id.* at *2.[1] For the reasons set out in this order, the Court now concludes that additional

---

[1] That order, as well as other previous decisions by this Court, discusses the salient background to this case and the litigation history.

1

sanctions are necessary, in the form of a liability finding against Defendants Godlevsky and Kuharsky on some of the remaining claims against them.

## I.     LEGAL STANDARD

The Court reviewed the legal framework for spoliation sanctions in a prior order in this case. *See* Sanctions Order at *12-22. Today, the Court considers only whether to increase the sanctions against Drs. Godlevsky and Kuharsky to include a partial death penalty sanction. "[A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 465, 469-70 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port. Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012).

In its prior order, the Court noted that courts in this circuit have identified two slightly different — but ultimately harmonious — standards for imposing severe sanctions for discovery misconduct. In *Rimkus Consulting Grp., Inc. v. Cammarata*, the court held that, before a district court may grant severe sanctions for spoliation of evidence, in must determine that "(1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." 688 F. Supp. 2d 598, 615-16 (S.D. Tex. 2010). In addition, Judge Rosenthal noted that the sanctions "should be no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery." *Id.* at 618.

And in a case concerning the violation of an express discovery order, the Fifth Circuit recently reiterated that a four-part test must be satisfied before a district court can terminate a

case as a sanction. *See Moore v. CITGO Ref. & Chemicals Co., L.P.*, 735 F.3d 309 (5th Cir. 2013) (citing *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380-81 (5th Cir. 1994)). *Conner* required findings that:

> (1) the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct;
> (2) the violation of the discovery order must be attributable to the client instead of the attorney;
> (3) the violating party's misconduct must substantially prejudice the opposing party; and
> (4) a less drastic sanction would not substantially achieve the desired deterrent effect.

*Moore*, 735 F.3d at 316 (citations omitted).

The Court continues to believe that the *Rimkus* and *Moore* standards are more or less equivalent, though they are framed somewhat differently. *See* Sanctions Order at *17. Here, there is no allegation of attorney wrongdoing. And the Court has previously found that both of these Defendants had a duty to preserve evidence beginning in late 2007. *Id.* at *33-34 (Godlevsky), 40 (Kuharsky).  Accordingly, the Court will focus on 1) culpability, 2) relevance/prejudice, and 3) the need to create sanctions that are no more severe than necessary in reviewing the new evidence against Defendants.

## II.   ANALYSIS

### A.  Additional Discovery Misconduct by Dr. Godlevsky

In its prior sanctions order, this Court reviewed evidence that Dr. Godlevsky had failed to produce numerous devices that were connected to his computers and computers containing Quantlab code in the 2007-2012 period. The Court concluded that Dr. Godlevsky had a duty to preserve those devices by late 2007, when Quantlab had filed its initial state court case, and that he acted in bad faith when he failed to preserve his devices. *Id.* at *33-34. The Court also held that the devices would likely have been relevant to Quantlab's claims, and that Quantlab was prejudiced by Dr. Godlevsky's failure to preserve the devices, particularly those devices attached

to computers seized by the FBI in 2008. *Id.* at *34-36. However, the Court held that "Quantlab has not made any showing of sinister motives on Dr. Godlevsky's part." *Id.* at *35.

In urging the Court to impose more stringent sanctions on Dr. Godlevsky today, Quantlab argues that Dr. Godlevsky intentionally destroyed evidence on his Singletick laptop, including after the prior sanctions order was issued in 2014, and that he intentionally misled Quantlab regarding the effects of the FBI raid on SXP's operations. Quantlab's new evidence shows that Dr. Godlevsky twice used a program called File Shredder to permanently delete thousands of files from his devices, including a compressed file named "Quantlab Files.zip." *See* Pathway Singletick Report, Doc. No. 551-7 at 26-27. He did this first on his Singletick laptop in August 2013, prior to turning the computer over to the company just before the discovery deadline in this case.[2] *Id.* Dr. Godlevsky then ran File Shredder *again* on his new Singletick laptop and a thumb drive in March 2014 — after the Court's prior sanctions order — before turning that laptop over to Singletick. *Id.* at 27-29.

The Court views these acts as significantly different in kind from those addressed in the first sanctions order. At that time, Quantlab "provide[d] no particularized basis for the Court to find that [Dr. Godlevsky] acted with the express purpose of destroying evidence." Sanctions Order at *35. Now, it has. Whereas the loss of various devices *could* have been inadvertent or merely negligent, there is no such explanation for repeatedly deleting files from devices that were about to be turned over to Quantlab. Dr. Godlevsky claims that the deleted documents consisted only of privileged legal materials. Godlevsky Aff., Doc. No. 567-1 at 3-4. In light of the strong message sent by the prior sanctions order, the Court cannot credit this explanation.

---

[2] One consequence of Dr. Godlevsky's decision to return the computer to Singletick rather than handing it over to Quantlab was to delay Quantlab's analysis of the computer until after the Court's prior hearing on sanctions.

4

Even if it were true, Dr. Godlevsky should have sought a protective order to shield those files from discovery. Then, the Court would have been in a position to evaluate his claim of privilege by conducting an *in camera* review of the computer. Now, Dr. Godlevsky has flouted this Court's order and permanently deprived both the Court and Quantlab from ever knowing what was on those computers.

Next, Quantlab argues that it has caught Dr. Godlevsky in a lie regarding what was captured in the 2008 FBI raid. At the October 2013 Sanctions Hearing, Dr. Godlevsky testified that "[the] FBI seized everything and now I can prove that everything started from the [sic] scratch." Doc. No. 471 at 140:8-16. However, e-mails produced by a third party former SXP employee, Corwin Joy, show that SXP — and Dr. Godlevsky in particular — retained at least some code following the FBI raid. *See* Doc. Nos. 551-1, 551-2. In an e-mail just days after the raid, Dr. Godlevsky told fellow SXP employees, "At least we didn't loose [sic] the code we wrote so far." Doc. No. 551-3.[3] Godlevsky's response makes no effort to explain this apparent contradiction. *See* Doc. No. 57.

This inconsistency is troubling because of the Defendants' repeated contentions that, even if they were using Quantlab code to accelerate SXP's development prior to the 2008 raid, they could not have done so afterwards because they were forced to start from scratch. Based in part on this testimony, the Court did not weigh Dr. Godlevsky's loss of post-2008 devices heavily in constructing the prior sanctions order. *See* Sanctions Order at *35. But the combination of the shredded files on the Singletick laptop and the post-raid e-mails now make it significantly more likely that the loss of the devices connected to Dr. Godlevsky's laptop in 2011

---

[3] Quantlab also raises concerns about Godlevsky's failure to produce these e-mails himself, even though they were clearly responsive to Quantlab's document requests. That failure, taken alone, would not be the basis for terminating sanctions. Accordingly, the Court will focus its discussion on those actions that might be the basis for escalating the sanctions.

or 2012 has been prejudicial to Quantlab's case.

Taken together, the new evidence materially changes the balance of the sanctions analysis. First, the clear evidence that Dr. Godlevsky intentionally destroyed files and lied about what was lost in the SXP raid bolsters Quantlab's contention that the deleted files would have been beneficial — as opposed to merely relevant — to its claims. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) ("*Zubulake IV*") ("[I]n the case of *willful* spoliation … the spoliator's mental culpability [is] itself evidence of the relevance of the documents destroyed."). Second, the fact that Dr. Godlevsky's conduct continued even after the Court entered its prior sanctions order shows that "a less drastic sanction would not substantially achieve desired deterrent effect. *Moore*, 735 F.3d at 316.

Accordingly, the Court reluctantly concludes that a partially dispositive sanction against Dr. Godlevsky is appropriate. The Court hereby finds Dr. Godlevsky liable for misappropriation of trade secrets.[4] The amount of damages will be left to be determined at trial.

### B. Additional Discovery Misconduct by Dr. Kuharsky

Quantlab has also produced new evidence of wrongdoing by Dr. Kuharsky. In its prior order, the Court reviewed evidence that Dr. Kuharsky failed to preserve a number of specific devices, including a SanDisk Cruzer flash drive, various flash drives connected to computers seized in the 2008 FBI raid, and two devices that had been connected to Kuharsky's personal

---

[4] The Court has already granted summary judgment to Quantlab on its claims of copyright infringement and breach of contract by Dr. Godlevsky. The Court believes the other claims against him — violation of the Computer Fraud and Abuse Act, tortious interference with contract, knowing participation in the breach of a duty of loyalty, and civil conspiracy — would not be susceptible to proof solely on the basis of the contents of his computer. Accordingly, the Court will allow the jury to consider those claims, subject to the adverse inference instruction imposed in its prior order.

laptop in 2013.[5] Sanctions Order at *37-41. At that time, the Court imposed sanctions in the form of an adverse inference instruction based on a finding that Dr. Kuharsky had a duty to preserve the devices and acted in bad faith in failing to preserve them, and that the devices were relevant to the suit and prejudicial to Quantlab. *Id.* at *41.

After the sanctions order was issued, Quantlab provided evidence of additional wrongdoing by Kuharsky related to his Singletick laptop. Like Dr. Godlevsky's Singletick laptop, this device was not handed over to Quantlab in time for these issues to be taken up at the first round of sanctions hearing. On July 26, 2013, the Court ordered Dr. Kuharsky to respond to discovery requests related to his post-SXP activities, including Singletick. *See* Order Granting Discovery Motions (July 26, 2013), Doc. No. 381. Instead, he returned the laptop to Singletick and told Quantlab he had nothing left to produce. *See* Andrew Kuharsky's Response to Quantlab's Third Set of Interrogatories, Doc. No. 398-3 at 4. Quantlab did not actually obtain meaningful access to Dr. Kuharsky's Singletick laptop until March 2014, when Dr. Kuharsky finally gave them the password to the laptop. Kersh Decl., Doc. No. 501-1 at ¶ 9.

Forensic analysis has now shown that before returning that laptop to Singletick — and after the Court's order that the laptop was properly the subject of discovery — Dr. Kuharsky ran various programs on his computer that 1) changed the last-modified and last-accessed dates on the files, *id.* at ¶ 15; 2) deleted logs that would have shown which external devices had been connected to the laptop, *id.* at ¶ 16; 3) erased the Bash history, which could have shown how files were copied to external drives, *id.* at ¶ 14; and 4) "zeroed out" unused space on the laptop to prevent the recovery of forensic artifacts, *id.* at ¶ 17. In addition, Dr. Kuharsky erased Skype,

---

[5] The Court also reviewed more generalized allegations of wrongdoing with respect to devices that were given away, broken or encrypted, but found that those allegations did not create the basis for heightened sanctions. Sanctions Order at *41-44.

Google Talk and other chat service histories. *Id.* at ¶ 19. And in the days after the July 26, 2013, court order, Dr. Kuharsky ran various Google searches suggesting that — contrary to his assertions, discussed below — these files were intentionally deleted. *Id.* at ¶ 18.[6]

Dr. Kuharsky suggests that these actions were merely those of a responsible computer user seeking faster performance or better system security. Kuharsky Decl., Doc. No. 509-1 at ¶¶ 11, 13-14. He asserts that changes to the last-modified and last-accessed dates were merely the result of an "experiment" run in connection with his work at Singletick. *Id.* at ¶ 12. But the evidence shows that he took these actions *while he was under a court order to produce the laptop*, and just days before he gave up custody of the laptop to Singletick. By that time, he knew or should have known that he was under a duty to preserve evidence then existing on the laptop, and his actions begin to look like intentional destruction of evidence.

And there is additional evidence of spoliation of the encrypted "virtual container" that Dr. Kuharsky maintained on the same laptop. The forensic examiners gained access to the container's contents only on April 7, 2015, when Dr. Kuharsky provided the password to the virtual container for the first time. Kersh Decl., Doc. No. 703-1 at ¶ 5. Analysis of the container showed that more than ten thousand files and folders were shredded on August 12, 2013 — just two days before the device was turned over to Singletick. *Id.* at ¶ 6. As a result, almost no files are left in the virtual container for Pathway to analyze. *Id.* A partial list of deleted file and folder names match the names of files containing Quantlab code that have been found on other devices. *Id.* at ¶ 7. Dr. Kuharsky acknowledges that the virtual container would have contained "working code of Singletick," Kuharsky Decl. at ¶ 7 — precisely the type of evidence that Quantlab had moved to compel and the Court had ordered Kuharsky to produce.

---

[6] The suspicious searches include "change access time," "change birth time of a file," and a search for where Skype logs are saved.

As with Dr. Godlevsky, the revelation that files were intentionally deleted while Dr. Kuharsky was under court order to produce the same files to Quantlab substantially alters the sanctions analysis. While the Court previously found that Dr. Kuharsky's culpability was a "hard" question, the new evidence presented by Quantlab makes that determination much easier. The evidence is now clear that Dr. Kuharsky intentionally removed evidence from his devices to prevent Quantlab from having access to that evidence, giving rise to an inference that the evidence would have been harmful to him in this lawsuit. Although there are no allegations of post-Sanctions Order misconduct by Dr. Kuharsky, the record is clear that he has sought to stymie Quantlab in its quest for discovery at every turn, including by the much-delayed production of passwords to his various devices.

The Court concludes that a partially dispositive sanction against Dr. Kuharsky is also appropriate. The Court hereby finds Dr. Kuharsky liable for misappropriation of trade secrets.[7] The amount of damages will be left to be determined at trial.

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that partially-dispositive sanctions are warranted against Defendants Vitaliy Godlevsky and Andrew Kuharsky on account of their bad faith, intentional spoliation of evidence. The evidence shows that the computer evidence that they destroyed would likely have been relevant and beneficial to Quantlab's suit against them. Accordingly, the Court hereby finds Drs. Godlevsky and Kuharsky liable to Quantlab for misappropriation of trade secrets, with the amount of damages to be determined at trial.

---

[7] As with Dr. Godlevsky, other remaining claims against Dr. Kuharsky will be given to the jury subject to an adverse inference instruction.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on the 27th of April, 2015.

                                                  KEITH P. ELLISON
                                                  UNITED STATES DISTRICT JUDGE