IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUANTLAB TECHNOLOGIES LTD. (BVI), AND QUANTLAB FINANCIAL, LLC, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-09-4039 |
| v. | § § § | |
| VITALIY GODLEVSKY, ANDRIY KUHARSKY, ANNA MARAVINA, PING AN, EMMANUEL MAMALAKIS, AND SXP ANALYTICS, LLC, | § § § § § | |
| Defendants. | § § | JURY TRIAL DEMANDED |

## AFFIDAVIT OF TIM MCINTURF

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF HARRIS | § |

BEFORE ME, undersigned official, on this day appeared Tim McInturf, who is personally known to me, and first being duly sworn to law upon his oath deposed and said:

1.  My name is Tim McInturf. I am over eighteen (18) years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts herein and they are true and correct.

2.  I am an attorney licensed to practice in the State of Texas and the Executive Vice President, Chief Administrative Officer, Secretary, and General Counsel of Quantlab Financial, LLC. I graduated from the University of Houston Law School, *magna cum laude*, in 1993 and have been licensed to practice law in Texas since that time. Following my graduation, I was a briefing attorney for Justice Frances J. Maloney on the Fifth District Court of Appeals in Dallas for one year, and was then in private practice in Houston from 1994[1] through 2009. I was a commercial litigation associate at the law firm Haynes and Boone LLP from 1995 to 1997, and at the law firm Hughes Watters Askanase LLP from 1997 to 1999. I was an associate from 1999 to 2001 and then shareholder from 2002 to 2009 at the law firm Littler Mendelson P.C. Since 2009, I have served as Quantlab's General Counsel. The majority of my legal work has been in litigation and contested matters, including conducting first-chair jury trials in state and federal

---

[1] I accepted an offer from Johnson & Gibbs, P.C. to start after my judicial clerkship. Johnson & Gibbs changed its name to Johnson & Wortley, P.C. during my clerkship. Johnson & Wortley, P.C. dissolved at the end of 1994 and the Houston litigation section joined Haynes and Boone, LLP.

courts. Over the course of my work in private practice and as Quantlab's General Counsel, I have become familiar with the customary rates charged for legal services in Houston, Texas.

3. It was necessary for Quantlab Technologies Ltd. (BVI) and Quantlab Financial, LLC (hereinafter jointly "Quantlab") to retain attorneys to represent it in this matter that threatened its very livelihood: the theft of trade secrets, including confidential and proprietary information (including computer files and algorithms), core to its successful work in high frequency trading, and the repeated use and attempted use of those trade secrets by competitors. Moreover, several defendants in this matter engaged in repeated, widespread, and willful spoliation of large volumes of electronic materials and repeatedly lied about the relevant facts, which necessitated large amounts of legal work by Quantlab's in-house attorneys, the law firm Smyser Kaplan & Veselka LLP ("SKV"), and the law firm Littler Mendelson P.C. ("Littler"), as well as the retention of several experts in computer forensics.

4. I have personal knowledge of this case and the work performed. This case involved numerous claims and counterclaims. Quantlab resolved its claims with several defendants prior to trial. Ultimately, Quantlab prevailed at trial against the remaining two defendants, Andrew Kuharsky and Emanuel Mamalakis, on several claims. The jury returned a verdict in favor of Quantlab, finding Dr. Kuharsky responsible for $1,800,000 for misappropriation of trade secrets and $5,400,000 for conspiracy to misappropriate trade secrets, and finding Mr. Mamalakis responsible for $1,000,000 for misappropriation of trade secrets and $4,000,000 for conspiracy to misappropriate trade secrets. In order to expedite trial, Quantlab dismissed its meritorious causes of action for fraud and the Computer Fraud and Abuse Act shortly before trial.

5. I am familiar with the experience, reputation, and ability of the attorneys from SKV and Littler who performed work on this case. All of the SKV and Littler attorneys who worked on this case are highly competent and skilled attorneys. The attorneys from SKV who primarily worked on the case were Lee Kaplan, Ty Doyle, and Alex Wolf for the trial and appeal, as well as Michelle Stratton for the appeal. The attorneys from Littler who primarily worked on the case were Allan Neighbors, Scott McDonald, and Tim Rybacki. These attorneys' qualifications and experience are set forth below.

> Mr. Kaplan is a name partner in SKV. He graduated from the University of Texas Law School with honors in 1976 and has been licensed to practice law in Texas since that time. He clerked for one year with the Honorable Joe M. Ingraham of the United States Court of Appeals for the Fifth Circuit, and has been in private practice in Houston since that time. He was an associate at the law firm Baker Botts LLP from 1977 to 1984, and then a partner from 1985 to 1995, before co-founding SKV in 1995. Mr. Kaplan has tried dozens of cases in state and federal courts. Mr. Kaplan served as Quantlab's lead counsel at trial.
>
> Mr. Doyle graduated from Stanford Law School in 2005 and clerked for the Honorable Edith Jones on the United States Court of Appeals for the Fifth Circuit. He is a partner at SKV and previously worked for the law firm Quinn Emmanuel Urquhart & Sullivan, LLP (at the time, it was known as Quinn Emanuel Urquhart Oliver & Hedges). He has

handled cases in federal and state court, arbitration, and federal administrative proceedings, and has extensive experience handling cases in every stage of litigation. He was part of the trial team and assisted with preparing Quantlab's successful appellate briefing.

Mr. Wolf graduated from Harvard Law School in 2012 and clerked for the Honorable Carolyn Dineen King on the United States Court of Appeals for the Fifth Circuit. He is an associate at SKV and previously worked for the law firm McDermott Will & Emery LLP. He has worked on complex civil cases at the trial and appellate level in federal court. He assisted the trial team with research and briefing, and assisted with preparing Quantlab's successful appellate briefing.

Ms. Stratton graduated first in her class from Louisiana State University's Paul M. Hebert Law Center. She clerked for the Honorable Edith Jones on the United States Court of Appeals for the Fifth Circuit and for Justice Clarence Thomas on the Supreme Court of the United States. She was a Bristow Fellow at the Office of the Solicitor General of the United States, and worked at Baker Botts for three years as an associate, primarily handling complex appellate matters, before joining SKV. She assisted with preparing Quantlab's successful appeal to the United States Courts of Appeals for the Fifth Circuit.

Mr. McDonald graduated from the University of Texas School of Law in 1987. He was an associate at Johnson, Bromberg & Leeds from 1987 to 1992. He joined Littler in 1992, and has been a shareholder at Littler since 1994. He has worked on complex civil cases at the trial and appellate level in federal court. He is a co-author of the BNA books *Drafting and Enforcing Covenants Not to Compete* (2009) and *Unfair Competition and Intellectual Property Protection in Employment Law* (2014). He was part of the trial team, focusing primarily on overall strategy and computer forensics, and assisted with preparing Quantlab's successful appellate briefing; he also argued Quantlab's appeal before the United States Court of Appeals for the Fifth Circuit.

Mr. Neighbors graduated from South Texas College of Law in 2001 and clerked for the Honorable Mary Lou Robinson on the United States District Court of the Northern District of Texas. He was an associate at Littler from 2002 until 2008, when he became a shareholder. He has worked on complex civil cases at the trial and appellate level in federal court. He was part of the trial team and assisted with preparing Quantlab's successful appellate briefing.

Mr. Rybacki graduated from Emory University School of Law in 2006. He was an associate at Littler from 2006 until 2014, when he became a shareholder. He has worked on complex civil cases at the trial and appellate level in federal court. He assisted with much of the initial investigation, research, and briefing through 2014.

In addition, given the volume of documents and exhibits, each firm was assisted by talented legal assistants. Terri Matthies from SKV was the primary legal assistant at trial.

3

697407.2

6.   Quantlab retained Littler in 2007 and SKV in 2013. Before Quantlab retained SKV, it retained several other attorneys or firms to assist with the investigation, legal research, and briefing and arguing of motions. These include: the Spencer Law Firm (2008), Tim Headley (2009–15), Hughes Watters Askanase (2012), and Whyte Hirschboeck (2012). The Spencer Law Firm was hired to evaluate possible securities law claims against the defendants in addition to the trade secret claims. Tim Headley was hired to and did assist with the copyright claims and other intellectual property issues throughout the litigation. Hughes Watters Askanase and Whyte Hirschboeck were hired to respond to SXP's fraudulent Bankruptcy filing while the case was pending.

7.   This case was complex. It involved numerous legal issues concerning trade secret law, copyright law, contract law, and related topics, but in particular, it involved significant misappropriation and spoliation. The evidence showed that the defendants misappropriated massive amounts of data from Quantlab; the Court found that the FBI recovered "hundreds of thousands of files that appeared to have been taken from Quantlab." Dkt. 490 at 6–7. There was testimony and other evidence showing the extraordinary scope of the defendants' misappropriation. The defendants consistently lied about their misappropriation, and moreover, engaged in widespread spoliation in an attempt to cover their tracks. The evidence revealed that various of the defendants spoliated thousands of files and dozens of electronic devices, and did so repeatedly and even after the Court entered its first sanctions order. More than a year before trial, the Court noted the "staggering amount of evidence" that had been lost due to spoliation, Dkt. 490 at 48; substantially more evidence was spoliated between that Order and trial, *see* Dkt. 725.

The defendants' spoliation required the retention of computer forensics experts, who performed detailed investigations, prepared reports of their findings, and testified at a multi-day sanctions hearing and at trial. Quantlab and its attorneys expended substantial attorney-hours investigating the spoliation, working with the retained forensics experts, briefing the issues, arguing the issues to the Court, preparing for various hearings on these issues, and preparing the evidence and witnesses on these issues for trial. **The defendants' pervasive spoliation was responsible for significantly increasing Quantlab's attorneys' fees and expert fees.**

8.   A chart of the attorney and expert fees that Quantlab seeks is attached to this Affidavit in Exhibit 1. Beginning in 2012 with the law firm Whyte Hirschboeck, and continuing from 2013 through 2017 with respect to all law firms and vendors, Quantlab split the invoices between Quantlab Financial, LLC and Quantlab Technologies Ltd. (BVI). For example, for February 2015, Quantlab *Financial* paid SKV $32,428.00 in legal fees and Quantlab *Technologies* also paid SKV $32,428.00 in legal fees. Thus, "Quantlab" paid SKV $64,856.00 in legal fees for SKV's work performed in the month of February 2015.

9.   True and correct copies of the invoices underlying Exhibit 1 are attached to this Affidavit as Exhibit 2. As can be seen in these invoices, the figures appearing in Exhibit 1 for law firms reflect only legal services that were rendered by the firms. Thus, the invoice from SKV for the month of February 2015, dated March 16, 2015, reflects total fees of $64,856.00, which is the same figure reported in Exhibit 1. Exhibit 1 does not include the "disbursements" that appear below the legal fees in the February 2015 SKV invoice. To the extent that Quantlab

seeks recovery of these expenses, they are outlined in Quantlab's Amended Bill of Costs. *See* Dkt. 870.

10. **Importantly, the defendants' vexatious and unreasonable litigation conduct significantly increased the legal costs for Quantlab.** The defendants resisted reasonable discovery at all turns, requiring Quantlab to file motions to compel and prepare for and attend multiple hearings on discovery issues. The defendants filed countless meritless motions, and after losing them, filed needless motions for reconsideration, as the Court noted at last month's hearing. *See* Transcript (Jan. 31, 2018) at 5:11–6:20. The defendants made false factual claims throughout the pretrial proceedings, and then maintained those falsities in the face of mountains of countervailing evidence at trial. (The defendants also repeated these falsities on appeal.) The defendants engaged in acts that unnecessarily multiplied the proceedings, such as when Dr. Kuharsky sent responsive evidence to third parties in Wisconsin rather than produce it to Quantlab or Mr. Mamalakis put SXP into bankruptcy. The defendants also engaged in the widespread, bad faith destruction of evidence mentioned previously.

11. Had this matter remained a typical misappropriation of trade secrets and breach of contract case, I have no doubt that Quantlab could have investigated, prepared, and tried the case for a fraction of the ultimate cost. However, given the defendants' vexatious litigation behavior and repeated spoliation, spread over a period of multiple years, the total fees that Quantlab necessarily incurred to bring the suit to a successful conclusion were very high.

12. Quantlab paid SKV a total of **$2,451,990.80** prosecuting and defending the case from 2013 through trial. The services provided by SKV included (1) investigating claims, (2) investigating and addressing spoliation, (3) drafting pleadings, questions, and responses, (4) engaging in discovery, (5) attending hearings, (6) preparing and trying the case, (7) preparing the appeal, and (8) taking other necessary actions to represent Quantlab in this matter. The services provided were necessary to properly develop the case.

13. Quantlab paid Littler a total of **$5,085,126.04** prosecuting and defending the case from 2007 through trial. The services provided by Littler included (1) investigating claims, (2) investigating and addressing spoliation, (3) drafting pleadings, questions, and responses, (4) engaging in discovery, (5) attending hearings, (6) preparing and trying the case, (7) preparing the appeal, and (8) taking other necessary actions to represent Quantlab in this matter. The services provided were necessary to properly develop the case.

14. Additionally, Quantlab paid Tim Headley a total of **$144,252.67**; Whyte Hirschboeck a total of **$305,398.13**; the Spencer Law Firm a total of **$30,195.00**; and Hughes Waters Askanase a total of **$30,913.50**.

15. The total amount in legal fees that Quantlab paid through trial was **$8,047,876.14**. (Quantlab's in-house attorneys also expended significant time on this matter over a ten-year period from 2007 through the successful appeal in 2017, but Quantlab does not seek recovery of their time in any way.)

16. Mr. Mamalakis and Dr. Kuharsky appealed this Court's final judgment to the United States Court of Appeals for the Fifth Circuit, which affirmed the jury's verdict. Quantlab's appellate fees totaled **$286,744.67**. Quantlab believes that its appellate fees are recoverable against Dr. Kuharsky on several theories outlined in its pleadings.

To determine SKV's attorneys' fees from this appeal, we tallied SKV's bills from July 2016 through June 2017. This period encompasses the preparation and submission of Quantlab's brief (filed in February 2017), oral argument (June 2017), and submission of the bill of costs (July 2017). The total appellate fees incurred by SKV for which reimbursement is sought is $174,723.50.

To determine Littler's attorneys' fees from this appeal, we tallied Littler's bills from July 2016 through June 2017. The total appellate fees incurred by Littler for which reimbursement is sought is $112,021.17.

17. In my opinion, the total fees and expenses incurred on Quantlab's behalf in this case from SKV, Littler, and the other law firms were and are reasonable and necessary under the circumstances of the litigation.

18. Based on my professional experience, my direct participation in the case, the fact that Quantlab's Associate General Counsel was responsible for organizing most of the facts and discovery materials so the outside lawyers did not have to do so, the team's weekly calls to ensure the work was being handled effectively and efficiently, Quantlab's monthly in-house fee and expense tracking system, and my review of the billing records, I estimate that at least 90% of the attorney time that SKV, Littler, and the other law firms billed for was non-duplicative work. I believe that the billing entries reflect that the vast majority of the attorney time was necessary, and that the various tasks that the attorneys engaged in were not redundant. The only possibly duplicative time was some hearings at which all attorneys on the case were present; however, even then it is not clear that those were duplicative because many of those hearings involved several motions and each attorney typically either prepared to argue a specific motion or issue, or assisted with the research and preparation of a motion or issue for argument.

I also believe that 100% of the attorney time was either devoted to expressly recoverable claims or should be recoverable in light of the defendants' vexatious and unreasonable litigation behavior.

19. The hourly rates charged in this case are rates customarily charged in this area for the same or similar services for attorneys of similar experience, reputation, and ability, considering the nature of the controversy, the time limitations involved, and the results obtained. In fact, SKV and Littler have charged less to handle this matter than they often charge clients for similar matters, and SKV froze its rates for the duration of the matter.

SKV's rates for its principal timekeepers for duration of the case were as follows:

Lee Kaplan (senior partner): $750
Michelle Stratton (counsel): $400

Ty Doyle (partner): $345
Alex Wolf (associate): $300
Terri Matthies (paralegal): $190

Littler's rates for its principal timekeepers increased incrementally by year as follows:

|  | *2012* | *2013* | *2014* | *2015* | *2016* | *2017* |
|---|---|---|---|---|---|---|
| Scott McDonald (senior partner) | $515 | $540 | $555 | $570 | $585 | $610 |
| Allan Neighbors (partner) | $340 | $395 | $405 | $415 | $425 | $445 |
| Tim Rybacki (associate) | $300 | $325 | $355 | $365 | N/A | N/A |

Other Littler timekeepers who were involved in the case at the outset billed at lower hourly rates than Mr. Neighbors and Mr. McDonald; associates who billed in 2012 and 2013 had rates between $275 and $315, other partners had rates in the high $300s, and paralegals had rates between $165 and $175.

20. Quantlab retained AON Consulting in 2007 and 2008 to perform forensic analyses of electronic devices. The total amount of fees and expenses incurred by AON Consulting on Quantlab's behalf for which reimbursement is sought is **$64,166.64**. *See* Exhibit 1.

21. Littler retained Pathway Forensics ("Pathway") in May 2010 on behalf of Quantlab to perform forensic analyses. Pathway performed work on the case from 2010 through 2015 and testified at trial. The overwhelming majority of Pathway's work was devoted to investigating Dr. Kuharsky and Mr. Mamalakis's bad faith spoliation.

The total amount of fees and expenses incurred by Pathway on Quantlab's behalf for which reimbursement is sought is **$1,321,405.15**. *See* Exhibit 1.

The primary individuals at Pathway who worked on the case were Noel Kersh and Chris Graham. Their qualifications and experience are set forth below.

Mr. Kersh is a partner at Pathway, where he has worked since 2009. He earned a BBA in Management Information Systems from Texas Tech University. He has extensive experience conducting forensic investigations. He is an EnCase Certified Examiner ("EnCE"), an Access Data Certified Examiner ("ACE"), and a member of the High Technology Crime Investigation Association ("HTCIA"). He is also licensed as a private investigator by the State of Texas. Mr. Kersh's professional experience includes conducting computer forensics examinations, testifying in court on my findings, electronic data discovery and recovery, directing the operations and personnel of Pathway Forensics, and almost 16 years of Information Technology experience.

Chris Graham is a partner at Pathway Forensics LLC, where he has worked since 2010. He is a Certified Computer Examiner through the International Society of Forensic Computer Examiners; a Certified Forensic Examiner through the Global Information Assurance Certification; a Certified Mobile Examiner through Cellebrite; and a licensed

7

697407.2

private investigator in the State of Texas. He has testified as a computer forensics expert in state and federal courts. Mr. Graham holds a B.S. in Computer Science and Information Assurance and a Master's of Science in Digital Forensics from Sam Houston State University.

22. In my opinion, the expenses incurred on Quantlab's behalf in this case from AON Consulting and Pathway were and are reasonable and necessary under the circumstances of the litigation.

23. Finally, the recoverable costs that Quantlab seeks recompense for are set out in Quantlab's Amended Bill of Costs, Dkt. 870. These costs total **$279,334.43**. The records underlying these costs appear in Exhibit 2, either as standalone vendor invoices or as disbursements or costs listed below legal fees in the law firm invoices.

24. After considering the factors listed in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, it is my opinion that these attorneys' fees were reasonable and necessary.

FURTHER AFFIANT SAYETH NOT.

_____
Tim McInturf


SUBSCRIBED AND SWORN to me on this the 21st day of February, 2018, to certify which witness my hand and official seal.

_____
Notary Public in and for the State of Texas